# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| Natalya Hogan,<br><br>        Plaintiff,<br><br>vs.<br><br>City of New York and the New York City<br>Department of Education,<br><br>        Defendants. | CASE NO.    23-cv-8727<br><br><br>**VERIFIED COMPLAINT**<br>JURY TRIAL DEMANDED |

*"The Religion then of every man must be left to the conviction and conscience of every man; and it is the right of every man to exercise it as these may dictate. This right is in its nature an unalienable right. It is unalienable, because the opinions of men, depending only on the evidence contemplated by their own minds cannot follow the dictates of other men: It is unalienable also, because what is here a right towards men, is a duty towards the Creator. It is the duty of every man to render to the Creator such homage and such only as he believes to be acceptable to him."*

— James Madison, 1784

Plaintiff NATALYA HOGAN, through undersigned Counsel, states for his Verified Complaint as follows:

## PRELIMINARY STATEMENT

1.    Plaintiff, Natalya Hogan ("Mrs. Hogan"), stands before this honorable Court seeking justice and compensation for the violation of her fundamental religious rights, which were violated by her employer, the New York City Department of Education ("DOE") working together with the City of New York (the "City").

2.    On or about August 24, 2021, then Mayor Bill de Blasio, with his then

1

Commissioner of Health David Chokshi, issued an "emergency" regulation mandating Covid-19 vaccination for all DOE employees (the "Mandate").

3.    Initially, the City and the DOE openly asserted that they would not consider any religious or medical accommodations, despite statutory commands to do so.

4.    Labor disputes, lawsuits and several temporary restraining orders forced the City to amend the Mandate to agree to provide for reasonable medical and religious accommodation and the DOE to adopt an accommodation policy.

5.    However, the DOE's religious exemption policy was designed and applied to deny as many applicants as possible.

6.    First, the policy adopted (hereinafter "Stricken Standards") was facially unconstitutional, imposing denominational preferences and requiring the DOE to unconstitutionally deny accommodation to applicants with unorthodox and personally held religious beliefs.

7.    The Stricken Standards facially preferred Christian Scientists, and required that employees whose religious beliefs were not shared by so-called "established" and "recognized" religious leaders would be denied.

8.    Second, DOE did not even abide by the Stricken Standards in the first round of denials.

9.    The Stricken Standards were discriminatory, but required that anyone who met the discriminatory criteria "shall be accommodated" with no provision for undue hardship as a defense to accommodation.

2

10.     However, in violation of its own policies and governing law, DOE sent every single applicant (including Mrs. Hogan) an autogenerated form email, asserting that the Mandate did not allow DOE employees to work in person and that DOE could not offer another worksite without undue hardship (which they defined as "i.e., more than a minimal burden") on DOE and its operations.

11.     This same email was even sent to employees who were already approved for remote work and were already engaged in remote work at the time, revealing that no individualized, good faith assessment was made about possible reasonable accommodations.

12.     The email also stated the wrong "*de minimus*" standard, even though the New York City Human Rights Law ("CHRL"), New York State Human Rights Law ("SHRL") and Title VII of the Civil Rights Act of 1964 ("Title VII") each require an employer to prove that accommodation would pose a significant hardship after individualized review and based on concrete data and evidence before denying accommodation.

13.     Moreover, the email misstated the facts. The Mandate had by that time been specifically amended to acknowledge that nothing therein prevented reasonable accommodation required by law, which could include in-person instruction.

14.     In implementing the policy, decision-makers and agents of the City and DOE repeatedly made defamatory and hostile statements about religious objections to Covid-19, showing clear animus, and engaging in what can only be considered heresy inquisitions.

15.     By November 2021, the Second Circuit had already issued a merits decision holding that the Stricken Standards were facially unconstitutional and likely violated employees' rights under the Free Exercise Clause of the First Amendment to the United States Constitution. *Kane* v. *De Blasio*, 19 F.4th 152, 168 (2d Cir. 2021) (per curiam).

16.     The City admitted the Stricken Standards were "constitutionally suspect" and promised to give "fresh review" under a new "Citywide Panel" process, and reinstate wrongfully denied employees with back pay.

17.     However, the Citywide Panel process proved to be just as much of an exercise in futility and bad faith as the Stricken Standards had been.

18.     The Citywide Panel refused to even consider the vast majority of those denied under the Stricken Standards, agreeing to review fewer than ten percent of the applicants originally denied accommodation.

19.     Mrs. Hogan is one of the thousands of employees who was denied fresh consideration by the Citywide Panel, despite repeated requests.

20.     Instead, she was only ever reviewed under the facially unconstitutional religious accommodation policy, which provided her with an autogenerated denial and nothing more.

21.     Mrs. Hogan seeks relief from the unlawful denials of accommodation from the City and DOE pursuant to rights secured by Title VII, the CHRL, SHRL, and the religion and equal protection clauses of the federal and state constitutions.

22.     Defendants not only dismissed this dedicated teacher's sincerely held

religious beliefs, but also subjected her to irreparable harm, distress, and undue duress. This lawsuit seeks to restore justice and dignity to a woman who has given her life to serving Defendants, and the children in the New York City public school system, and to safeguard religious freedom and the sanctity of personal convictions in a just society.

## PARTIES

23.     Plaintiff is a citizen of the United States and a resident and domiciliary of Nassau County, New York.

24.     Plaintiff has sincerely held religious beliefs that did not allow her to take any of the available Covid-19 vaccines during all relevant times discussed in this Complaint.

25.     Prior to being denied reasonable religious accommodation, suspended without pay and eventually terminated, Plaintiff worked for the DOE for over eighteen years at a public school in Queens. She was a tenured math teacher.

26.     Defendant City of New York is a municipality organized and existing under the laws of New York State.

27.     The City of New York helped DOE to propose their original unconstitutional Stricken Standards accommodation policy and took voluntary responsibility for conducting "fresh reviews" of those denied thereunder, which were supposed to result in reinstatement without break in service, and repayment of back pay and benefits.

28.     Defendant New York City Department of Education is responsible for

5

the management of the New York City School District and the administration of New York City's public schools.

29.    At all times relevant, DOE met the definition of Mrs. Hogan's public employer under statutory and constitutional standards and employed no fewer than fifteen people.

30.    At the relevant times, the City acted as an agent and co-conspirator with the DOE, and proximately caused the harms complained of herein.

## JURISDICTION AND VENUE

31.    This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343. Plaintiff further invokes the supplemental jurisdiction of this Court pursuant to 28 U.S.C. § 1367 to hear related claims arising under New York State law.

32.    Venue is proper in this district under 28 U.S.C § 1391(b) because it is the district in which a substantial part of the events giving rise to Plaintiffs' claims occurred and continues to occur, and the District where Plaintiff worked and lives.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES/PROCEDURES

33.    All conditions precedent to filing claims under Title VII have been performed or have occurred.

34.    Plaintiff filed a timely charge of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC"); and the EEOC issued a right-to-sue notice on August 29, 2023.

35.    This case is brought within 90 days of receipt of the EEOC notice.

36.    Plaintiff fully exhausted her administrative remedies and is entitled to

file in the district court. The Complaint is filed within the statutory deadlines for each claim.

37.    Following commencement of this action, a copy of this Complaint will be served on the New York City Commission on Human Rights and the Office of Corporation Counsel of the City of New York, thereby satisfying the notice requirements of the New York City Administrative Code.

38.    Any and all other prerequisites to the filing of this suit have been met.

## FACTS

39.    Mrs. Hogan was employed by the DOE as an employee in good standing for over eighteen years before she was denied religious accommodation and suspended without pay for failing to get vaccinated in or around October 4, 2021.

40.    According to scientists, at some point between the fall of 2019 and spring of 2020, Covid-19 began circulating in New York City.

41.    In March 2020, then Governor Andrew Cuomo declared a state of emergency due to the Covid-19 pandemic.

42.    Mrs. Hogan was allowed to work from March 2020 through the end of the 2020-2021 school year, returning to in person learning in September 2021.

43.    On June 23, 2021, Governor Cuomo announced that the pandemic emergency was officially over in New York State.

44.    By the end of July 2021, the scientific consensus among world public health leaders coalesced around three facts: (1) vaccinated people could still catch and spread SARS-CoV-2 and were equally as infectious as unvaccinated people when they

did; (2) herd immunity could not be achieved with available vaccines; (3) vaccine protection wanes significantly after a matter of weeks.

45.    By August 2021, governments around the world were publicly acknowledging that vaccination would not stop the spread of the virus, and that everyone, vaccinated and unvaccinated alike, would likely catch Covid-19.

46.    Nonetheless, on August 3, 2021, Mayor de Blasio declared war on the unvaccinated, announcing a "Key to New York City" pass which intentionally excludes unvaccinated people from accessing basic aspects of life in New York in a blatant effort to coerce them to get vaccinated with one of the experimental COVID-19 vaccines. At a press conference, he described the goals of the program as follows:

> The key to New York City – when you hear those words, I want you to imagine the notion that because someone's vaccinated, they can do all the amazing things that are available in this city. This is a miraculous place literally full of wonders. And, if you're vaccinated, all that's going to open up to you. You'll have the key. You can open the door. **But, if you're un-vaccinated, unfortunately, you will not be able to participate in many things. That's the point we're trying to get across. It's time for people to see vaccination as literally necessary to living a good and full and healthy life**. The Key to NYC Pass will be a first-in-the-nation approach. It will require vaccination for workers and customers in indoor dining, in indoor fitness facilities, indoor entertainment facilities. This is going to be a requirement. The only way to patronize these establishments indoors will be if you're vaccinated, at least one dose. The same for folks in terms of work, they'll need at least one dose. This is crucial because we know that this will encourage a lot more vaccination.[1]

47.    Two days after this announcement, Wolf Blitzer interviewed Centers for Disease Control and Prevention ("CDC") Director Rochelle Walensky ("Dr.

---

[1]Office of the Mayor, NYC. (2021, August 3). *Transcript: Mayor de Blasio Holds Media Availability* [Press release]. https://www1.nyc.gov/office-of-the-mayor/news/539-21/transcript-mayor-de-blasio-holds-media-availability

Walensky"), who clarified on national television that the data on vaccine effectiveness against the now dominant delta variant are conclusive: though the vaccines can prevent severe illness, they cannot stop infection or transmission. "But what they can't do anymore is prevent transmission. So if you are going home to somebody who has not been vaccinated, to somebody who can't get vaccinated, somebody who might be immunosuppressed or a little bit frail, somebody who has co-morbidities that put them at high risk, I would suggest you wear a mask in public indoor settings." When asked if asymptomatic vaccinated people could pass on the virus, Dr. Walensky said, "that's exactly right."[2]

48.    Rather than cause him to cease or pause the mandates, the emerging consensus that the vaccines cannot stop transmission only prompted Mayor de Blasio to become more aggressive in his vaccine crusade.

49.    In the weeks that followed Dr. Walensky's announcement, Mayor de Blasio and Commissioner Chokshi announced to the press that a new and more aggressive Mandate was being issued for DOE employees.

50.    Previously, there was a mandate in place that allowed DOE employees to test weekly if they did not want to get vaccinated, just as every other district allowed, and just as all other municipal employees were allowed to do.

51.    But according to the new Mandate, beginning September 27, 2021, the testing option would be removed for DOE employees, who would now have to get vaccinated to keep their jobs, with no exemptions offered and no possibility of less

---

[2] Blitzer, W. (2021, August 5). *Transcript: Interview with CDC Director Dr. Walensky.* The Situation Room, CNN. http://www.cnn.com/TRANSCRIPTS/2108/05/sitroom.02.html

restrictive measures being implemented to accommodate them.

52.     No new emergency was guiding the Mayor's efforts. The state of emergency had been lifted months before by the Governor, and there were no urgent increases in hospitalizations or deaths guiding the implementation of these policies in New York City or elsewhere in the State.

53.     Without any explanation or valid reason, both the City and DOE announced that they would not consider any religious or medical accommodation requests.

54.     The DOE Mandate was the first "no exemption option" employee vaccination mandate in the country.

55.     New York City labor unions unanimously decried the Mandate as reckless and unlawful and announced that they would be taking legal action. Leaders from all major impacted unions, the Municipal Labor Committee ("MLC"), and leaders from each of the member unions of the MLC all put out statements that the Vaccine Mandate for teachers violates basic constitutional rights.

56.     Mass protests, lawsuits, and labor disputes ensued.

***Arbitration and Lawsuits Forced Defendants to Adopt Religious Accommodation Policies.***

57.     On or about September 9, 2021, the MLC and sixteen unions filed a lawsuit ("MLC Litigation") in State Court, challenging the Mandate and the Defendants' refusal to consider reasonable accommodations pursuant to their statutory duties.

58.     On September 14, 2021, the Supreme Court, New York County, issued

a temporary restraining order ("TRO") enjoining the City from enforcing the Mandate "solely because the Department of Health and Mental Hygiene Order's mandate did not reference the possibility of any medical or religious exemption." *The New York City Mun. Labor Committee v. The City of New York,* No. 158368/2021, 2021 WL 4502854, at *2 (N.Y. Sup. Ct. Sep. 22, 2021).

59.    The next day, on September 15, 2021, the DOE Mandate was rescinded and reissued, with an amendment clarifying that "[n]othing in this order shall be construed to prohibit any reasonable accommodation otherwise required by law."[3]

60.    The Supreme Court accordingly vacated the TRO, stating that it was "obviate[d]" by the Commissioner's amendment. *Mun. Labor Committee,* 2021 WL 4502854, at *3.

61.    In a parallel litigation, the United Federation of Teachers ("UFT"), Local 2, AFT, AFL-CIO ("UFT") filed a Declaration of Impasse on September 1, 2021, contending, among other things, that the DOE's failure to provide religious and medical accommodations was unlawful and that the DOE further failed to afford due process regarding job and benefits protection. The challenge moved to arbitration by agreement of the parties.

62.    On September 10, 2021, a decision was rendered by Arbitrator Martin Scheinman (who has served as a major donor and fundraiser to the mayor) requiring that the DOE provide full- time UFT-eligible employees with medical and religious exemptions, as defined in the arbitration award ("Arbitration Award"). A true and

---

[3] The Mandate was also further amended later in September 2021, but not substantively for purposes of this Petition other than to push back the effective date as a result of further lawsuits.

accurate copy of the UFT Arbitration Award is attached hereto as <u>Exhibit 1</u> ("Stricken Standards").

63. Subsequently, the Counsel of School Supervisors and Administrators ("CSA") submitted the matter to Arbitrator Scheinman, who issued a materially identical award covering CSA employees on September 15, 2021.

### *The Stricken Standards were Openly Discriminatory*

64. The Stricken Standards are facially discriminatory.

65. For example, they state, among other objectionable provisions, that: "religious exemptions for an employee to not adhere to the mandatory vaccination policy must be documented in writing by a religious official (e.g., clergy). Requests shall be denied where the objection is personal, political, or philosophical in nature. Exemption requests shall be considered for recognized and established religious organizations (e.g., Christian Scientists). Stricken Standards at 9.

66. Multiple problems stand out in this definition of what constitutes "acceptable" religious beliefs.

67. First, the policy preferences Christian Scientists and requires the government to decide which religions are "recognized" as "established religious organizations." If an applicant belongs to a religion that is not deemed "established" and "recognized" by the government employer, whatever that means, the person must be denied.

68. A clearer violation of the Establishment Clause is hard to imagine; it is well-settled law that government cannot "establish" which religions are

12

"recognized" and thus valid. New York incorporates the federal constitutional standards defining protected religion and prohibiting government from establishing any "recognized" (versus unrecognized) religions.

69.     The policy also provides that religious objection based on personally held or "philosophical" religious beliefs will be denied. Under the federal, state, and local standards, personally held or unorthodox religious beliefs are just as protected as those that are provided by official church dogma.

70.     Personally held, and philosophical beliefs are defined by statutory guidance as expressly protected, but under the Stricken Standards, they are excluded from protection even if they are sincere.

71.     Another problem is that the requirement that the objection "must be documented in writing by a religious official (e.g. clergy)." The certification requirement discriminates against those who practice religions that do not belong to a hierarchical organization or who have personal religious beliefs.

72.     It is long-established law in New York that governments cannot require a person to show a clergy letter or belong to an "established religion" to have their religious beliefs protected. *See, e.g., Sherr v. Northport-E. Northport Union Free Sch. Dist.*, 672 F. Supp. 81, 92 (E.D.N.Y. 1987).

73.     But it gets worse. Under the Stricken Standards, even if a person does happen to belong to an "established" and "recognized" religion, according to the government employer, and that religious organization provides a clergy letter, the applicant must still be denied if anyone the government deems a "leader" of their

faith has publicly expressed support for vaccination.

74.     "Leader" is not defined, but in practice, the DOE repeatedly interpreted this concept in the most ignorant and reckless manner to categorically deny accommodation to huge categories of religious employees.

75.     For example, DOE found an article in the Jerusalem Post stating that the Sephardic Chief Rabbi of Israel was vaccinated. DOE representatives repeatedly cited this article to assert that all Jews should therefore be denied, even when the applicants explained that their own Rabbi did not share the Israeli Rabbi's opinion, or that Judaism is a diverse religion, and a random Rabbi in Israel could not be deemed the "leader" of all Jews.

76.     Similarly, DOE argued that all Christians, even non-denominational ones, should be denied because the Catholic Pope was vaccinated, and they even argued that a Buddhist should be denied because his views were not shared by the Catholic Pope.

77.     The DOE's discriminatory statements were common and well-documented throughout the accommodation process.

78.     The widespread discrimination infected every decision made, including Mrs. Hogan's denial.

79.     A group of educators brought a proposed class action lawsuit, titled *Kane v. de Blasio et al*, in the Southern District of New York in or about September 2021.

80.     In November 2021, the Second Circuit Court of Appeals held, first in a

14

motion panel and then a merits panel, that the DOE's religious accommodation policies were facially unconstitutional, and the plaintiffs were likely to succeed on the merits of their claim and deserved injunctive relief.

81.     As the Second Circuit pointed out, the religious exemption criteria in the Stricken Standards are blatantly unlawful.

82.     It violates the most basic governing standards of state and federal law to discriminate against those with personally held religious beliefs, or deny accommodation based on someone else's religious beliefs, even the leader of one's own faith.

83.     Notwithstanding the obvious illegality of the Stricken Standards, the DOE adopted and enforced the policy to decide religious accommodation requests to the Mandate.

84.     Upon information and belief, the criteria for religious exemption were composed entirely, or nearly entirely, of language and procedures proposed by the City and DOE attorneys, including Eric Eichenholtz ("Mr. Eichenholtz"), who was, at all times relevant to this Complaint, working under the direction and guidance of the City of New York, and has since been promoted to Managing Attorney for the New York City Law Department.

85.     Regardless, DOE knew or should have known that the Stricken Standards are blatantly unconstitutional, and that the Government cannot make *or enforce* unconstitutional policies.

86.     Nothing in the arbitration award, or in the governing collective

bargaining agreement waived Mrs. Hogan's right to challenge the religious discrimination inflicted by DOE or the City on her through plenary proceedings in court against the Defendants.

**Plaintiff's application and denial**

87.    The Stricken Standards were not circulated to teachers until the eve of the deadline, and some teachers, like Mrs. Hogan, never received them at all.

88.    Plaintiff was never told about the Stricken Standards, or instructed to apply under them by DOE, even though she'd informed her supervisor verbally that she needed religious accommodation from the Mandate.

89.    Plaintiff searched the DOE website after receiving no direction from her administration or any email.

90.    On the website, Plaintiff saw a button that directed her to the Self-Service Online Leave Application System ("SOLAS") to apply for religious or medical exemptions, so she submitted a request on or about September 23, 2021.

91.    She had no instruction about what needed to be included in the application, or when it was due.

92.    The DOE acknowledged receipt of the request, and within 36 hours, sent her an autogenerated email, upon information and belief, the same one sent to all her colleagues, stating:

Dear NATALYA HOGAN,

We have reviewed your application and supporting documentation for a religious exemption from the DOE COVID-19 vaccine mandate.

Our application has failed to meet the criteria for a religious

accommodation. Per the Order of the Commissioner of Health, unvaccinated employees cannot work in a Department of Education (DOE) building or other site with contact with DOE students, employees or families without posing a direct threat to health and safety. We cannot offer another worksite as an accommodation as that would impose an undue hardship (i.e., more than a minimal burden) on the DOE and its operations.

Sincerely,
HR Connect
Medical, Leaves, and Records Administration

Please do not reply to this message via email. This email address is automated.

93. The autogenerated denial was deficient in multiple ways.

94. First, at no time did the DOE engage in any cooperative dialogue or individualized review before sending the denial out.

95. Mrs. Hogan was not contacted by any person at DOE to discuss her application before it was denied.

96. Upon information and belief, DOE did not even individually review her application or any of the others before sending out the autogenerated emails to each employee, even those who could have been easily accommodated.

97. Second, the notice cited the wrong legal standard for asserting undue hardship. The email stated that accommodation could not be made under the de minimis standard, but, under Title VII as well as the SHRL and CHRL, the employer bears the burden of at least showing that it would be a "significant" burden or expense under the governing statutory criteria.

98. DOE did not even assess these criteria or analyze any of the factors, leave aside prove that there was undue hardship before denying the application.

99.    For example, under statutory standards, the employer bears the burden of proving on an individualized basis that an employee would pose a direct threat.

100.    The safety analysis cannot be speculative or generalized. Rather, "The employer must make an individualized assessment, based on reasonable judgment that relies on current medical knowledge or the best available objective information, to ascertain: the nature, duration and severity of the risk; the probability that potential injury will actually occur; and whether reasonable accommodation, such as modification of policies, practices or procedures, will mitigate the risk." 9 CRR-NY 466.11(g)(2).

101.    Neither the City nor the DOE made any good faith attempt to individually analyze these or the other required statutory factors before conclusively denying Mrs. Hogan based on undue hardship.

102.    Nor did DOE or the City analyze the list of economic statutory factors that must be assessed before determining that accommodation could not be made.

103.    Mr. Eichenholtz admitted, in depositions, that no such analysis took place for DOE employees, either of the statutorily required safety or economic factors tests, and that DOE could not meet its burden of proof on these factors.

104.    For example, DOE had set up buildings specifically for remote work for those who would be accommodated under the Stricken Standards. At all times relevant to this Complaint, those building stood largely empty and well below capacity.

105.    Third, the notice incorrectly states that the Mandate does not allow for accommodation, and that the DOE is prohibited from allowing any unvaccinated employee to work in any DOE building or other site with contact with students, employees, or families. This is not true, as the Mandate expressly states that nothing therein should be construed to prevent reasonable accommodation.

106.    Mrs. Hogan was not given any option to appeal, or any instruction for how or when to appeal.

107.    Nonetheless, Mrs. Hogan tried repeatedly to submit an appeal through SOLAS and through the regular mail when SOLAS would not accept documents from her.

108.    On or about October 4, 2021, Mrs. Hogan was placed on involuntary leave without pay.

109.    Arbitrarily, 164 other DOE employees, many of them teachers, were accommodated by DOE after the initial denial was appealed, which eviscerates the claim that no one could have been accommodated without undue hardship.

110.    Mrs. Hogan hired an attorney to try to help her appeal.

111.    On multiple occasions, Mrs. Hogan attempted to submit more documentation and request review or cooperative dialogue through the system (which was the only option), but she kept receiving an error message telling her that her application could not be uploaded because she was noncompliant with the Mandate.

112.    Desperate, Mrs. Hogan even mailed her application for religious

accommodation to the DOE, through certified mail, but received no response.

113.    In mid-November 2021, first a motions panel and then a merits panel at the Second Circuit determined that the religious accommodation policy the DOE had adopted and implemented was discriminatory and unconstitutional.

114.    During this process, the City offered to provide a "fresh review" by a newly created "Citywide Panel", spearheaded by Defendants' attorneys, and specifically, by Mr. Eichenholtz, who upon information and belief had advised the City in crafting the first unlawful policy.

115.    The City and the DOE promised to reinstate applicants who met the governing statutory accommodation standards with back pay.

116.    The Second Circuit allowed the City this chance to remediate the harms, ordering that the City give fresh consideration and though the order did not apply to non-named plaintiffs in the *Kane* lawsuit, the City promised to make the Citywide Panel review available more broadly, after admitting that the religious accommodation policy was likely unconstitutional as applied to everyone.

117.    Mrs. Hogan tried repeatedly to apply for fresh consideration.

118.    She repeatedly got error messages from "error" messages from the SOLAS system stating that she was noncompliant with the vaccine mandate so was not able to submit documents.

119.    On or about November 30, 2021, Mrs. Hogan was finally able to submit another application, which was accepted by the SOLAS system. Attached is a true and accurate screenshot of the SOLAS screen that Mrs. Hogan took, showing her

religious accommodation documents that were received. <u>Exhibit 2.</u>

120.    English is not Mrs. Hogan's first language, and Mrs. Hogan is not a theological scholar.

121.    But she tried her best to explain and her attorney also prepared a letter explaining her beliefs.

122.    Mrs. Hogan grew up in the Soviet Union, where it was very common for religious people, like her family, to be persecuted.

123.    Religion was sacred to her and her family and by necessity private and personal.

124.    A devout Christian, Mrs. Hogan is deeply opposed to abortion.

125.    When she learned that the Covid-19 vaccines were developed using fetal cell lines in the manufacture or testing processes, she realized she could not participate in what she deemed sin by partaking of the vaccine in any event without violating her sincerely held religious beliefs.

126.    This realization led Mrs. Hogan to research and realize that some other vaccines are also connected to abortion.

127.    She is religiously opposed to all of products that are connected to abortion in this way.

128.    Mrs. Hogan's history also has led her to develop a personal relationship with God.

129.    She routinely prays over medical decisions and has followed such guidance even when it appears to be against personal interest.

130.    For example, there was a time when Mrs. Hogan needed a critical blood transfusion.

131.    But her guidance from prayer told her to abstain, though it was against medical advice, and her husband was worried she might die.

132.    She abstained out of her faith in God, and she pulled through.

133.    Similarly, in this case, Mrs. Hogan prayed once she heard that vaccines might be connected to abortion and found that God was guiding her not to take the Covid-19 vaccine.

134.    She will not violate this advice, even though it has cost her dearly.

135.    Though her application was deemed submitted on November 30, 2021, Mrs. Hogan never received any determination from the Citywide Panel.

136.    Instead, she waited patiently for almost a year, without any income, and in a state of severe anxiety.

137.    Other than the initial screenshot confirming receipt, DOE nor the Citywide Panel never gave her any confirmation at all that they would even consider her application.

138.    In fact, they provided her with confusing and contradictory statements about the status of her application.

139.    Mrs. Hogan also mailed her application to the DOE on multiple occasions as backup but did not receive confirmation that it was being reviewed by DOE or the Citywide Panel or when she would receive a determination.

140.    At no time did DOE or the Citywide Panel engage in cooperative

dialogue with Mrs. Hogan.

141.    At no time did Mrs. Hogan sign any waiver of her right to sue over the religious discrimination she faced from DOE or the City.

142.    On January 31, 2022, Mrs. Hogan received a notice that she would be terminated on February 11th for failure to comply with the Mandate.

143.    But on February 4, 2022, Mrs. Hogan received a follow-up email stating that the notice of termination was in error, and to please disregard it.

144.    On or about September 6, 2022, Mrs. Hogan lost access to her DOE email account. The message she received when she tried to login to SOLAS stated that DOE would be "making access to all DOE employees" available again soon.

145.    On or about September 6, 2022, Mrs. Hogan confirmed that she still had health insurance.

146.    However, on or about September 8, 2022, Mrs. Hogan noticed that she might not have insurance anymore after speaking with another insurance representative.

147.    The same day, Mrs. Hogan requested her work history and status, and DOE sent her a work history document stating that she was still on leave without pay.

148.    On or about February 6, 2023, Mrs. Hogan requested another work history. This new work history form said she had "been voluntarily resigned" and backdated the termination to September 6, 2022.

149.    This February 6, 2023 notice was inconsistent with the work history

that she'd received on September 8, 2022, showing that she was still on leave without pay two days after she supposedly was "involuntarily resigned."

150.    The February 2023 notice was the first official notice she ever got that she was, in fact, separated from employment.

151.    Mrs. Hogan timely filed a notice of claim within ninety days of learning about her separation from DOE in March 2023.

152.    DOE failed to adjust her claim.

153.    Mrs. Hogan had also served the DOE with a similar verified notice, as an addendum to her EEOC complaint filed in May 2022, after it became apparent that the Citywide Panel was likely not going to give her a determination.

154.    This notice listed statutory and constitutional claims, which were never adjusted.

155.    On August 29, 2023, Mrs. Hogan received a right to sue letter from the EEOC.

***Defendants Cannot Prove Undue Hardship***

156.    Defendants used the wrong undue hardship standards and did not bother to assess any of the statutory criteria.

157.    Mrs. Hogan did not pose a threat to anyone based on her vaccination status and could have been easily accommodated.

158.    The vaccines could not stop transmission, and this was known at the time of the denial and when Mrs. Hogan was terminated.

159.    The DOE's own data supported this fact. At the time, the DOE

published regular updates on the number of staff infected with Covid-19 on any given day. Excluding the unvaccinated beginning on October 4, 2021 did not slow the infection rates. On the contrary, after the unvaccinated staff were excluded, infection rates rose astronomically among the fully vaccinated staff, with daily numbers jumping from 40 infections at a time to over 5,000 infections a day among the fully vaccinated staff.

160.    Worse, due to the severe staffing crisis caused by the exclusion of unvaccinated staff, infected staff were instructed to go back into classrooms to teach in person, even though they were actively able to transmit the virus to their students, while Mrs. Hogan and her colleagues were excluded even though they were not infectious.

161.    Even if the Covid-19 vaccines could mitigate transmission in some way, the DOE could not meet its burden of proof to show that an unvaccinated employee constituted a "direct threat" which could not be mitigated other than through termination.

162.    It makes no sense to say that one million students could come to school unvaccinated, riding the enclosed bus with unvaccinated school-district employed bus drivers (who were exempt from the Mandate due to staffing concerns) and commingling with one another but that they would suddenly be in severe danger just because their teacher was also unvaccinated.

163.    If congregating with unvaccinated people was such a severe hazard, the rule should have applied universally to everyone in the population.

164.    One person could not make any difference to herd immunity when the bulk of the population was unvaccinated.

165.    Indeed, a 2021 Harvard Study showed that there was "no discernable relationship between percentage of the population fully vaccinated and new Covid-19 cases." Subramanian S. V. and Akhil Kumar. "Increases in Covid-19 are unrelated to levels of vaccination across 68 countries and 2947 counties in the United States." *European Journal of Epidemiology*, 1-4. 30 Sep. 2021, doi: 10.1007/s10654-021-00808-07.

166.    The DOE was on notice that the great weight of the evidence showed that unvaccinated employees did not constitute a direct threat and could be easily accommodated.

167.    Attached, and incorporated herein by reference as if fully set forth herein, are sworn declarations submitted in related litigation at various relevant points from public health experts at Stanford (Exhibit 3), Johns Hopkins (Exhibit 4) and Yale (Exhibit 5).

168.    As the expert declarations explain, being unvaccinated does not and did not pose any direct threat, and there were numerous additional measures that could have been taken to the extent that there was any confusion on this point, including but not limited to weekly testing, symptom checks, or other protective measures.

169.    Every other school district in the state, including many neighboring school districts on Long Island, which had nearly identical populations of students

and staff, allowed teachers to test weekly in lieu of vaccination throughout the pandemic.

170.    Moreover, despite the push to move most instruction to in person, the New York City DOE continued to provide a sizeable remote program and could have accommodated Mrs. Hogan by allowing her to work remotely.

171.    In fact, the DOE continued to hire remote teachers and advertise these positions even after Mrs. Hogan was denied accommodation.

172.    Mrs. Hogan is aware of other teachers at schools in Queens that were given remote assignments, and that there was a need for additional teachers in her field to teach remotely.

**The DOE's policies were not neutral nor generally applicable.**

173.    The DOE's religious exemption denials were not neutral or generally applicable.

174.    First, the multiple mechanisms for exemption defeat general applicability.

175.    The Mandate expressly allowed for religious accommodation, and DOE adopted policies to provide a mechanism for such accommodation decisions.

176.    Multiple employees were accommodated under this mechanism.

177.    One unvaccinated employee was even allowed to have a full exemption under this mechanism.

178.    Moreover, not only does Federal law provide an exception, but state law and even local municipal law each provide a mechanism for exemption as well.

179.    Pursuant to the SHRL and CHRL, employers are required to reasonably accommodate an employee's religious practices unless the employer can prove that they are unable to do so.

180.    Under these statutes, such decisions must be individualized, and cannot be generalized.

181.    When deposed, Defendants' attorneys admitted that the decision-making process for who was rejected or accepted was entirely discretionary.

182.    In addition, the Mayor exercised discretion to issue orders exempting various employees from the vaccine mandates.

183.    The various versions of the DOE Mandate were just a few of about 160 different "Emergency Executive Orders" issued by the Mayor's office, which collectively imposed vaccine mandates on nearly every category of employee in New York City.

184.    But the Mayor had total discretion to add or subtract from that list for secular reasons as he deemed appropriate.

185.    Most controversially, in March 2022, Mayor Eric Adams issued an emergency executive order ("EEO 62") exempting athletes, entertainers (including adult entertainers), and their entourages from having to comply with the vaccine mandates covering nearly every other New York City employee.

186.    In announcing these carve-outs, Mayor Adams acknowledged that the exemptions were made due to anticipated economic benefits to the City (and incidentally to the Mayor's top donors), not based on any physical health difference

between athletes, makeup artists, strippers or any other category of employee, including teachers.[4]

187.    As EEO 62 reveals, the City's vaccine mandate decisions, including decisions about exemptions, were not driven by safety analysis, and the Mayor had enormous discretion to decide who to cover and when, for reasons unrelated to health or safety concerns.

188.    Second, the statements from the Mayor, DOE officials and agents, and other decision-makers, and even on the face of the religious exemption policies themselves, defeat neutrality.

189.    In a press briefing, held on September 23, 2021, the same day that Mrs. Hogan applied for religious accommodation, then Mayor de Blasio was asked how the City intended to handle religious accommodations from DOE employees, and what criteria would be used. He responded by dismissing the validity of religious objections to the vaccines as largely invalid and stating that the applicants would be subjected to discriminatory review policies:

> **Mayor:** Yeah, it's a great question. Thank you. Yes. And very powerfully, Pope Francis has been abundantly clear that there's nothing in scripture that suggests people shouldn't get vaccinated. Obviously, so many people of all faiths have been getting vaccinated for years and decades. There are, I believe, its two well-established religions, Christian Science and Jehovah's Witnesses that have a history on this, of a religious opposition. But overwhelmingly, the faiths all around the world have been supportive of vaccination. So, we are saying, very clearly, it's not something someone can make up individually. It has to be, you're a standing member of a faith that has a very, very specific long-standing objection.[5]

---

[4] Office of the Mayor Eric Adams, NYC, Emergency Executive Order 62 (2022, March 24), https://www.nyc.gov/office-of-the-mayor/news/062-003/emergency-executive-order-62

[5] Office of the Mayor, NYC (2021, September 223). *Transcript: Mayor de Blasio Holds Media Availability* [Press release]. https://www.nyc.gov/office-of-the-mayor/news/644-21/transcript-mayor-de-blasio-holds-media-availability

190.    Defendants knew, or should have known, that discrimination against personally held religious beliefs is unconstitutional, as is preferencing certain faiths, or making judgments about the theological validity of religious objections.

191.    The Mayor's statements also reveal that the City was directing DOE policy on religious accommodations to his Mandate and is jointly culpable for the initial denials as well as the later action by the Citywide Panel.

192.    The City further participated in proximately causing the initial denials by issuing a letter, written by Commissioner of Health David Chokshi, in which the Commissioner derided religious objections to abortion as invalid because he believes the connection is too indirect to merit religious concern.

193.    Commissioner Chokshi's judgment about this theological matter are wholly inappropriate and discriminatory. It does not matter what Commissioner Chokshi thinks, it matters what the adherent believes.

194.    But the DOE relied on this letter to adopt a reflexive policy of denying all applications in which employees' religious objections were based on or included an objection to the use of aborted fetal cells in testing or development.

195.    The letter itself was frequently cited by DOE agents in various arbitration appeals as proof of why a person should be denied accommodation, even if sincere.

196.    Mr. Eichenholtz also confirmed in later depositions that Defendants took the position that applicants' concerns were wrong and invalid, and thus were reflexively denied, when based on concerns about abortion.

197.    In limited discovery in a related case, the City also produced an email revealing that the panelists on the Citywide Panel were *instructed* to categorically deny religious objections rooted in opposition to abortion.

198.    The email, from a Panelist in training, to Mr. Eichenholtz, who is the architect of the Citywide Panel, and served as the City's Chief Labor and Employment litigation attorney at the time, stated: "I'm mostly seeing folks expressing their view that all Covid vaccines contain or were tested using fetal stem cells…My understanding from our conversation is that those would not constitute sincerely held religious beliefs…"

199.    Mr. Eichenholtz did not correct this Panelist in his follow up email. Though he initially denied the blanket instruction, when pressed in depositions, he admitted that the Panel was instructed to routinely deny such objections based on his opinion that the belief was wrong. For example, he stated his approach to religious concerns regarding the use of aborted fetal cells in testing or development was to redefine such concerns as "nonreligious" since he believed them to be wrong: "It's not a religious belief. They cannot an employee cannot claim a vaccine contains something they don't claim. If the clergy says it. If---regardless. If someone says the sky is green, that is – you know, and we know the sky is blue, then the sky is blue."

200.    To this day, Mr. Eichenholtz also admits that beliefs that are based on personal prayer were reflexively denied as well, both by DOE at the initial stage, and by the City later in the process, as Defendants do not deem beliefs to be religious in nature if they are personally held, or able to be derived independent of an official

church dogma or command.

201.   Such statements are dismissive of Mrs. Hogan's religious beliefs and constitute animus, and it is well-settled that the government is prohibited from passing judgment on the validity of religious beliefs or requiring that the beliefs align with written or other Church orthodoxy.

202.   All these statements alone would constitute direct evidence of discrimination.

203.   But, here, the problem is even more apparent, since the DOE adopted a facially discriminatory policy that completely lines up with the Mayor's and City's ongoing hostile directions.

204.   In cases such as this one, where the government adopts a facially discriminatory written policy, the government cannot rebut the presumption of discrimination by proving that there was some other, non-discriminatory reason for denial. *See, e.g., TWA v. Thurston,* 469 U.S. 111, 121 (1985) (holding that in cases of direct discrimination, summary judgment must be afforded to plaintiffs unless the government can prove an affirmative defense).

205.   But far from rebutting discrimination, the Defendants actions and reasoning only provide further evidence of continued widespread discrimination against religious minorities, and that the denials were pretextual.

206.   Mrs. Hogan's denial (and effective denial by the Panel due to never getting a response) were not decided in a vacuum.

207.   While religious accommodation requests are typically granted by DOE,

religious accommodation requests to the Covid-19 vaccine mandate were nearly all denied.

208. Out of seven thousand original applicants, everyone was denied initially, and only about 165 employees were ever accommodated after appeals.

209. Most were given no appellate review, without explanation or justification, or, like Mrs. Hogan, were never provided with any decision for their follow-up review request.

210. Those that were provided with decisions from the Panel or just the DOE below received insufficient conclusory determinations that are arbitrary and capricious and wholly lacking in reasoning.

211. Whether analyzed under the direct threat, mixed motive, or indirect evidence standard, Defendants' widespread discrimination is not justified and cannot withstand judicial review.

212. As a direct and proximate cause of Defendants actions, Mrs. Hogan suffered financial harm, including but not limited to, loss of pay and benefits, and ancillary bonuses such as a $12,000 a year math fellowship she had qualified for and had just been renewed for at least four years.

213. She also suffered severe humiliation, psychological and emotional damage, and physical manifestations such as insomnia, headaches, depression, anxiety, and other serious harms.

## FIRST CAUSE OF ACTION

### (Failure to Accommodate in Violation of Title VII)

214.   Plaintiff incorporates all other paragraphs of this Complaint as if fully set forth herein.

215.   Title VII was enacted with the purpose of prohibiting employment discrimination based on religion, among other protected characteristics. 42 U.S.C § 2000e et seq. 71.

216.   Under Title VII, it is an unlawful employment practice for an employer: (1) to fail or to refuse to hire or discharge any individual, or to otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin; or (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin. 42 U.S.C §2000e-2(a).

217.   Title VII imposes an affirmative obligation on employers to make reasonable accommodations for their employees' religious beliefs and practices. 42 U.S.C §2000e(j); 20 C.F.R. §1605.2(b).

218.   The term "religion" includes all aspects of religious observance and practice, as well as belief. 42 U.S.C §2000e(j). Religious beliefs as stated in 42 U.S.C §2000e(j) also include "moral or ethical beliefs as to what is right and wrong which are sincerely held with the strength of traditional religious views." 29 C.F.R. 1605.1.

219.   It is well-settled law, acknowledged by the Supreme Court of the

34

United States all the way down to the district courts and administrative agencies as well as state court systems, that an individual seeking to demonstrate a sincerely held religious belief under New York State or federal statutory or constitutional standards need not prove that his belief is part of the recognized dogma of a religious sect. *See, e.g., Widmar v. Vincent*, 454 U.S. 263 (1981) ("The beliefs need not be consistent with the dogma of any organized religion, whether to not the plaintiffs belong to any recognized religious organization.")

220.   "The fact that the religious group to which the individual professes to belong may not accept such belief will not determine whether the belief is a religious belief of the employee." 29 C.F.R. 1605.1.

221.   An employee's belief or practice can be "religious" under Title VII even if the employee is affiliated with a religious group that does not espouse or recognize that individual's belief or practice, or if few – or no – other people adhere to it. *Welsh v. U.S.*, 398 U.S. 333, 343 (finding that petitioner's beliefs were religious in nature although the church to which he belonged did not teach those beliefs); *Thomas v. Rev. Bd. Of Ind. Emp't Sec. Div.*, 450 U.S. 707, 715 (1981) (disagreement among sect workers as to whether their religion made it sinful to work in an armaments factory irrelevant to whether belief was religious in nature because "[t]he guarantee of free exercise is not limited to beliefs which are shared by all of the members of a religious sect.").

222.   The Supreme Court of the United States cautions: "it must be remembered that, in resolving these exemption problems, one deals with the beliefs

of different individuals who will articulate them in a multitude of ways. In such an intensely personal area, of course, the claim of the registrant that his belief is an essential part of a religious faith must be given great weight." *U.S. v. Seeger*, 85 S.Ct. 850, 863 (1965); *See also EEOC v. United Health Programs of Am., Inc.*, 213 F. Supp. 3d 377, 393 (E.D.N.Y. 2016) ("Delineating the meaning of 'religion' for purposes of Title VII often requires resort to First Amendment cases, where nontraditional religious practices are a frequent source of litigation.").

223.    It is impermissible "to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds." *Hernandez v. Comm'r*, 490 U.S. 680, 699 (1989).

224.    Under Title VII, the burden is on the employer to demonstrate "that he is unable to reasonably accommodate an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employers' business." 42 U.S.C. §2000e(j).

225.    Undue hardship is shown "when a burden is substantial in the overall context of an employer's business". *Groff v DeJoy*, 143 S Ct 2279, 2294 (2023). "[A]n employer must show that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business." *Id.* at 2295 (internal citations omitted).

226.    Plaintiff has a bona fide religious belief that conflicts with the Mandate.

227.    Plaintiff cannot receive the COVID-19 vaccine because to do so would

violate her sincerely held religious beliefs.

228.    Plaintiff notified the Defendants that her sincerely held religious beliefs conflicted with the Mandate and requested reasonable accommodation.

229.    Plaintiff was denied religious accommodation, and placed on leave without pay, and eventually terminated for failing to violate her faith by getting vaccinated against Covid-19.

230.    Defendants did not engage in an interactive process to determine the feasibility of accommodating Plaintiff.

231.    Plaintiff made multiple attempts to articulate and explain her sincerely held religious beliefs to Defendants.

232.    Defendants did not question the sincerity of Plaintiffs beliefs.

233.    Defendants made no good faith effort to accommodate Plaintiff's need for religious accommodation and did not engage in an individualized assessment of possible accommodations pursuant to the required statutory standards.

234.    Defendants did not assess the significance, duration, or likelihood of any danger, and did not assess objective medical sources. Instead, Defendants relied on assumption and speculation and issued a blanket determination that they each could not accommodate Plaintiff.

235.    Defendants did not assess possible accommodations on an individualized basis that could have mitigated any actual risks.

236.    The DOE accommodated other unvaccinated employees than Plaintiff, including many people who had substantially similar job duties as Plaintiff.

237.   It would not cause an undue hardship to accommodate Plaintiff, either by granting her an exemption with no conditions, allowing her to work remotely, allowing her to test weekly, or wear a mask, allowing her to do daily symptom checks, or any number of other potential accommodations, which the Defendants failed to even assess.

238.   As a direct and proximate result of Defendants' failure to accommodate her, Plaintiff suffered, and continues to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, including physical symptoms, for which she is entitled to an award of monetary damages in an amount to be determined at trial.

239.   Plaintiff is entitled to injunctive and other equitable relief, including reinstatement with no break in service, front pay and back pay in salary and all benefits and employment terms, including retirement credits, compensatory damages, including pain and suffering, nominal damages at an amount to be determined at trial, and attorney's fees. 42 U.S.C. §§ 1981a(a)(1), 2000e-5(g)(1), (k).

240.   Plaintiff is also entitled to punitive damages in an amount to be determined at trial. Under Title VII, Plaintiffs can "recover punitive damages . . . [by] demonstrat[ing] that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1).

241.   Defendants were put on notice many times over that their religious

accommodation policies were unconstitutional and discriminatory and yet they displayed reckless disregard for Mrs. Hogan's rights by failing to give her application fresh review even after the Second Circuit chastised them for their policies.

## SECOND CAUSE OF ACTION

### (Discrimination in Violation of Title VII, SHRL and CHRL and the Equal Protection Clause of the United States Constitution)

242.    Plaintiff reincorporates all paragraphs of this Complaint as if fully written herein.

243.    Plaintiff asserts that DOE's adoption of a facially discriminatory religious accommodation policy, which conditioned access to accommodation on membership in a preferred religious organization, and excluded access to those with unorthodox religious beliefs, constitutes direct evidence of discrimination in violation of Plaintiff's protected statutory and constitutional rights.

244.    Moreover, hostile comments by high-level City actors' and DOE agents about the invalidity of sincere religious objections grounded in concerns about abortion or personal prayer, or derived from religions other than Christian Science, constitute direct evidence of discrimination.

245.    Plaintiff's denial of accommodation must be presumed to be pretextual and discriminatory under this framework, and Defendants cannot survive summary judgment without asserting an affirmative defense.

246.    As the Second Circuit already noted, Defendants cannot meet this burden: "The City concedes that the Arbitration Award...'may' have been 'constitutionally suspect,' [] and its defense of that process is half-hearted at best.

Indeed, it offers no real defense of the Accommodation Standards at all." *Kane v. de Blasio,* 19 F.4th 152, 167 (2d Cir. 2021). "We confirm the City's 'susp[icion]' …" *Id.* First, the Court held that the written policy is not neutral, because on its face, it singles out unorthodox beliefs and faiths for disparate and unequal treatment: "We conclude, first, that the procedures specified in the Arbitration Award and applied to Plaintiffs are not neutral. The Supreme Court has explained that 'the government, if it is to respect the Constitution's guarantee of free exercise, cannot impose regulations that are hostile to religious beliefs of affected citizens and cannot act in a manner that passes judgment upon or presupposes the illegitimacy of religious beliefs and practices.' *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n,* ---U.S.---, 138 S. Ct. 1719, 1731 (2018)." *Id.* at 168.

247. Next, the Court also acknowledged additional direct evidence of discrimination in the application of DOE's facially unlawful standards, for example, through DOE's pattern of recharacterizing people's beliefs as personal rather than religious. "Denying an individual a religious accommodation based on someone else's publicly expressed religious views – even the leader of her faith – runs afoul of the Supreme Court's teaching that [i]t is not within the judicial ken to question the centrality of particular beliefs or practices of faith, *or the validity of particular litigants' interpretation of those creeds." Id.* at 168-169 (emphasis in original).

248. As and for another count of direct evidence of discrimination, the City and DOE further discriminated against Plaintiff by subjecting those who did not qualify under the Stricken Standards to a more onerous undue hardship standard.

249.   Under the Stricken Standards, those who met the discriminatory definition "shall be accommodated" and no provision was made for an undue hardship defense. Pursuant to that policy, at least 164 people were accommodated.

250.   However, the DOE adopted a policy whereby everyone who applied and was not later accepted by an arbitrator under the Stricken Standards would be issued a blanket denial on the basis of assumed undue hardship, and the Citywide Panel continued this policy by categorically denying every teacher based on the same unsubstantiated assumption of undue hardship.

251.   By adopting a substantially different undue hardship standard for those who were deemed to meet the discriminatory criteria of the Stricken Standards, both DOE and the City showed direct discrimination against unorthodox religious beliefs.

252.   The Defendants also violated the requirements of Title VII, by applying the "de minimis" standard rather than attempting to even prove a significant hardship for those who did not meet the discriminatory express classification.

253.   The Supreme Court has held that an employer's adoption of a policy that makes express classifications based on a protected characteristic) constitutes direct evidence of discrimination, which is sufficient as a matter of law to state a claim. *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111 (1985). I

254.   In so holding, the Supreme Court explained that "the *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination." *Id.* at 121 (referencing *McDonnell Douglas Corp. v. Green,* 411 U.S.

792 (1973)).

255.   Use of such classifications demonstrates a discriminatory purpose as a matter of law, without regard to the decision-makers' animus or subjective intent. *See Miller v. Johnson*, 515 U.S. 900, 904–05 (1995); *see also Hassan v. City of New York*, 804 F.3d. 277, 295 (3d Cir. 2015) ("Put another way, direct evidence of intent is 'supplied by the policy itself.'").

256.   The Plaintiff's case here is even stronger than *TWA*, because unlike the age discrimination statutes, there is no affirmative defense to a policy that discriminates between orthodox and unorthodox religious beliefs. The government may not target religious minorities for disparate treatment, no matter how well-intentioned the subject regulation may be. *Trump v. Hawaii*, 138 S. Ct. 2392, 2423 (2018).

257.   In the alternative Plaintiff sets forth a prima facie case under the mixed motive framework.

258.   Plaintiff holds a sincere religious belief against Covid-19 vaccines, not derived from Church orthodoxy but from her prayer and reliance on a minority of Christian and Catholic Bishops and leaders who share her concern about the use of aborted fetal cell lines in the development of the vaccines.

259.   Plaintiff was, at the time, otherwise qualified for employment, being a tenured and well-respected teacher for eighteen years, and was only suspended and then terminated because she was denied religious accommodation.

260.   Even after Plaintiff was suspended, the DOE continued to advertise for

and hire remote teachers, and to accommodate other teachers deemed to meet the discriminatory religious accommodation standards.

261.    Plaintiff should also prevail under a disparate impact theory of discrimination.

262.    Disparate impact discrimination is also barred by Title VII, and "occurs when an employer uses facially neutral policies or practices that a have a disproportionately adverse effect on protected groups." *Ricci v. DeStefano*, 557 U.S. 557, 577–78 (2009).

263.    "Disparate-impact claims do not require a showing of discriminatory intent." *United States v. Brennan*, 650 F.3d 65, 90 (2d Cir. 2011). Rather, "a plaintiff establishes a prima facie violation by showing that an employer uses 'a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin.'" *Ricci v. DeStefano*, 557 U.S. 557, 578 (2009) (citing 42 U.S.C. § 2000e–2(k)(1)(A)(i)).

264.    An employer can rebut a prima facie case "by demonstrating that the practice is 'job related for the position in question and consistent with business necessity.'" *Id*.

265.    The plaintiff, in turn, can rebut that showing by "showing that the employer refuses to adopt an available alternative employment practice that has less disparate impact and serves the employer's legitimate needs." *Id*. (citing §§ 2000e–2(k)(1)(A)(ii) and (C)).

266.    "The basis for a successful disparate impact claim involves a

comparison between two groups—those affected and those unaffected by the facially neutral policy." *Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 575 (2d Cir.2003).

267. Defendants' policies caused a disparate impact on minority faiths who oppose vaccination for religious reasons.

268. A recognized minority of religious people, including Mrs. Hogan, cannot take a Covid-19 vaccine for religious reasons, particularly concerns about abortion.

269. Defendants expressed hostility to these religious beliefs as theologically flawed, and failed to consider available accommodations that could have mitigated the impact of the Mandate on the small percentage (about 2%) of employees who hold these sincere religious beliefs.

270. For example, Defendants could have considered actual safety risks, allowed for remote work, weekly testing, daily symptom checks, masking or a large number of other accommodations deemed sufficient in every other school district in the state.

271. Instead, Defendants refused to consider any accommodations in good faith, other than for 164 employees deemed to fit within openly discriminatory criteria set forth in the Stricken Standards.

272. All other employees were reflexively denied, by the DOE and the Citywide Panel, without any analysis of the Stricken Standards, causing a disparate impact on those whose beliefs were not derived from the orthodoxy of the "leaders" of an "established" and "recognized" religious organization that DOE and the City preferred.

273. As a direct and proximate result of Defendants' discrimination, Plaintiff suffered, and continues to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages in an amount to be determined at trial.

274. Plaintiff is entitled to injunctive and other equitable relief, including reinstatement with no break in service, front pay and back pay in salary and all benefits and employment terms, including retirement credits, compensatory damages, including pain and suffering, nominal damages at an amount to be determined at trial, and attorney's fees. 42 U.S.C. §§ 1981a(a)(1), 2000e-5(g)(1), (k).

## THIRD CAUSE OF ACTION

### (Failure to Accommodate and Retaliation in Violation of the CHRL)

275. Plaintiff repeats and realleges all paragraphs of this Complaint as if fully set forth herein.

276. At all relevant times, the CHRL has been in full force and effect and has applied to Defendants' conduct.

277. Pursuant to the CHRL:

It shall be an unlawful discriminatory practice for an employer or an employee or agent thereof to impose upon a person as a condition of obtaining or retaining employment any terms or conditions, compliance with which would require such person to violate, or forego, a practice of, such person's creed or religion,…and the employer shall make reasonable accommodation to the religious needs of such person.

N.Y.C. Admin Code § 8-107(3)(a).

278.    Plaintiff has a sincerely held religious belief (and creed) that prevents her from being able to take a Covid-19 vaccine.

279.    Plaintiff requested reasonable accommodation to retain her employment without violating her faith.

280.    The DOE denied Plaintiff's request for reasonable religious accommodation.

281.    The City, who had agreed to review the initial denials after DOE's religious accommodation policies were held unconstitutional, also effectively denied her accommodation request, by refusing to issue any decision before Plaintiff was fired over a year later.

282.    Both Defendants actions violated Plaintiff's rights and proximately caused her termination.

283.    Both Defendants also failed to engage in the required cooperative dialogue with Plaintiff before denying her accommodation request, which is a separate and independent act of discrimination under the CHRL.

284.    The CHRL prohibits denial of accommodation until the employer engages in a cooperative dialogue.

> The determination that no reasonable accommodation would enable the person requesting an accommodation to satisfy the essential requisites of a job or enjoy the right or rights in question may only be made after the parties have engaged, or the covered entity has attempted to engage, in a cooperative dialogue.

> N.Y.C. Admin. Code § 8-107(28)(2).

285.    Pursuant to statute, the cooperative dialogue must include analysis

and discussion about any possible accommodation and the challenges they might face, so that the employee has a chance to engage with the process and offer suggestions too which can be considered in good faith before denial.

286.   This amendment was made in response to a Court of Appeals holding that the failure to engage in cooperative dialogue, while very important and indicative of whether an employer acted in good faith, was not enough to result in a summary judgment determination absent more.

287.   The legislative history of the CHRL amendment notes that the amendment was meant to cure this holding, and to make failure to engage in cooperative dialogue an independent basis for finding summary judgment against the employer, even if undue hardship could have ultimately been proven.

288.   Other important amendments are relevant too.

289.   In 2005, the New York City Council amended the CHRL by passing the Local Civil Rights Restoration Act of 2005 (the "Restoration Act"), N.Y.C. Local L. No. 85.

290.   "In amending the []CHRL, the City Council expressed the view that the []CHRL had been 'construed too narrowly' and therefore 'underscore[d[ that he provisions of New York City's Human Rights Law are to be construed independently from similar or identical provisions of New York state or federal statutes.'" Restoration Act § 1.

291.   To bring about the change, the Act established two new rules of construction. First, it created a "one way ratchet" by which interpretations of state

and federal civil rights statutes can serve only "'as a *floor* below which the City's Human Rights law cannot fall.'" Restoration Act § 1. Second, it amended the CHRL to require that its provisions "be construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof, regardless of whether federal or New York State civil and human rights laws, including those laws with provisions comparably-worded to provisions of this title[,] have been so construed." Restoration Act § 7 (amending N.Y.C. Admin. Code § 8-130).

292.    In 2011, New York City enacted the Workplace Religious Freedom Act, amending sections 8-102 and 8-107, to adopt a stiffer standard for assessing undue hardship. The committee report noted that the City Council's intention was "to provide greater protection to workers under the City Human Rights Law than the federal, and even the State, human rights provisions provide." N.Y.C. Council, Report of Committee on Civil Rights on Proposed Int. No. 632, Aug. 16, 2011.

293.    Under the CHRL, undue hardship is defined:

"Reasonable accommodation" as used in this subdivision, shall mean such accommodation to an employee's or prospective employee's religious observance or practice as shall not cause undue hardship in the conduct of the employer's business. The employer shall have the burden of proof to show such hardship. "Undue hardship" as used in this subdivision shall mean an accommodation requiring significant expense or difficulty (including a significant interference with the safe or efficient operation of the workplace or a violation of a bona fide seniority system.)

N.Y.C. Admin. Code § 8-107(3)(b).

294.    Plaintiff was able to perform the essential duties of her job with reasonable accommodation.

295.    Accommodating Plaintiff would not require significant expense or

difficulty from the Defendants.

296.    Accommodating Plaintiff would not require the Defendants to violate a bona fide seniority system.

297.    Accommodating Plaintiff would not significantly interfere with the safe or efficient operation of Defendant's workplace.

298.    Defendants did not indicate that they had any question or concern about the sincerity of Plaintiff's religious accommodation request, or the religious nature of her request.

299.    Nor was there any objective basis for questioning her sincerity.

300.    Defendants did not establish that Plaintiff posed a direct threat because of her vaccine status, nor can they do so, as set forth more fully above.

301.    As a direct and proximate result of Defendants' unlawful discriminatory practices, Plaintiff has suffered and continues to suffer substantial losses, for which she is entitled to an award of monetary damages which exceeds the jurisdiction limits of all lower courts, along with reinstatement, declaratory nominal, compensatory and other relief.

302.    As a direct and proximate result of Defendants' failure to accommodate Plaintiff, Plaintiff suffered, and continues to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages in an amount to be determined at trial.

303.   As a direct and proximate result of Defendants' failure to accommodate, Plaintiff is also entitled to injunctive and declaratory relief, nominal and compensatory damages, pain and suffering and punitive damages.

304.   As set forth above, Defendants' conduct was willful and showed a reckless disregard for Plaintiff's rights, and the rights of all of her similarly situated colleagues. In denying accommodation, Defendants violated their own policies as well as well-established law, all while flouting multiple court orders.

305.   Plaintiff is also entitled to attorneys' fees, expert fees, and other costs under the CHRL N.Y.C. Admin Code §8-502(g).

## FOURTH CAUSE OF ACTION

### (Failure to Accommodate in Violation of the SHRL)

306.   Plaintiff reincorporates all paragraphs of this Complaint as if fully set forth herein.

307.   At all relevant times, the SHRL has been in full force and effect, and has applied to Defendants' conduct.

308.   The SHRL provides:

It shall be an unlawful discriminatory practice for an employer, or an employee or agent thereof, to impose upon a person as a condition of obtaining or retaining employment, including opportunities for promotion, advancement or transfers, any terms or conditions that would require such person to violate or forego a sincerely held practice of his or her religion…unless, after engaging in a bona fide effort, the employer demonstrates that it is unable to reasonably accommodate the employee's or prospective employee's sincerely held religious observance or practice without undue hardship on the conduct of the employer's business.

N.Y. Executive Law § 296(10(a).

309.    Undue hardship is defined under the SHRL as "an accommodation requiring significant expense or difficulty (including significant interference with the safe or efficient operation of the workplace…)." N.Y. Executive Law § 296(10(d).

310.    If the undue hardship is alleged based on a safety concern, "the employer must make an individualized assessment, based on reasonable judgment that relies on current medical knowledge or the best available objective information to ascertain: the nature, duration and severity of the risk; the probability that the potential injury will actually occur, and whether reasonable accommodations, such as modification of policies, practices or procedures, will mitigate the risk." 9 CRR-NY 466.11.

311.    At all relevant times, DOE was Plaintiff's employer, or potential employer, as defined by the SHRL.

312.    For the Citywide Panel review, the City served as DOE's agent.

313.    Plaintiff has sincerely held religious beliefs which prohibit her from receiving any of the then-available Covid-19 vaccines.

314.    The same standards which define protected religious beliefs under federal standards govern state and local statutory accommodation requests, though the SHRL and CHRL are more generous and expressly include creed as a protected category of religious belief.

315.    Plaintiff requested reasonable accommodation from the Mandate based on her religious beliefs.

316.    Defendants accepted Plaintiff's religious beliefs as sincerely held.

317.  Nonetheless, DOE denied Plaintiff's requests for accommodation, without engaging in good faith individualized analysis pursuant to the statutory factors, and without "demonstrating" that it would present an undue hardship under those factors.

318.  Instead, Defendants each simply relied on the existence of a Mandate, and ignored that the Mandate allowed for reasonable accommodation and exception on its face.

319.  Upon information and belief, the DOE's policy and practice was to initially simply deny all requests for religious accommodation to the Mandate regardless of whether reasonable accommodations were available that would resolve the religious conflict without posing an undue burden on Defendants.

320.  Those lucky few who arbitrarily were deemed to have acceptable religious beliefs under the discriminatory Stricken Standards on appeal were than accommodated.

321.  The rest, including Plaintiff, were not.

322.  The City compounded this error by failing to provide any decision or fresh review of the application even though the City volunteered to remedy the DOE's initial unconstitutional denials of accommodation.

323.  At all relevant times, Plaintiff was able to perform the essential duties of her job with reasonable accommodation.

324.  Accommodating Plaintiff would not have required significant expense or difficulty from DOE.

325.   Accommodating Plaintiff would not significantly interfere with the safe or efficient operation of the DOE's workplaces.

326.   Accommodating Plaintiff would not require the DOE to violate a bona fide seniority system.

327.   Defendants failed to engage in any interactive process with Plaintiff regarding her accommodation request.

328.   Defendants violated the SHRL by denying Plaintiff's request for reasonable accommodation without first engaging in an interactive process and assessing the statutory factors.

329.   Instead of accommodating Plaintiff's religious beliefs, Defendants retaliated against Plaintiff by suspending her, and eventually terminating her.

330.   As a direct and proximate result of Defendants' failure to accommodate, Plaintiff has suffered, and continues to suffer, substantial losses, including but not limited to the loss of past and future earnings, compensation and benefits, increases, promotions, bonuses, and other employment benefits, loss of reputation and ability to obtain similar employment, and other financial losses for which she is entitled to an award of monetary damages which exceeds the jurisdictional limits of all lower courts, and other relief.

331.   As a direct and proximate result of Defendants' failure to accommodate, Plaintiff suffered, and continues to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem, and self-confidence, and emotional pain and suffering

for which she is entitled to an award of monetary damages in an amount which exceeds the jurisdictional limits of all lower courts.

332.   Plaintiff is entitled to injunctive and declaratory relief as well as reinstatement, compensatory, nominal, actual and punitive damages for the injuries and losses sustained as a result of Defendants' unlawful discriminatory conduct under the SHRL, in an amount which exceeds the jurisdictional limits of all lower courts.

333.   Plaintiff is further entitled to an award of attorney's fees, expert fees and other costs under the SHRL. Executive Law § 297(10).

### FIFTH CAUSE OF ACTION

**(Infringement of Free Exercise Rights – United States Constitution)**

334.   Plaintiff repeats and realleges all paragraphs of this Complaint as if fully set forth herein.

335.   The Free Exercise Clause of the First Amendment to the United States Constitution prohibits the government's burdening of a sincerely held religious belief. The First Amendment provides, in pertinent part, that "Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof…" U.S. Const. amend. I.

336.   The Supreme Court has held that "a law burdening religious practice that is not neutral or not of general application must undergo the most rigorous of scrutiny." *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 546 (1993).

337. Where there is evidence of animus, or where there is a mechanism for exemption or lack of general neutrality requirements, an infringement must be strictly scrutinized, and the Defendants bear the burden of showing that they applied a law or policy using the least restrictive means available to further a compelling state interest.

338. Plaintiff's sincerely held religious beliefs prohibit her from taking a Covid-19 vaccine.

339. Defendants' denial of accommodation substantially burdened Plaintiff's free exercise of religion, in that she was forced to violate her faith if she wanted to keep her job and avoid serious consequences.

340. Defendants' refusal to accommodate Plaintiff created coercive pressure on her to change or violate her sincerely held religious beliefs.

341. The Mandate, which Defendants used to justify the denial of accommodation, was not neutral nor was it generally applicable as applied, as set forth more fully above.

342. As recognized by the Second Circuit, Substantial evidence of a lack of neutrality was evidenced by DOE's adoption of a facially discriminatory religious accommodation policy.

343. The Mayor's comments, coupled with later developed evidence of animus towards personally held and unorthodox religious beliefs, particularly those grounded in concerns about abortion revealed through depositions and discovery, also breach

neutrality, as do the comments made by DOE actors during the implementation of the Mandate.

344.    Pursuant to state and municipal law, discretionary mechanisms for exemption existed whereby each of the Defendants was not only allowed but required to consider whether to grant a religious or medical accommodation when an employee applies.

345.    These exemption reviews are defined to be individualized processes, which are, like the "good cause" standard, open to interpretation and not a ministerial act, like determining whether a person has a doctor's note. Thereby, discretion is routinely applied in deciding whether to accept or deny an application for accommodation.

346.    The DOE also adopted a policy for religious accommodations, thereby defeating general applicability, and the City also added an express provision, coupled by a promise to a state court, that religious accommodation and exemption would be allowed.

347.    Last, the Mayor and executive branch exercised complete discretion about who to exempt and routinely made carve outs or additions, or other decisions based on secular concerns, while ignoring religious concerns that posed a similar level of danger to the community.

348.    Pursuant to governing law, this means that the Mandate is not generally applicable, and Plaintiff's free exercise claims must be strictly scrutinized.

349. Defendants, who are each state actors, did not have a compelling interest in requiring Plaintiff to be vaccinated and refusing to accommodate her sincerely held religious beliefs, particularly the sincerely held religious beliefs of minority religions that did not have the backing of religious leaders the government preferred.

350. To the extent that the Defendants could prove that any significant danger existed as a result of Plaintiff's vaccine status, reasonable accommodations such as weekly testing, daily symptom checks, mask use or allowing remote or off-site meetings could have been implemented without undue hardship.

351. In refusing to accommodate Plaintiff's sincerely held religious beliefs, Defendants did not use the least restrictive means of furthering any compelling state interest.

352. Defendants' actions injured and continue to injure Plaintiff, by chilling her right to practice her religion and imposing lasting consequences and harm to her emotional, psychological, physical, and financial wellbeing, as well as her reputation.

353. Plaintiff seeks, and is entitled to, declaratory relief and nominal damages stating that the denial of her religious accommodation and subsequent employment consequences is void ab initio and violated her First Amendment right to freely practice her religion.

354. Plaintiff is entitled to, and seeks, reinstatement with no break in service, and full compensation for front and back pay of salary, benefits, retirement credits and all employment benefits, including anticipated raises, as if she had never

been denied religious accommodation, along with compensatory damages for actual harm, including pain and suffering and emotional damages, along with punitive damages and attorney's fees. *Tanzin v. Tanvir*, 141 S. Ct. 486 (2020).

355.    Particularly given the animus, and disregard of temporary injunctions in place at the time that Plaintiff was denied religious accommodations and disciplined, Defendants have demonstrated reckless disregard and indifference to her religious rights, and to Plaintiff's wellbeing.

## SIXTH CAUSE OF ACTION

### (Infringement of Free Exercise Rights - New York State Constitution)

356.    Plaintiff repeats and realleges all paragraphs of this Complaint as if fully set forth herein.

357.    According to the New York Constitution, "*the Free Exercise and enjoyment of religious profession and worship, without discrimination or preference, shall be forever allowed in this State to all mankind.*"

358.    By reason of the aforementioned acts, policies, practices, customs and procedures created, adopted, and enforced under color of state law, Defendants deprived Plaintiff of her right to the free exercise of his sincerely held religious beliefs in violation of the Free Exercise Clause of the New York Constitution.

359.    As discussed above, the Mandate was not neutral or generally applicable.

360.    Plaintiff has sincerely held religious beliefs that prevent her from taking a Covid-19 vaccine and would not have posed a danger to anyone if she had been allowed an exemption.

361.    However, because the religious accommodation policies were not generally applicable, Defendants used their discretion to deny her religious accommodation request.

362.    This triggers strict scrutiny, as does the evidence of animus described herein.

363.    Defendants' denial of accommodation cannot survive strict scrutiny because their decisions and policies were not narrowly tailored.

364.    Defendants' policies and practices failed to provide the least restrictive means of furthering any stated compelling state interest.

365.    Defendants' policies and practices create employer-imposed, coercive pressure on Plaintiff to change or violate his sincerely held religious beliefs.

366.    Defendants' policies, practices, customs, and procedures, punish and impose discipline on Plaintiff for exercising her right to free exercise of his religious beliefs.

367.    Defendants' action injures Plaintiff by restricting her religious activity and religious speech through threat of discipline, termination, or sanction by Defendants for failure to comply with its vaccine policies.

368.   Moreover, Courts in New York provide constitutional review of violations of the state constitution's free exercise clause even in cases where a regulation is deemed neutral and generally applicable.

369.   In such cases, a balancing test is imposed, which Defendants cannot overcome.

370.   As set forth above, Plaintiff could have been accommodated easily without endangering the state's interest in limiting the spread of Covid-19 in schools.

371.   As a direct and proximate result of Defendants' violation of the New York Free Exercise Clause, Plaintiff has suffered, and will suffer, irreparable harm, including the loss of her fundamental constitutional rights, entitling her to declaratory relief that the denial of accommodation is void ab initio, as were all subsequent employment consequences arising therefrom. Additionally, Plaintiff is entitled to reinstatement with no break in service and damages, including nominal, punitive, actual and compensatory damages for the loss of her constitutional rights in the amount to be determined at trial, along with attorneys' fees and costs.

## SEVENTH CAUSE OF ACTION

## (Violation of the Establishment Clause of the United States Constitution)

372.   Plaintiff repeats and realleges all paragraphs of this Complaint as if fully set forth herein.

373.   The Establishment Clause of the First Amendment to the United States Constitution prohibits the State from preferencing any particular religion or religious dogma or belief, or abridging Plaintiffs' rights to free exercise of religion.

374.    Defendants each violated the Establishment Clause by expressing a preference for certain faiths and leaders over others and by expressing animus towards religious objection to vaccination.

375.    The DOE took this so far as to adopt a facially discriminatory policy, which favors Christian Scientists on its face, and requires discrimination against minority and unorthodox faiths.

376.    The various preferences expressed by the state actors for some religions and religious leaders or religious beliefs over others trigger strict scrutiny of Defendants' denial of Mrs. Hogan's religious beliefs as a violation of the Establishment Clause.

377.    Defendants cannot meet the burden of proof to show that their denial of accommodation was narrowly tailored to further a compelling state interest.

378.    There is no legitimate, rational or compelling interest in applying the Mandate to discriminate against unorthodox religious beliefs, particularly since: (a) DOE employees of New York City are no more susceptible to contracting and spreading COVID-19 than students or all the other unvaccinated people still allowed in schools;  (b) available vaccines cannot stop transmission, so the vaccinated are just as capable of spreading disease as the unvaccinated; (c) naturally immune persons who have recovered from COVID have superior immunity to those who are vaccinated; and (d) vaccinating naturally immune people puts them at increased risk of adverse reaction to the vaccine.

379. The Mandate is not the least restrictive means of achieving an otherwise permissible government interest, which could be achieved by other protective measures.

380. The Mandate, on its face and as applied, has caused, is causing and will continue to cause irreparable harm and actual undue hardship to Plaintiffs from the violation of their sincerely held religious beliefs and the occupational, professional, social, and economic consequences pleaded above.

**WHEREFORE,** for all causes of action pleaded above, Plaintiff prays that this Court grant judgment to her containing the following relief:

A. A declaratory judgment that the Defendants' failure to accommodate Plaintiff's sincerely held religious beliefs are void ab initio and constitute unlawful discriminatory practices pursuant to Title VII of the Civil Rights Act of 1964; and

B. A declaratory judgment that the Defendants' failure to accommodate Plaintiff's sincerely held religious beliefs are void ab initio and constitute unlawful discriminatory practices pursuant to the New York City Human Rights Law; and

C. A declaratory judgment that the Defendants' failure to accommodate Plaintiff's sincerely held religious beliefs are void ab initio and constitute unlawful discriminatory practices pursuant to the New York State Human Rights Law; and

D. A declaratory judgment that the Defendants' failure to accommodate Plaintiff's sincerely held religious beliefs are void ab initio and constitute unlawful discriminatory practices pursuant to the Establishment Clause and/or Equal Protection Clause of the United States Constitution; and

E.      A declaratory judgment that the Defendants' failure to accommodate Plaintiff's sincerely held religious beliefs are void ab initio because and violate the Free Exercise Clause of the First Amendment of the United States Constitution; and

F.      A declaratory judgment that the Defendants' failure to accommodate Plaintiff's sincerely held religious beliefs are void ab initio because and violate the Free Exercise Clause of the New York State Constitution; and

G.      Nominal damages for such violations; and

H.      An order that Defendants' reinstate Plaintiff to her former positions with full seniority, no break in service, status, retirement credits, salary increments, bonuses and benefits as if the denials of accommodation had never occurred; and

I.      An award to Plaintiff of compensatory damages for Plaintiff's lost wages, back pay, front pay, overtime, salary increases, benefits and retirement credits, in an amount to be determined at trial; and

J.      An award to Plaintiff of costs in this action and any appeals, including reasonable attorney's fees and expert fees under 42 U.S.C. § 1988, Title VII of the Civil Rights Act of 1964, the New York State Human Rights Law, and other governing laws; and

K.      An award to Plaintiff for punitive damages in an amount to be determined at trial; and

L.      An order for civil fines and penalties pursuant to New York Executive Law §297(9); and

M.     An award of pre- and post-judgment interest on all amounts awarded to the Plaintiff at the highest rates and from the earliest dates allowed by law on all causes of action; and

N.     Such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure and Rule 38(b) of the Local Rules, Plaintiff demands trial by jury for all the issues pleaded herein so triable.

Dated: Ithaca, New York
     November 27, 2023


Respectfully Submitted,
Gibson Law Firm, PLLC

By:   */s/ Sujata S. Gibson*
       Sujata S. Gibson
       120 E Buffalo Street, Suite 201
       Ithaca, NY 14850
       (607) 327-4125
       sujata@gibsonfirm.law

       **Attorneys for the Plaintiff**

## VERIFICATION

STATE OF NEW YORK )
                  ) ss.
COUNTY OF NASSAU  )

I, Natalya Hogan, being duly sworn, depose and say:

1. I am the Plaintiff in the within action.
2. I have reviewed the contents of this Complaint and verify that the statements contained herein are true to the best of my knowledge, except as to matters alleged on information and belief, and as to those matters, I believe them to be true.

NATALYA HOGAN

Sworn to before me this
27th day of November 2023.

Notary Public