# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| NATALYA HOGAN, CARLOS CONTRERAS, RICARDO ALEXANDER, RENEE BUTLER, KARIN CROWLEY, LUZ CRUZ, PATRICIA DECARLO, ABIGAIL GARCIA, DELLA HALEY, STELLA JACK, KATHRYN KIESLING, BARBARA KYDD, KATHLEEN MAGUIRE, KIM MODZELEWSKI, ROSE NEWMAN, SAMUEL PAGAN, MARIA ANN PIROZZI, RODNEY EPPS PRESSLEY, JOSEPH SABATINO, DIANA SALOMON, NICOLE ANN SCHMIDT, MARIA VASILIOU, and all others similarly situated,<br><br><br>               Plaintiffs,<br><br>  -against -<br><br>CITY OF NEW YORK and the NEW YORK CITY DEPARTMENT OF EDUCATION,<br><br>           Defendants. | CASE NO. 23-cv-8727<br><br><br>**PROPOSED AMENDED CLASS ACTION COMPLAINT**<br>JURY TRIAL DEMANDED |

*"The Religion then of every man must be left to the conviction and conscience of every man; and it is the right of every man to exercise it as these may dictate. This right is in its nature an unalienable right. It is unalienable, because the opinions of men, depending only on the evidence contemplated by their own minds cannot follow the dictates of other men: It is unalienable also, because what is here a right towards men, is a duty towards the Creator. It is the duty of every man to render to the Creator such homage and such only as he believes to be acceptable to him."*

— James Madison, 1784

The above-named Plaintiffs, through their counsel, stand before this honorable court

seeking justice and compensation for unlawful religious discrimination carried out by their employer, the New York City Department of Education ("DOE") in concert with the City of New York (the "City"). Plaintiffs assert claims under Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), 4200 U.S.C. § 2000e, *et seq*; 42 U.S.C.§1983, for the deprivation of rights under the First Amendment and Fourteenth Amendment of the United States Constitution; the New York City Human Rights Law ("CHRL"), NYC Administrative Code Title 8, and the New York State Human Rights Law ("SHRL"), NY Executive Law § 296, *et seq.*

## INTRODUCTION AND SUMMARY OF THE CASE

1.       This case arose because the City, working in concert with its DOE, engaged in widespread religious discrimination in an attempt to evade statutory obligations to accommodate religious practices of DOE employees that conflicted with the City's Covid-19 vaccine mandate.

2.       Plaintiffs bring this lawsuit as a proposed class-action on behalf of themselves and all others similarly situated.

3.       Through this lawsuit, Plaintiffs seek to safeguard religious freedom for themselves and others and to restore justice and dignity to educators who spent their careers faithfully serving New York City's public-school children.

## JURISDICTION AND VENUE

4.       This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343. Plaintiff further invokes the supplemental jurisdiction of this Court pursuant to 28 U.S.C. § 1367(a) to hear related claims arising under New York State law because they are so related to the federal claims that they form part of the same controversy.

5.       Venue is proper in this district under 28 U.S.C § 1391(b) because it is the district in which a substantial part of the events giving rise to Plaintiffs' claims occurred.

## **NAMED PARTIES**

6.     Plaintiff NATALYA HOGAN is a resident of Nassau County, New York. Prior to being denied religious accommodation, Mrs. Hogan was a tenured math teacher in good standing, working in Queens with over eighteen years of service at DOE.

7.     Plaintiff CARLOS CONTRERAS is a resident of Bronx County, New York. Prior to being denied religious accommodation, Mr. Contreras was a Substance Abuse Prevention Intervention Specialist (SAPIS) Supervisor in good standing, working in the Bronx with forty-one years of service at DOE.

8.     Plaintiff RICARDO ALEXANDER is a resident of Kings County, New York. Prior to being denied religious accommodation, Mr. Alexander was a tenured math and physics teacher in good standing, working in Brooklyn with twenty-one years of service at DOE.

9.     Plaintiff RENEE BUTLER is a resident of Queens County, New York. Prior to being denied religious accommodation, Ms. Butler was a tenured early childhood teacher in good standing, working in Queens with over eight years of service at DOE.

10.     Plaintiff KARIN CROWLEY is a resident of Richmond County, New York. Prior to being denied religious accommodation, Ms. Crowley was a tenured math teacher in good standing, working in Staten Island with just under eighteen years of service at DOE.

11.     Plaintiff LUZ CRUZ is a resident of Bronx County, New York. Prior to being denied religious accommodation, Ms. Cruz was a teaching assistant in good standing, working in the Bronx with just under twenty-five years of service at DOE.

12.     Plaintiff PATRICIA DECARLO is a resident of Richmond County, New York. Prior to being denied religious accommodation, Ms. DeCarlo was a tenured math teacher in good standing, working in Brooklyn with over eighteen years of service at DOE.

13.    Plaintiff ABIGAIL GARCIA is a resident of Putnam County, New York. Prior to being denied religious accommodation, Mrs. Garcia was a tenured kindergarten teacher in good standing working in the Bronx with twenty-nine years of service at DOE.

14.    Plaintiff DELLA HALEY is a resident of Rockland County, New York. Prior to being denied religious accommodation, Ms. Haley was a tenured elementary school teacher in good standing, working in the Bronx with twenty-two years of service at DOE.

15.    Plaintiff STELLA JACK is a resident of Nassau County, New York. Prior to being denied religious accommodation, Ms. Jack was a special education teacher in good standing, working in Brooklyn with five years of service at DOE.

16.    Plaintiff KATHRYN KIESLING is a resident of Nassau County, New York. Prior to being denied religious accommodation, Ms. Kiesling was a school counselor in good standing, working in Queens with over fifteen years of service at DOE.

17.    Plaintiff BARBARA KYDD is a resident of Queens County, New York. Prior to being denied religious accommodation, Mrs. Kydd was a tenured reading specialist in good standing, working in Queens with twenty-four years of service at DOE.

18.    Plaintiff KATHLEEN MAGUIRE is a resident of Suffolk County, New York. Prior to being denied religious accommodation, Mrs. Maguire was a tenured physical education teacher in good standing, working in Brooklyn with over twenty-three years of service at DOE.

19.    Plaintiff KIM MODZELEWSKI is a resident of Richmond County, New York. Prior to being denied religious accommodation, Mrs. Modzelewski was a secretary in good standing working in Staten Island, with ten years of service at DOE.

20.    Plaintiff ROSE NEWMAN is a resident of Putnam County, New York. Prior to being denied religious accommodation, Ms. Newman was a tenured art teacher in good standing,

working in Queens with over twenty years of service at DOE.

21.    Plaintiff SAMUEL PAGAN is a resident of Putnam County, New York. Prior to being denied religious accommodation, Mr. Pagan was a teaching assistant in good standing, working in the Bronx with sixteen years of service at DOE.

22.    Plaintiff MARIA ANN PIROZZI is a resident of Richmond County, New York. Prior to being denied religious accommodation, Ms. Pirozzi was a tenured teacher in good standing, working in Staten Island with over thirty-one years of service at DOE.

23.    Plaintiff RODNEY EPPS PRESSLEY is a resident of Richland County, South Carolina. Prior to being denied religious accommodation, Mr. Pressley was a tenured teacher in good standing, working in Queens with twenty years of service at DOE.

24.    Plaintiff JOSEPH SABATINO is a resident of Nassau County, New York. Prior to being denied religious accommodation, Mr. Sabatino was a tenured teacher in good standing, working in Queens with over seventeen years of service at DOE.

25.    Plaintiff DIANA SALOMON is a resident of Suffolk County, New York. Prior to being denied religious accommodation, Ms. Salomon was a paraprofessional in good standing, working in Queens with five years of service at DOE.

26.    Plaintiff NICOLE ANN SCHMIDT is a resident of Suffolk County, New York. Prior to being denied religious accommodation, Ms. Schmidt was a tenured special education teacher in good standing, working in Queens with seventeen years of service at DOE.

27.    Plaintiff MARIA VASILIOU is a resident of Suffolk County, New York. Prior to being denied religious accommodation, Ms. Vasiliou was a tenured teacher in good standing, working in Queens with over fifteen years of service at DOE.

28.    Defendant CITY OF NEW YORK is a municipal corporation of the State of New

York and can sue and be sued. The City operates and employs people through its municipal agencies. Since 2002, the City has exercises Mayoral control over DOE pursuant to a grant of authority to the City from the State Legislature.

29.     Defendant DOE is a school board organized under, and existing pursuant to, the New York Education Law. Defendant DOE maintains its headquarters at 52 Chambers Street, New York, New York and operates in all five boroughs of the City of New York. The Mayor of the City of New York exercises mayoral control over the DOE.

## CLASS ACTION ALLEGATIONS

30.     Plaintiffs propose that this matter be certified as a class action pursuant to Rule 23 in their representative capacity on behalf of themselves and the class of all others similarly situated, as defined in this Amended Complaint.

31.     Plaintiffs propose that the class consist of all persons who requested religious accommodation from the Covid-19 vaccine mandate applicable to DOE employees and contractors (the "Class") and were denied without being allowed "fresh consideration" by the Citywide Panel.

32.     This action meets the following prerequisites of Rule 23(a):

    a.  Numerosity: upon information and belief, the Class consists of thousands of employees who applied for but were denied religious accommodation by the DOE yet were not allowed to reconsideration by the Citywide Panel after the Second Circuit Court of Appeals held that the DOE's original process was unconstitutional. Due to the large number of class members, joinder of all members is impracticable, and indeed, virtually impossible.

    b.  Ascertainability: the Class is ascertainable, as the DOE has to keep records of all persons who applied for religious accommodation and the result of those

applications and Plaintiffs and Class members can further attest to the method and time of their application for religious accommodation.

c.  <u>Commonality</u>: the central issues in this case are common to the whole Class, including but not limited to –

  i.  Whether the facts give rise to an inference of discrimination that could have impacted the Defendants' religious accommodation decisions and policies; and
  ii.  Whether the DOE's original accommodation policies were unlawful or discriminatory on their face or as applied; and
  iii.  Whether the City aided and abetted the discrimination or is jointly liable for failing to provide Plaintiffs with fresh consideration after promising the Second Circuit to do so; and
  iv.  Whether employees were required to exhaust their remedies when the policies at issue were facially unconstitutional, excluded whole categories of religion from access to accommodation, and the DOE's online portal froze and would not accept appeals; and
  v.  Whether the denials based on undue hardship were pretextual; and
  vi.  Whether Defendants could have accommodated Plaintiffs and other members of the Class without undue hardship; and
  vii.  Whether the policies at issue are subject to strict scrutiny; and
  viii.  Whether Defendants' policies can survive strict scrutiny or rational basis review.

The Second Circuit already has joined and consolidated multiple appeals by different groups of DOE plaintiffs challenging the religious accommodation policies at issue here and the district court in the *Kane* case consolidated two related group cases with similar groups of plaintiffs as here, showing that the claims can and should be adjudicated together.

d.  <u>Typicality</u>: Plaintiffs' claims are typical of the claims of the Class. Each Plaintiff alerted the DOE that they needed religious accommodation from the DOE Mandate but was nonetheless denied accommodation without any opportunity for appeal to the Citywide Panel. The claims of the Plaintiffs and the Class arise from the same events and actions by Defendants and are based

on the same legal theories.

e.  Adequacy: Plaintiffs will fairly and adequately protect the interests of the Class. They do not have any interests that conflict with the interests of the Class. They have engaged competent counsel who are experienced in complex litigation, including class actions, and have won relief for groups of Plaintiffs impacted by these very same policies.

f.  Superiority: a class action is superior to alternatives, if any, for the timely, fair, and efficient adjudication of the issues alleged herein. A class action will permit numerous similarly situated individuals to prosecute their common claims in a single forum simultaneously without duplication of evidence, expense and resources. This action will result in uniformity of decisions and avoid risks of inconsistency and incompatible standards of conduct in the judicial system. It will also more efficiently allow adjudication of the pattern and practice claims.

g.  Maintainability: this action is properly maintainable as a class action for the above-mentioned reasons and under Rule 23(b). Individual litigation is too costly. This is expensive litigation against deep-pocket government employers who have shown an unwillingness to afford relief class wide even after admitting that its policies were discriminatory. The City and DOE routinely appeal when they lose and tie up case in years of expensive appeals. These hard-working employees, who have been shut out of work and retaliated against for three years now, do not have the means to hire attorneys to individually litigate their claims for years on end, and there are not enough attorneys who work in this area to represent them all individually even if they did. Individual actions

would also unnecessarily burden the courts and waste judicial resources.

h.  <u>Predominance</u>: questions of law or fact common to Class Members predominate over any question that may affect only individual members. A class action is superior to other methods for fairly and efficiently adjudicating the controversy.

## **STATEMENT OF FACTS COMMON TO ALL CLAIMS**

*The Pandemic*

33.    At some point between the fall of 2019 and spring of 2020, the Covid-19 virus began circulating in New York City and around the world.

34.    In March 2020, New York State declared a state-disaster emergency due to the Covid-19 pandemic.

35.    Schools were closed for the remainder of the Spring 2020 semester across the state, including all DOE schools.

36.    In the 2020-2021 school year, DOE schools reopened for in-person learning, with the option of remote instruction if families preferred that option.

37.    Teachers and most staff were required to return to in-person instruction.

38.    However, DOE liberally granted accommodations to most DOE employees who wished to work from home or remotely.

39.    In or around December 2020, vaccines became available against Covid-19.

40.    But there was no vaccine mandate during the 2020-2021 school year, and DOE allowed Plaintiffs to continue to work unvaccinated for the entire school year and following summer.

41.    On June 23, 2021, Governor Cuomo announced that the pandemic emergency was officially over in New York State.

9

42.     By the end of July 2021, the scientific consensus among world public health leaders coalesced around three facts:

    a.  vaccinated people could still catch and spread SARS-CoV-2 and were equally as infectious as unvaccinated people when they did; and

    b.  herd immunity could not be achieved through vaccination; and

    c.  any vaccine protection waned significantly after a matter of weeks.

43.     By August 2021, governments around the world publicly acknowledged that vaccination would not stop the spread of the virus, and that everyone, vaccinated and unvaccinated alike, would likely catch Covid-19.

### The City's First Mandates

44.     Notwithstanding the science, on August 3, 2021, Mayor de Blasio declared war on the unvaccinated, announcing a "Key to New York City" pass which intentionally excludes unvaccinated people from accessing basic aspects of life in New York in a blatant effort to coerce them to get vaccinated with one of the experimental COVID-19 vaccines.

45.     In a press conference, the Mayor described his draconian "Key to NYC" mandate as the "first-in-the-nation" of its kind, since it had no mechanism for religious or medical accommodation.

46.     Two days later, Wolf Blitzer interviewed CDC Director Rochelle Walensky, who acknowledged on national television that the vaccines could not stop transmission of Covid-19.

47.     Dr. Walensky said: "But what [the vaccines] can't do anymore is prevent transmission." When asked if asymptomatic vaccinated people could pass on the virus, Dr. Walensky further stated, "that's exactly right."[1]

---

[1] Blitzer, W. (2021, August 5). *Transcript: Interview with CDC Director Dr. Walensky.* The Situation Room, CNN. http://www.cnn.com/TRANSCRIPTS/2108/05/sitroom.02.html

48.    The CDC's public acknowledgment that the Covid-19 vaccines cannot stop transmission only triggered the Mayor to become more zealous about mandating them.

49.    Earlier that summer, New York City had adopted a vaccination policy that allowed DOE employees to test weekly if they did not want to get vaccinated, which was supposed to go into effect in September 2021.

50.    On or about August 24, 2021, Mayor Bill de Blasio and Commissioner Chokshi changed course, issuing the first version of a new "emergency" regulation *mandating* Covid-19 vaccination for most DOE employees and removing the testing option in lieu of vaccination.

51.    No new emergency justified this new aggressive mandate.

52.    There were no urgent increases in hospitalizations or deaths necessitating the implementation of these policies in New York City in August or September 2021.

53.    Nor did it make sense to remove the option of testing in lieu of vaccination.

54.    Most DOE employees had been working in person unvaccinated for over a year.

55.    Most employees, including most of the named Plaintiffs in this case, already had natural immunity.

56.    By August it was well established that natural immunity provided superior immunity to Covid-19 than vaccination.

57.    Children are also the least vulnerable population, when it comes to Covid-19, with few hospitalizations and essentially zero deaths.

58.    Nonetheless, both the City and DOE announced that not only were they imposing this Mandate, but they would also not even consider any religious or medical accommodation requests from the vaccine Mandate for any DOE employee.

59.    Meanwhile, there were carve-outs made for secular reasons that defeated the stated

purpose of the Mandate in the same way and defeated any possibility of herd immunity.

60.     Importantly, there was no mandate for students in the fall of 2021.

61.     In or around December 2021, the City imposed an "emergency" regulation that mandated vaccines for students engaging in extracurricular activities, but even then, it declined to extend the same mandate to all students, leaving most of the one million students in the New York City public schools free to attend in person unvaccinated so long as they did not attend the glee club or participate in plays or sports afterwards.

62.     Given this fact, herd immunity would not have been possible even if the vaccines could have stopped transmission, as students would still be exposed to their unvaccinated classmates even if 100% of all teachers and staff were fully vaccinated.

63.     Even if all 100,000 plus DOE staff were vaccinated, they would still reflect less than ten percent of the population in schools.

64.     Ten percent vaccination rates can never stop transmission of disease in a community, even for vaccines that can prevent infection and transmission in the recipient.

65.     The vaccine status of one teacher in a classroom with twenty to fifty unvaccinated students could not have any impact on stopping the spread of Covid-19, even if the vaccines did stop transmission.

66.     There were other carve outs too.

67.     For example, unvaccinated bus drivers were allowed to continue driving students in enclosed buses due to staffing issues.

68.     And unvaccinated members of the public could come to the schools to vote and man volunteer tables, among other reason.

69.     The DOE Mandate states on its face that it relied in part on the state's healthcare

worker mandate to justify its imposition of the DOE Mandate.

70.    It should be noted that the healthcare worker mandate was later struck down as arbitrary and capricious, in part because of the New York State Department of Health's admission that the vaccines cannot stop the spread of the Covid-19 virus.

***Pfizer's Influence***

71.    Upon information and belief, one reason that the City decided to pass such aggressive mandates and keep them in place so long despite the scientific consensus that they could not stop transmission was due to political and economic pressure and/or incentives from Pfizer, Inc ("Pfizer").

72.    Pfizer exercises significant financial influence in New York City politics.

73.    Pfizer is headquartered in New York City and was the only pharmaceutical company to gain FDA approval of their Covid-19 vaccine in 2021.

74.    The DOE Mandate was timed to coincide with Pfizer's receipt of FDA approval for the first licensed Covid-19 vaccine in or around August 2021.

75.    Pfizer is a major donor and employer in New York City.

76.    Pfizer has donated money to help elect Mayor de Blasio.

77.    Pfizer also donated money that went to help elect Mayor de Blasio's successor, Eric Adams.

78.    Pfizer has also donated money to the DOE.

79.    Upon information and belief, both Mayor de Blasio and Mayor Adams own stock in Pfizer.

80.    Pfizer's stock prices would be significantly impacted by the amount of vaccine uptake in the first two quarters after vaccine approval (ending September 30, 2021 and December

31, 2021).

81.     It has been well-documented that vaccine mandates impact Pfizer's stock prices significantly too.

82.     The Key to NYC and DOE Mandates were the first "no accommodation" employee vaccination mandates in the country.

83.     Upon information and belief, eliminating, or at least vastly reducing, the availability of accommodations to vaccine mandates, was part of Pfizer's business model.

84.     Pfizer knew, before the Mandate went into effect, that its vaccine was not effective against the new strains of Covid-19, including Delta and Omicron strains.

85.     Aggressive vaccine mandates could help ensure that the vaccine would be profitable as people began to realize that the vaccinated were catching Covid-19 as readily as the unvaccinated – because they would have no choice but to keep taking the vaccines if they wanted to keep their jobs.

86.     Upon information and belief, Pfizer was in communication with the Mayor's office prior to the enactment of the Mandate and encouraged the Mayor to enact aggressive mandates on or before the end of September, 2021.

87.     Upon information and belief, Pfizer and the City attempted to implement New York City's no or low accommodation mandate to serve as a model that could be adopted by other cities after it was established in New York City.

88.     Pfizer agreed to give the NYC DOE over one million dollars in grants after the mandate was implemented.

***Labor Disputes and Lawsuits***

89.     Whatever the motive, New York City labor unions unanimously decried the DOE

14

Mandate from the start as reckless and unlawful and announced that they would be taking legal action.

90.    Leaders from all major impacted unions, as well as the Municipal Labor Committee ("MLC"), and leaders from each of the member unions of the MLC all put out statements that the DOE Mandate violates basic legal rights.

91.    Mass protests, lawsuits, and labor disputes ensued immediately upon the announcement of the Mandate.

92.    On or about September 9, 2021, the MLC and sixteen unions filed a lawsuit ("MLC Litigation") in State Court, challenging the Mandate and the Defendants' refusal to consider reasonable accommodations pursuant to their statutory duties.

93.    On September 14, 2021, the Supreme Court, New York County, issued a temporary restraining order ("TRO") enjoining the City from enforcing the Mandate "solely because the Department of Health and Mental Hygiene Order's mandate did not reference the possibility of any medical or religious exemption." *The New York City Mun. Labor Committee v. The City of New York,* No. 158368/2021, 2021 WL 4502854, at *2 (N.Y. Sup. Ct. Sep. 22, 2021).

94.    The next day, on September 15, 2021, the DOE Mandate was rescinded and reissued, with an amendment clarifying that "[n]othing in this order shall be construed to prohibit any reasonable accommodation otherwise required by law."[2]

95.    The New York State Supreme Court accordingly vacated the TRO, stating that it was "obviate[d]" by the Commissioner's amendment allowing for religious and medical accommodation. *Mun. Labor Committee,* 2021 WL 4502854, at *3.

---

[2] The Mandate was also further amended later in September 2021, but not substantively for purposes of this Petition other than to push back the effective date as a result of further lawsuits.

96.     What was not before the Court was the Defendants' religious accommodation policies, which were clearly designed to try to evade the DOE's responsibility to consider religious accommodation in good faith.

***DOE Implements and Ratifies the "Stricken Standards"***

97.     In a parallel proceeding, the United Federation of Teachers ("UFT"), Local 2, AFT, AFL-CIO ("UFT") filed a Declaration of Impasse on September 1, 2021, contending, among other things, that the DOE's failure to provide religious and medical accommodations was unlawful and that the DOE further failed to afford due process regarding job and benefits protection.

98.     On September 10, 2021, an impact arbitration decision was rendered by Arbitrator Martin Scheinman requiring that the DOE provide UFT members with reasonable religious accommodation. [Exhibit 1 – not offered for the truth of the document, but to show what the policy said].

99.     In the award, the arbitrator offered, "as an alternative to any other statutory reasonable accommodation process" that DOE could use Scheinman's religious accommodation policy, using the criteria and terms set forth in the arbitration award.

100.    Subsequently, Arbitrator Scheinman issued materially identical awards covering Counsel of School Supervisors and Administrators ("CSA") employees and District Council ("DC37) DOE employees.

101.    The policies are collectively referred to hereafter as the "Stricken Standards" since they were later struck down as unconstitutional by the Second Circuit Court of Appeals.

102.    The arbitrator, Martin Scheinman served as a major donor and fundraiser for Mayor de Blasio and his neutrality is and was contested at the time that DOE adopted the Stricken Standards.

103.    The Stricken Standards were clearly designed to deny most applicants by unconstitutionally narrowing the definition of what beliefs could qualify for religious accommodation.

104.    On their face, the Stricken Standards express unconstitutional denominational preferences and categorically exclude most religions from protection and access to accommodation.

105.    For example, the Stricken Standards provide the following criteria for determining who could access accommodation: "religious exemptions for an employee to not adhere to the mandatory vaccination policy must be documented in writing by a religious official (e.g., clergy). Requests shall be denied where the objection is personal, political, or philosophical in nature. Exemption requests shall be considered for recognized and established religious organizations (e.g., Christian Scientists)." Stricken Standards at 9.

106.    The language in the above quoted paragraph was almost entirely drafted and proposed by Defendants' attorneys.

107.    Multiple problems stand out in this definition of what constitutes so called acceptable religious beliefs.

108.    First, the policy favors Christian Scientists, predefining Christian Science as the only enumerated example of a "recognized" and "established religious organization." This gives Christian Scientists an unfair advantage.

109.    Second, the policy requires the government to decide which other religions than Christian Science are "recognized" as "established religious organizations."

110.    If an applicant belongs to a religion that is not deemed "established" and "recognized" by the government employer, whatever that means, the person must be denied.

111.   A clearer violation of the Establishment Clause is hard to imagine; it is well-settled law that government cannot "establish" which religions are "recognized" and thus valid.

112.   Third, the policy also provides that religious objection based on personally held or "philosophical" religious beliefs must be denied.

113.   But under the federal, state, and local standards, personally held or unorthodox religious beliefs are just as protected as those that are endorsed by official church dogma.

114.   In fact, even moral or philosophical beliefs are defined by the EEOC and governing law as expressly protected religious beliefs, but under the Stricken Standards, they were excluded from protection even if the beliefs were sincerely held.

115.   Fourth, the Stricken Standards require that the religious objection "must be documented in writing by a religious official (e.g. clergy)."

116.   The certification requirement discriminates against those who practice religions that do not belong to a hierarchical organization or who have different religious beliefs than their pastor or church leader.

117.   Defendants were on notice that the clergy requirement was illegal.

118.   It is long-established law in New York that governments cannot require a person to show a clergy letter or belong to an "established religion" to have their religious beliefs protected. *See, e.g., Sherr v. Northport-E. Northport Union Free Sch. Dist.*, 672 F. Supp. 81, 92 (E.D.N.Y. 1987).

119.   Fifth, the Stricken Standards require that, even if the DOE were to determine a person does belong to an "established" and "recognized" religion, and that religious organization provided a clergy letter, the applicant must still be denied if the "leader" of their faith has publicly expressed support for vaccination.

120.    "Leader" is not defined in the Stricken Standards, but in practice, the DOE repeatedly interpreted this concept broadly to categorically deny accommodation to whole categories of religious employees based on sometimes random ideas about who the leader of a faith might be.

121.    Pursuant to these determinations, DOE argued that all Jews, Muslims, Hindus, Buddhists, Catholics, and even non-denominational Christians other than Christian Scientists had to be denied.

122.    In sum, the DOE conditioned access to accommodation based on membership in preferred religious organizations.

***DOE showed additional bad faith by initially denying 100% of applicants without review.***

123.    Notwithstanding that the Stricken Standards already was designed to categorically deny most applicants, Defendants applied the Stricken Standards to exclude even more employees from protection than the discriminatory policy allowed.

124.    As bad as the Stricken Standards were, the one thing that the policy did for employees was to guarantee that the DOE had to grant religious accommodation if an applicant qualified under its criteria.

125.    There was no provision for undue hardship, which the union had argued would be used as a pretext given the Defendants' prior refusal to cooperate.

126.    Rather, pursuant to the arbitrators' order, at both the initial DOE review and in the appeals, any applicant who qualified "within the specific criteria identified above **shall be permitted the opportunity to remain on payroll**…"

19

127.    However, within hours or days of submitting their application, every single applicant who initially applied under the Stricken Standards received the same autogenerated email, stating:

Dear [NAME],

We have reviewed your application and supporting documentation for a religious exemption from the DOE COVID-19 vaccine mandate. Your application has failed to meet the criteria for a religious based accommodation.

Per the Order of the Commissioner of Health, unvaccinated employees cannot work in a Department of Education (DOE) building or other site with contact with DOE students, employees, or families without posing a direct threat to health and safety. We cannot offer another worksite as an accommodation as that would impose an undue hardship (i.e. more than a minimal burden) on the DOE and its operations.

Sincerely, *HR Connect* Medical, Leaves, and Records Administration

Please do not reply to this message via e-mail. This email address is automated.

128.    Those who applied on or before the deadlines set forth in their union's version of the Stricken Standards had the following additional language tacked on:

This application was reviewed in accordance with applicable law as well as the Arbitration Award in the matter of your union and the Board of Education regarding the vaccine mandate. Under the terms of the Arbitration Award, you may appeal this denial to an independent arbitrator. If you wish to appeal, you must do so within one school day of this notice by logging into SOLAS https://dhrnycaps.nycenet.edu/SOLAS and using the option "I would like to APPEAL". As part of the appeal, you may submit additional documentation and also provide a reason for the appeal.

129.    In addition to violating the arbitrator's award, the autogenerated denials violated statutory standards in multiple ways.

130.    <u>First</u>, the DOE did not engage in any good-faith individualized attempts to accommodate employees before issuing blanket "undue hardship" denials to 100% of applicants.

131.    No one at the DOE individually reviewed any of the applications before sending out the autogenerated emails denying accommodation.

132.    Applicants were not contacted by any person at DOE to discuss their applications before they were denied.

133.    No cooperative dialogue was offered or took place before the denials were issued.

134.    The same or substantially the same email was sent to all applicants.

135.    The DOE also sent out the same email to employees who were already approved to work remotely and those who did not have student-facing jobs.

136.    _Second_, the denial incorrectly states that the Mandate did not allow DOE employees to work in person.

137.    It was not true that the Mandate did not allow DOE employees to work in person– on the contrary, the Mandate had been expressly amended to allow for religious accommodation, which would include in person accommodation if an employee did not constitute a direct threat that could not be mitigated through reasonable accommodation.

138.    The Stricken Standards and the DOE's own policies show that DOE understood that the Mandate did not prohibit them from offering in person accommodation. For example, DOE had made arrangements for employees to work unvaccinated around other DOE employees from one of the remote work locations that the DOE set up for those accommodated under the arbitration awards, or from an administrative building, even though the DOE's undue hardship denials stated that the Mandate prohibited employees from working around other DOE staff unvaccinated.

139.    Ultimately, the DOE admits it accommodated at least 163 persons in this manner, some of them teachers.

140.    And one or more unvaccinated teachers were even knowingly allowed by the DOE to go back in person to teach their class while the Mandate was in effect.

21

141.    Nothing in the Mandate provided justification for a blanket ban on in-person accommodation without individualized analysis of the statutory factors for each employee.

142.    By law, employers bear the burden of proving that an employee is a direct threat and of proving that no reasonable accommodation could be made without undue hardship.

143.    <u>Third,</u> the denials admitted - on their face - that Defendants applied the wrong legal standard for assessing whether accommodation would pose an undue hardship.

144.    The denials stated that Defendants used the "more than a minimal burden" (*de minimis*) standard, but under the SHRL and CHRL, the employer bears the burden of proving that accommodation would create a "significant" burden or expense, and under Title VII, the employer must prove substantial hardship, not *de minimis* hardship.

145.    Pursuant to federal, state and local law, employers also must prove that they made the undue hardship determination after assessing specific statutory criteria, using the best available evidence, on a good-faith individualized basis before denying an applicant.

146.    For example, under all three statutes, if the hardship has to do with a safety concern, the employer bears the burden of proving on an individualized basis that an employee would pose a direct threat before segregating them or imposing any adverse employment consequence on them.

147.    The direct threat analysis cannot be speculative or generalized. Rather, under the CHRL, "The employer must make an individualized assessment, based on reasonable judgment that relies on current medical knowledge or the best available objective information, to ascertain: the nature, duration and severity of the risk; the probability that potential injury will actually occur; and whether reasonable accommodation, such as modification of policies, practices or procedures, will mitigate the risk." 9 CRR-NY 466.11(g)(2).

148.    Similar analysis is required under the SHRL and Title VII.

149.    Defendants did not make any good faith attempt to individually analyze these or the other required statutory factors for any applicant before conclusively denying them all based on alleged undue hardship.

150.    The best-available objective science at the time did not support a blanket policy that in person accommodation was *per se* a direct threat.

151.    The DOE did not prove or individually assess whether any employee was a direct threat due to their vaccination status before sending out the autogenerated blanket denials.

152.    The DOE did not prove or individually assess whether it would be an undue hardship to provide reasonable accommodation for any employee deemed a direct threat before sending out the autogenerated blanket denials.

153.    Some employees were already working remotely, or could have easily worked remotely, when they received the blanket undue hardship denials.

154.    Most of those who received the email denial had already been accommodated to work remotely in the past and could have easily been accommodated to do so again.

155.    And all employees could have been easily accommodated in person or remotely, as they had been for the entirety of the pandemic, without undue hardship or safety concerns.

156.    Plaintiffs did not pose a threat to anyone based on their vaccination status and they could have each been accommodated without undue hardship.

157.    The vaccines could not stop transmission.

158.    Moreover, even if Covid-19 vaccines could meaningfully stop transmission, it is illogical to mandate vaccination for only a small fraction of the school population.

159.    It makes no sense to say that one million students could safely come to school

unvaccinated, riding in busses with unvaccinated school-district employed bus drivers (who were exempt from the Mandate due to staffing concerns) and commingling with thousands of their unvaccinated peers, but that they would suddenly be in severe danger just because one or two teachers in the building were also unvaccinated.

160.    If being in proximity with a few unvaccinated people was such a severe hazard, the rule should have applied universally to everyone in the population.

161.    A few extra unvaccinated people in each building could not make any difference to herd immunity when the bulk of the population in that building are unvaccinated as well.

162.    By the fall of 2021, it was already well-understood that the Covid-19 vaccines could not create herd immunity no matter what percentage of the population was vaccinated.

163.    As one of many examples, a 2021 Harvard Study showed that there was "no discernable relationship between percentage of the population fully vaccinated and new Covid-19 cases." Subramanian S. V. and Akhil Kumar. "Increases in Covid-19 are unrelated to levels of vaccination across 68 countries and 2947 counties in the United States." *European Journal of Epidemiology*, 1-4. 30 Sep. 2021, doi: 10.1007/s10654-021-00808-07.

164.    Even in 2021, the great weight of the evidence showed that unvaccinated employees did not constitute a direct threat and could be easily accommodated.

165.    Defendants were on notice of this fact.

166.    Attached, and incorporated herein by reference as if fully set forth herein, are sworn declarations submitted in related litigation at various relevant points from public health experts at Johns Hopkins (Exhibit 2 – Dr. Makary), Yale (Exhibit 3 – Dr. Risch), and Stanford (Exhibit 4 – Dr. Bhattacharya).

167.    As the declarations point out, the great weight of the objective science, even at the

time the Mandate was imposed and shortly thereafter, showed the vaccine could not stop transmission and did not offer robust or durable protection from infection or symptoms.

168.    The declarations establish that DOE employees did not pose a direct threat and could have been accommodated in person.

169.    Moreover, the vaccines were still at an experimental stage.

170.    There was insufficient data available to determine what the risks and benefits were, or that a benefit overrode risks to particular people, especially those with underlying health conditions.

171.    And, though Pfizer's vaccine was being rushed through for FDA approval, Pfizer did not actually offer any of the FDA approved vaccines in New York State.

172.    It was not possible to obtain an FDA approved Covid-19 vaccine in New York State at any time between August 2021 through September 2022.

173.    The only available vaccines that Pfizer made available in New York State during this timeframe were those authorized under Emergency Use Authorization ("EUA").

174.    EUA vaccines cannot be mandated, by the terms of their authorization.

175.    Additionally, children had the lowest risk from Covid-19 of any population, and their risk of severe harm from the disease was so low as to be statistically insignificant.

176.    Tellingly, every other school district in the state, including many neighboring school districts on Long Island, which had nearly identical populations of students and staff, allowed teachers to test weekly in lieu of vaccination throughout the pandemic.

177.    These other school districts did not see any statistically significant increase in infection rates from the infection rates at the NYC DOE after the DOE's Mandate went into effect.

178.     Moreover, there were numerous additional measures that could have been taken, including but not limited to weekly testing, symptom checks, or other protective measures, each of which could have mitigated any perceived or actual increased risk of transmission from unvaccinated employees.

179.     Remote accommodation would not have been a significant hardship either.

180.     Every Plaintiff had previously been accommodated remotely for short or long periods of time during the pandemic.

181.     The Mandate was supposed to be a temporary emergency measure (and indeed, did have to be continued or renewed repeatedly throughout the year and a half it was imposed).

182.      The DOE had accommodated widespread remote work for the past year and a half, and the DOE could have continued to allow those needing religious accommodation to work remotely.

183.     Despite the DOE's argument that they had moved most instruction back to in person in 2021, the DOE continued to provide a parallel remote program for many students throughout the 2021-2022 school year.

184.     The DOE could have accommodated some of the Plaintiffs and their colleagues in this remote program.

185.     Indeed, the DOE continued to advertise vacancies for and hire remote teachers throughout the 2021-2022 school year, even as they claimed it would be an undue hardship to accommodate any unvaccinated DOE teacher remotely.

186.     There were other ways that DOE employees could have been accommodated through remote work as well without significant hardship.

187.     For example, before sending out the denials, DOE set up buildings specifically for

remote work for those who would be accommodated under the Stricken Standards.

188.    At all times relevant to this Complaint, those building stood largely empty and well below capacity.

189.    Teachers and paraprofessionals could have worked with a co-teacher (which many already had) and pushed in through Google Classroom (from home or the remote worksites) to work with individuals or groups or modules throughout the day.

190.    There was also plenty of work that could be done that did not require in person presence that they could have been reassigned to temporarily until the "emergency" was over.

191.    Upon information and belief, the summary blanket denials were issued to demoralize and harass religious employees, who got the message, loud and clear, that DOE was not acting in good faith.

192.    Employees had poured their hearts out into their religious accommodation letters, which is a vulnerable thing to do.

193.    They were given only a few days to commit their most sacred innermost thoughts to paper, and to gather a clergy letter if they could.

194.    Receiving an autogenerated response, almost immediately, with a boilerplate denial from a "donotreply" email address felt like a mockery of their faith and showed many employees – both the recipients and their colleagues who were considering whether to apply or litigate - that further efforts were futile.

195.    Tellingly, many who received the autogenerated undue hardship denials, including some named Plaintiffs here, did not even work in student facing positions – or in person at all in some cases - in the Fall of 2021.

196.    But these remote and administrative employees still received the same

autogenerated email asserting they were denied because the Mandate did not allow employees to work unvaccinated around students.

197.    DOE's initial autogenerated denials stated, on their face, that they were issued in accordance with the Stricken Standards.

198.    But pursuant to the Stricken Standards, DOE was not authorized to deny *any* applicant based on undue hardship.

199.    Rather, the Stricken Standards, which were supposed to apply (per the policy) to both the initial DOE review and the appeals to the arbitrators, had no mechanism for undue hardship denial.

200.    According to the Stricken Standards, employees who met the defining criteria for qualifying religious beliefs "shall be" accommodated.

201.    The DOE's decision to violate even the one helpful aspect of the Stricken Standards by proactively denying 100% of the applicants through an autogenerated email pretextually asserting "undue hardship" shows animus and bad faith and leads to a reasonable inference that all subsequent religious accommodation decisions and policies implemented by DOE were pretextual.

### *The DOE refused to allow many employees to appeal their denials*

202.    The DOE's policies made it very difficult for employees to apply for religious accommodation or appeal their denials.

203.    The Stricken Standards were not widely announced, and deadlines were not clearly explained to employees.

204.    Many employees were never told when the "deadline" to apply for religious accommodation was, only that they had to get vaccinated before September 27, 2021, and that

this deadline was later moved to October 4, 2021, due to the Second Circuit's temporary restraining order issued in September 2021.

205.    The deadlines were also irrelevant.

206.    In truth, pursuant to the accommodation standards, an employer cannot impose an arbitrary cutoff deadline to apply for religious accommodation.

207.    Rather, the statutes each specify that the employer has an affirmative obligation to accommodate an employee or prospective employee's religious practices when the employer knows, or should know, that the employee needs accommodation, whenever that may occur.

208.    Each one of the various arbitration awards provided a different "deadline" to get the expedited review available under the Stricken Standards.

209.    Each was circulated, if at all, only a few days before these deadlines.

210.    Plaintiffs and their colleagues were in a state of emergency.

211.    The start of a new school year is already a hectic time for educators.

212.    This was particularly hectic, as many students were returning from a year and a half of remote instructions, and there was quite a bit to work out.

213.    The DOE's sudden and aggressive announcement had DOE employees scrambling, attempting to secure loans and contingency plans in case they were suddenly out of a job, raise money to file lawsuits to challenge the blatantly unconstitutional religious accommodation policy, run around town trying to gather medical records and clergy letters, write long heart-felt letters that could explain their innermost sacred beliefs to secular and hostile strangers, and ensure that the students were taken care of and that they met their extensive job responsibilities.

214.    To make matters worse, the SOLAS system, where the applications were supposed

to be uploaded, froze repeatedly, especially during the deadlines to apply or appeal, leaving some unable to apply by the "due date."

215.    Those that were able to get their applications in before the "due dates" then had only 24 hours to appeal their initial DOE denials.

216.    These denials were sent by email, and many employees did not see them within the twenty-four hours allotted.

217.    Too often, the denials were issued on the Sabbath or a holy day, leaving those with religious practices that forbid Sabbath work with no time to appeal.

218.    And, once again, many employees were unable to appeal, since the SOLAS system crashed during their brief window to appeal.

219.    Many others felt it was futile to appeal, after receiving DOE's insulting autogenerated generic denials in response to their good-faith and heartfelt accommodation requests and hearing from colleagues that everyone was getting the same denial, even those who already worked remotely.

220.    Requests for medical and religious accommodation could not be filed at the same time.

221.    Employees were instructed that they had to pick one or the other to submit first.

222.    Though they were not informed of this consequence prior to deciding which one to apply for first, anyone who submitted a medical exemption first, even one that was granted temporarily, was immediately denied with the same autogenerated undue hardship denial email, but was not allowed to have any appeal from this autogenerated request.

223.    Similarly, anyone who was on any kind of leave at the time the "deadlines" passed was also denied the right to appeal the initial blanket denial, even if they timely applied for

religious accommodation when they returned from their leave.

224.    Similarly, those that submitted religious accommodation requests "late" were allowed to apply, and still denied through the same autogenerated email, but were not allowed to appeal.

225.    Moreover, anyone who was on leave when the "deadline" arrived for submitting the first religious accommodation request was allowed to later apply but was immediately denied with the same undue hardship email, though the last few lines were removed since the DOE refused to allow any appeal.

226.    And, of course, those who were shut out of appealing due to problems with the SOLAS website were also denied the right to appeal.

227.    So, all of these categories of people did not receive a single individualized review of their application, but were just sent an autogenerated, boilerplate undue hardship denial based on the unlawful "more than a minimal burden" standard.

228.    Those who did get to appeal did not fare much better.

229.    Most were provided with no explanation whatsoever, just given a paper that had an "x" next to the word "Denied."

230.    The decision whether to grant a hearing or not was arbitrary.

231.    Multiple Plaintiffs who met the criteria in the Stricken Standards were denied the right to a hearing and denied with no further explanation than an "x" next to the word "denied."

232.    Some applicants were allowed a zoom hearing.

233.    There was no apparent reason why some were granted, and others denied.

234.    Arbitrators were given unfettered discretion whether to allow a hearing.

235.    Neither DOE nor the arbitrators kept any records explaining the decisions and

DOE admitted in other lawsuits and position statements to the EEOC that it cannot explain the reasons why some were granted a hearing, and others denied.

236. At the zoom hearings, the arbitrators and DOE representatives engaged in what can only be described as heresy inquisitions, in which they discriminated even more zealously than the already discriminatory policy required.

237. For example, DOE openly and repeatedly took the position that all Jews must be denied because of a Jerusalem Post article stating that a Rabbi in Israel was vaccinated.

238. DOE representatives repeatedly referenced this article in zoom hearings to assert that all Jews must be categorically denied accommodation.

239. Jewish applicants from this and other lawsuits repeatedly documented that though they explained that their own Rabbi did not share the Israeli Rabbi's opinion, that Judaism is a diverse religion, and that a random Rabbi in Israel could not be deemed the "leader" of all Jews, they were still told that Jews could not qualify under the Stricken Standards because of the Jerusalem Post article.

240. Similarly, DOE also took the repeated position that all Catholics had to be denied, because Pope Francis is vaccinated.

241. There is substantial debate within the Catholic faith, like many other faiths, about whether it is religiously permissible to take a Covid-19 vaccine.

242. In fact, a whole council of Catholic Bishops set forth a document asserting that it is likely *not* permissible for Catholics to take any of the Covid-19 vaccines due to the use of aborted fetal cell lines in production and development of the vaccines.

243. Moreover, while Pope Francis is vaccinated and expressed his public opinion that vaccination might be permissible despite the connection to abortion, he also instructed Catholics

that they must each consult their religious conscience to make the choice for themselves.

244.    Nonetheless, DOE argued repeatedly in the zoom hearings that all Catholics should be denied because the Catholic Pope was vaccinated.

245.    DOE maintained this position even if the applicant provided a letter from their own Priest or religious leader stating that they had a valid religious belief.

246.    DOE representatives went so far as to argue in at least one documented case that a Buddhist applicant should be denied because his views were not shared by the Catholic Pope even though the DOE representative acknowledged that DOE found his religious beliefs sincere.

247.    DOE representatives also often argued that all non-denominational Christians other than Christian Scientists should be denied due to the Pope's beliefs.

248.    Even in cases where Plaintiffs submitted letters from their own religious leaders, explaining that the whole congregation opposed vaccination, DOE argued that the Pope's beliefs controlled all Christians other than Christian Scientists, and the applicant had to be denied, even if sincere.

249.    Similarly, the DOE representatives routinely pulled out a letter purporting to be from a Seventh Day Adventist leader to assert that all Seventh Day Adventists must be denied.

250.    DOE also argued that all Buddhists had to be denied because the Dalai Lama was vaccinated.

251.    The Dalai Lama is a spiritual leader of the Gelug ("Yellow Hat") sect, which is one of at least four sects of Tibetan Buddhism.

252.    There are many other sects of Buddhism - perhaps thousands of other sects, outside of Gelug Buddhism.

253.    Moreover, according to spiritual texts, Buddha told his followers not to take any

leader when he was dying, but rather, that each must rely on the dharma to examine the truth for themselves.

254.    But DOE still repeatedly argued that all Buddhists should be categorically denied because the Dalai Lama was vaccinated.

255.    DOE also argued repeatedly that all Muslims must be denied due to the alleged discovery of an alleged "leader" of that diverse faith who was vaccinated.

256.    The DOE's discriminatory statements and ignorant assumptions about faith were common and well-documented throughout the accommodation process.

257.    Arbitrators often joined in in the discriminatory positions and comments, accusing applicants of being wrong about what their faith required, or essentially, of being heretics for not allegedly following Pope Francis or the Dalai Lama or the Israeli Rabbi or whoever they decided to deem the leader of the faith.

258.    DOE representatives encouraged such harassment from the arbitrators, joining in and doing nothing to remediate the comments when made.

259.    DOE also categorically denied several types of belief.

260.    Especially, DOE representatives argued that any religious objection based on concerns about the use of aborted fetal cell lines was presumptively invalid.

261.    The City provided DOE with a letter from Health Commissioner David Chokshi, in which the Commissioner argued that concerns about aborted fetal cells did not merit religious protection.

262.    It is well-documented that aborted fetal cell lines were used in the production and development of the available Covid-19 vaccines.

263.    DOE's attorneys have admitted they have no basis to contest this fact.

34

264.    Mr. Chokshi's opinion that these concerns do not merit religious protection is impermissible governmental entanglement in religious questions and constitutes discrimination.

265.    Nonetheless, the DOE repeatedly used Commissioner Chokshi's letter in zoom hearings, arguing that concerns about the use of aborted fetal cell lines did not merit religious protection.

266.    After their zoom hearings, each of the Plaintiffs received a denial, with no explanation whatsoever, just an "x" next to the word "Denied."

267.    Conversely, at least 163 other DOE employees were accommodated after the administrative appeals, some of them classroom teachers.

268.    Upon information and belief, most of these employees were accommodated after a group of educators filed for an emergency injunction protecting them from the discriminatory religious accommodation policies on or about October 4, 2021.

269.    Upon information and belief, DOE hoped that by accommodating some employees from various religious groups previously categorically denied, it could try to defend against their obvious and widespread discrimination.

270.    But whatever the reason, DOE showed that it could accommodate employees by accommodating these 163 who were deemed to meet the unconstitutional criteria applied by DOE and the arbitrators.

271.    Some of the accommodated classroom teachers were given alternative assignments.

272.    Others were assigned to teach some of the online students who remained in the remote program.

273.    And many were accommodated by allowing (or hiring) a co-teacher to stay in the

classroom while the accommodated teacher taught via Google Classroom.

***The City aided, abetted and colluded in DOE's discrimination.***

274.    The City is jointly liable for the DOE's discriminatory religious accommodation policies and practices.

275.    As a threshold matter, in 2002, the New York State Legislature granted the City "Mayoral Control" over New York City's public schools. At all times relevant to this Complaint, pursuant to this authority, as extended and amended over the years, the Mayor's office exercised control over DOE and its operations.

276.    At all times relevant to this Complaint, the Mayor's office worked closely with DOE to oversee and direct the religious accommodation policies and their discriminatory implementation.

277.    The City also actively participated in harassing and discriminating against DOE employees who sought religious accommodation from the Covid-19 vaccine mandate.

278.    The Mayor's office and Mayor's legal counsel initially directed DOE not to offer any religious or medical accommodation from the Mandate.

279.    The Mayor's office and/or Mayor's legal counsel participated in drafting the proposed language for what criteria to use in judging a valid religious accommodation requests, which were later adopted in the Stricken Standards.

280.    Upon information and belief, the criteria for religious exemption were composed entirely, or nearly entirely, of language and procedures proposed by the City's attorneys.

281.    Attorney Eric Eichenholtz, who was, at all times relevant to this Complaint, working under the direction and guidance of the City of New York, was one of the City's attorneys who drafted the proposed criteria adopted in the Stricken Standards.

282.     At the time, Mr. Eichenholtz directed the labor and employment litigation group.

283.     As such, he was essentially in charge of the City's legal defense to the discrimination charges.

284.     After assisting Defendants with blatant, widespread religious discrimination, both in the original DOE policies and then during the pretextual Citywide Panel "reviews" (which he was in charge of), Mr. Eichenholtz was promoted to Managing Attorney for the New York City Law Department.

285.     The City was also intimately involved in directing the DOE in the implementation of these policies and aiding and abetting the exclusion of as many applicants as possible from accommodation based on unconstitutional criteria.

286.     In a press briefing held on September 23, 2021, the day before the DOE appeal hearings began, Mayor de Blasio was asked how the City intended to implement the religious exemption policies for DOE employees and what criteria the City would use. He responded:

> **Mayor**: Yeah, it's a great question. Thank you. Yes. And very powerfully Pope Francis has been abundantly clear that there's nothing in scripture that suggests people shouldn't get vaccinated. Obviously, so many people of all faiths have been getting vaccinated for years and decades. **There are, I believe it's two well-established religions, Christian Science and Jehovah's Witnesses that have a history on this, of a religious opposition.** But overwhelmingly the faiths all around the world have been supportive of vaccination. **So, we are saying very clearly, it's not something someone can make up individually. It has to be, you're a standing member of a faith that has a very, very specific longstanding objection**.[3]

287.     This statement admits an intention to categorically discriminate against most religions and only grant religious accommodation to members of certain faiths that have "a very, very specific longstanding objection" according to the Mayor.

---

[3] Office of the Mayor, NYC. (2021, September 23). *Transcript: Mayor de Blasio Holds Media Availability* [Press release]. https://www.nyc.gov/office-of-the-mayor/news/644-21/transcriptmayor-de-blasio-holds-media-availability

288.    It is also an admission that the City was involved in and directing DOE to discriminate against most faiths in the appeals.

289.    If the City had no involvement, the Mayor would have stated that the City was not involved, in response to questions about how it was going to decide which teachers to accommodate.

290.    There is additional evidence that the City was intimately involved in and aided and abetted the DOE's discriminatory policies.

291.    The Mayor's office and/or City's legal counsel provided the letter from the Jerusalem Post to DOE and advised DOE to deny Jewish applicants based upon that article.

292.    The Mayor's office and/or City's legal counsel also directed DOE to categorically exclude Buddhists, because of the Dalai Lama.

293.    The Mayor's office and/or City's legal counsel also directed DOE to deny Muslims, because of a random City-defined "leader" of Muslims who the City believed was vaccinated.

294.    The Mayor's office and/or City's legal counsel directed the DOE to deny Catholics, because Pope Francis was vaccinated.

295.    The Mayor's office and/or City's legal counsel directed the DOE to deny Seventh Day Adventists, because of an alleged leader's position statement which they provided to the DOE.

296.    The Mayor also took an official City position on religious questions, announcing to the press that "Pope Francis has been abundantly clear that there's nothing in scripture that suggests people shouldn't get vaccinated" when explaining that the City would not allow people with personally held religious beliefs that differed from the leaders of their faith to get

accommodation.

297.    The City also provided a letter from Commissioner Chokshi to DOE and the arbitrators and instructed them to use it to deny those with religious objections based on the use of aborted fetal cell lines.

298.    The Mayor and/or City's legal counsel also directed DOE to deny all personally held religious beliefs.

***DOE's religious accommodation policies declared unconstitutional.***

299.    A group of educators brought a proposed class action lawsuit against the City and DOE, titled *Kane v. de Blasio et al*, in the Southern District of New York on or about September 21, 2021, arguing, among other things, that the DOE's religious accommodation policies were unconstitutional.

300.    This verified complaint, which was served on the DOE and the City, notified both Defendants that the Stricken Standards were discriminatory and violated the rights of <u>all</u> DOE employees seeking religious accommodation.

301.    Both Defendants acknowledged receipt of the notice by entering the *Kane v. de Blasio* case.

302.    The Complaint was timely served on the Department of Education and the City of New York.

303.    Neither Defendant adjusted the class wide claims.

304.    In November 2021, the Second Circuit Court of Appeals held, first in a motion panel and then a merits panel, that the DOE's religious accommodation policies were unconstitutional, and the plaintiffs were likely to succeed on the merits of their claim and deserved injunctive relief.

305.    As the Second Circuit pointed out, the religious exemption criteria in the Stricken Standards are blatantly unlawful.

306.    First, the Court held that DOE's policies were not neutral, pointing out that it violates the most basic governing standards of state and federal law to discriminate against those with personally held religious beliefs, or deny accommodation based on someone else's religious beliefs, even the leader of one's own faith.

307.    They particularly chastised the Defendants for denying Catholics because the Pope was vaccinated.

308.    Second, the Court held that the policies were not generally applicable, as Defendants had discretion whether to grant accommodation.

309.    The Court rejected Defendants attempts to pin the illegality on the arbitrators or to argue that Plaintiffs had to sue the union, not the DOE and the City.

310.    Nothing in the arbitration award, or in the governing collective bargaining agreement waived Plaintiffs' rights to challenge the religious discrimination inflicted by DOE or the City in Court.

311.    Both Defendants knew or should have known, that the Stricken Standards are blatantly unconstitutional, and that the Government cannot make or enforce unconstitutional policies, nor can it encourage, aid or abet discrimination.

312.    Notwithstanding the obvious illegality of the Stricken Standards, the DOE adopted and enforced the policy to decide religious accommodation requests to the Mandate and the City participated in and was complicit in these discriminatory denials.

313.    In *Kane*, in the proceedings before the Second Circuit, Defendants' attorneys admitted that the religious accommodation policies adopted by DOE were likely unconstitutional.

314.    The City asked the Court to let them try to mitigate the harm by providing a "fresh review" by a newly created "Citywide Panel", spearheaded by Defendants' attorneys, particularly, Mr. Eichenholtz.

315.    The City promised that any employee whose religious beliefs qualified under lawful standards would be reinstated with back pay.

316.    The DOE agreed to this plan.

317.    In November 2021, first a motion panel and then a merits panel of the Second Circuit Court of Appeals issued an order requiring the City to give fresh consideration through a new "Citywide Panel" and reinstate those who qualified with backpay.

318.    Though the orders did not apply to non-named plaintiffs in the *Kane* lawsuit, the orders acknowledged that the Court's decision to limit relief to named plaintiffs in the preliminary injunction order was impacted by the fact that the City promised to make the Citywide Panel review and reinstatement available more broadly on a voluntary basis.

319.    However, the Citywide Panel did not review the vast majority of applicants.

320.    According to later representations by Defendants counsel in related litigation, the Citywide Panel only reviewed about 500 of an estimated 5,000 to 7,000 applicants denied religious accommodation from the DOE Mandate.

321.    According to DOE, only employees who had been able to submit an appeal within 24 hours of their initial denial were reviewed by the Citywide Panel.

322.    But those who were deprived of an appeal suffered from the discriminatory and pretextual policies too, and had no recourse even after Defendants admitted that their original policies were unconstitutional.

***The Citywide Panel denials were also pretextual and showed ongoing animus***

323.   The Citywide Panel reviews did not comply with the statutory standards and created further equal protection problems.

324.   The reviews were not carried out in good faith.

325.   Out of an estimated five hundred reviewed, only one applicant's denial was reversed by the Citywide Panel.

326.   This reversal was done *subjudice* and was only granted so Defendants could argue to the Court that the Citywide Panel was a valid remedial measure to the initial acknowledged discrimination.

327.   The Citywide Panel did not engage in cooperative dialogue about possible accommodations.

328.   Between February 2022 and August 2022, the Citywide Panel sent out autogenerated emails from an email address called "noreply@salesforce.com" which stated that the denial was the final denial, and that employees had to get vaccinated within three days.

329.   The reasoning was generic, typically stating in generic language that DOE had demonstrated that it would be an undue hardship given the need for safe in-person learning and sometimes tacking on a statement indicating that the applicant had failed to establish that their religious beliefs preclude vaccination.

330.   Some employees never received a decision at all.

331.   Most employees were then terminated a few weeks or a few months later.

332.   The Citywide Panel reviews were also infected by the same animus that plagued the initial denials of accommodation.

333.   First, the Citywide Panel imposed a different undue hardship standard on those given fresh review than had been imposed on those accepted under the discriminatory policy.

42

334.    Specifically, the Citywide Panel applied a complete blanket undue hardship ban on accommodation for all teachers and most administrators, even those with sincere religious beliefs, claiming that DOE "had demonstrated" it would be an undue hardship to accommodate anyone who worked in a building with children.

335.    By contrast, under the Stricken Standards, if an employee's religion met the discriminatory definition for determining they had a qualifying religious belief, they had to be accommodated without regard to undue hardship.

336.    Under the discriminatory Stricken Standards policy, at least 163 employees were therefore accommodated, some of them classroom teachers.

337.    Plaintiffs were denied that same accommodation because their religious beliefs were not favored, not because they would somehow be harder to accommodate than the 163 who were granted accommodation under the discriminatory policy.

338.    In sum, the Citywide Panel's more rigorous blanket undue hardship bar for those who qualified under "lawful" standards versus those that qualified under the openly discriminatory standards, constituted a fresh incident of discrimination (since it was not applied to those who were impermissibly favored under the old policy).

339.    Second, the Citywide Panel's blanket undue hardship determinations violated statutory factors.

340.    In related litigation, the City offered Mr. Eichenholtz, who created and was in charge of supervising the Citywide Panel, to be deposed for the purpose of addressing the Citywide Panel's policies.

341.    Mr. Eichenholtz was the "architect" of the Citywide Panel and oversaw it and had veto power over determinations.

342.    He admitted in his sworn deposition that neither the City nor the DOE analyzed any of the statutory factors before denying applicants.

343.    He further admitted that neither the City nor the DOE ever assessed any objective evidence to determine that employees could not safely be accommodated before issuing the undue hardship denials.

344.    He further admitted that the Citywide Panel did not know or assess whether the vaccine could stop transmission of disease or whether unvaccinated employees were more dangerous than vaccinated ones.

345.    Mr. Eichenholtz further admitted under penalty of perjury that DOE never provided information to the Citywide Panel "as to the number of employees it could afford to employ without causing undue hardship."

346.    He also swore that the "inability to pay employees" who were not able to work in person "has not come up" nor had DOE submitted any information about increased costs that could present an undue hardship if employees were accommodated.

347.    Mr. Eichenholtz said the Citywide Panel did not ask the DOE to explain whether the remote worksites it set up were at capacity (they were not).

348.    He also said that he was not aware of any direct threat analysis conducted for any employee.

349.    Mr. Eichenholtz could not recall any panel member assessing whether Covid-19 vaccination could limit the spread of Covid-19.

350.    He finally conceded that the Panel had not imposed "no evidentiary requirement" from any agency on the undue hardship issue. When pressed, Mr. Eichenholtz stated that he did not think analysis of any statutory factors was necessary for an appellate body like the Citywide

Panel, and he had made sure there was no requirement that the DOE or any other agency "provide that kind of data."

351. Bizarrely, Mr. Eichenholtz admitted that neither he nor the panel ever relied on any evidence or data to conclude that unvaccinated employees might pose a substantial risk of significant harm if allowed to work in person unvaccinated.

352. He confirmed that the Citywide Panel did not assess the duration of any risk or any of the other statutory factors on direct threat either.

353. From this testimony alone, it is patently clear that the Citywide Panel, like the DOE before it, failed to meet its burden of proof on undue hardship.

354. Outrageously, throughout the winter of 2021-2022, when the Citywide Panel was making its undue hardship decisions, the DOE was sending *actively infected and infectious* vaccinated teachers with Covid-19 back into the classrooms.

355. Meanwhile, thousands of uninfected teachers with natural immunity, including Plaintiffs, were kept on leave without pay, and even terminated after the Panel decided it would be an "undue hardship" to allow them to be unvaccinated around the students.

356. <u>Third</u>, the Citywide Panel applied the wrong legal standard to determine undue hardship.

357. In his deposition and in many sworn pleadings, Mr. Eichenholtz repeatedly admitted under oath that the City and DOE used the same unlawful "*de minimis*" standard for undue hardship rather than the significant or substantial standard required by the three controlling statutes even though they had been repeatedly put on notice that the statutes required more.

358. Using the unlawful *de minimis* standard, the City and DOE made blanket assumptions that any accommodation would be "more than a minimal burden" and justified

denial of all classroom teachers on that basis.

359.    Citywide Panel members under Mr. Eichenholtz' direction routinely went even further, and continued to recommend that even applicants who already worked remotely should be denied based on unsupported "undue hardship" assumptions.

360.    Fourth, the Citywide Panel failed to engage in cooperative dialogue with any applicant about possible accommodations and challenges thereto before denying their applications.

361.    This leads to an inference that the undue hardship determinations were pretextual and discriminatory, especially because some of those denied under these blanket bans already worked remotely or in buildings without students.

362.    Fifth, nothing in the Mandate specified that DOE employees could not be given religious accommodation that would allow them to work in person.

363.    On the contrary, the Mandate specified that nothing in it prevented reasonable accommodation as required by law.

364.    Pursuant to statute, employers must grant religious accommodation unless they can show that there is a safety concern.

365.    Defendants' own decisions show that safety concerns were pretextual.

366.    For example, shortly after all unvaccinated employees were excluded, thousands of fully vaccinated DOE employees were infected with Covid-19.

367.    In or around January 2022, before the Citywide Panel undue hardship denials were issued, DOE adopted an open policy of encouraging and cajoling *actively infected* teachers to come back to the classroom within five days of onset of infection due to staffing shortages.

368.    It was well-understood at the time that Covid-19 was still transmissible five days

after onset in most cases.

369.    But, while DOE allowed actively infected teachers to teach children in person, they excluded Plaintiffs and their religiously opposed colleagues, who were not infected and were willing to test and take other precautions to protect themselves and the students.

370.    Moreover, DOE did not enforce the Mandate equally.

371.    For example, DOE allowed thousands of employees to remain only partially vaccinated in violation of the Mandate.

372.    DOE did this even though the Mandate required that employees get their second dose within 45 days and even though it was well-understood that one dose provided no protection against transmission or even personal progression of disease.

373.    Yet, these teachers were allowed to keep teaching in person unvaccinated in violation of the Mandate.

374.    The City was aware of this fact and did nothing to require compliance.

375.    But the City and DOE were totally inflexible when it came to religious accommodation, refusing to even consider reasonable accommodation as required by the Mandate itself.

376.    Sixth, the Citywide Panel failed to assess individual circumstances, claiming it would be an undue hardship to accommodate employees even when those employees already had remote non-student facing jobs.

377.    Seventh, by the time the Citywide Panel began issuing undue hardship denials, the vast majority of its vaccinated workforce had gotten Covid-19.

378.    When the undue hardship denials were issued, there was no good faith basis to assert that unvaccinated employees posed a direct threat due to their religious practices.

379.    The objective scientific consensus overwhelmingly showed that vaccination could not stop transmission of Covid-19.

***The City continued to discriminate***

380.    The Citywide Panel also continued to apply discriminatory criteria to determine whether an applicant had, so called, qualifying religious beliefs.

381.    First, the Citywide Panel continued to apply a blanket ban on anyone whose religious belief included objection to the connection between the vaccines and abortion.

382.    All three of the available Covid-19 vaccines at the time used aborted fetal cell lines in production or development of the product.

383.    Emails exchanged between a Panelist and Mr. Eichenholtz provide evidence that Mr. Eichenholtz instructed the panel that such beliefs do not merit religious protection and should be rejected as invalid.

384.    Mr. Eichenholtz's own sworn testimony and statements show that he and the Citywide Panel improperly denied accommodation to applicants with religious objections to the use of aborted fetal cell lines, on the arrogant assumption that they are "wrong."

385.    When deposed, Mr. Eichenholtz admitted that he did not know whether aborted fetal cell lines were used in the development and production of the Covid-19 vaccines and had not researched this issue.

386.    But shortly before this testimony, he wrote to various applicants to the Citywide Panel who had this concern and told them, flat out, that they were wrong, and there was no connection.

387.    Mr. Eichenholtz has also filed numerous sworn pleadings in related cases which admit that the Citywide Panel substitutes judgment about whether abortion related concerns are

"religious in nature" and deny sincere applicants who assert this religious concern.

388.   Multiple Plaintiffs with this religious objection received a notation in the spreadsheet kept by the Citywide Panel indicating that their beliefs do not actually preclude vaccination.

389.   The City has later explained that regardless of what the applicant sincerely believes, the City routinely substituted judgment to decide whether the applicant was wrong about their beliefs and whether the applicants' religious beliefs truly prohibit vaccination even if the applicant believes that they do.

390.   The Citywide Panel also continued to deny beliefs grounded in prayer or consultation with the moral conscience, on the mistaken theory that such beliefs are somehow personal and not "religious."

391.   Beliefs derived from prayer and conscience are religious in nature and are protected as such.

392.   As one of many examples, it is a foundational catechism of Catholicism that the Holy Spirit, and ultimately God, speaks to us and reveals truth through the conscience.

393.   Many Catholics believe they are required to consult their conscience and follow the guidance of the Holy Spirit when it is provided, regardless of what any other person may believe.

394.   Many other religious people have similar beliefs.

395.   But the Citywide Panel routinely decided that such beliefs are not religious because they allegedly allow a person to pick and choose what they believe they should do.

396.   This is ignorant, as many religious people would say that instructions from God or the Holy Spirit *do not* allow a person to pick and choose what they want to do, since religious

people believe they are required to follow such guidance even over black letter law handed down by man.

397.    But in any event, the rejection of these beliefs is also discriminatory.

398.    In a nutshell, the Citywide Panel continued the same discrimination against unorthodox faiths that had been codified in the Stricken Standards, that is, requiring that a person's religious objection come from dogma or instruction from church leaders, rather than from guidance from God or other personally held sources of religious belief.

399.    The Citywide Panel also entangled itself to an unconstitutional degree with religious questions, denying applicants because their beliefs were allegedly not logical or articulated in a sufficiently coherent manner.

400.    The Citywide Panel also denied employees if they'd taken other vaccines, even if the employee explained that they took the previous vaccine before they converted to their current beliefs system, or that their religious objection did not apply to that vaccine (for example, if the other vaccine did not use aborted fetal cell lines in production or development).

401.    The Citywide Panel also refused to credit applicants' own interpretation of their faiths, instead adopting a policy that the City was tasked with the job of determining what their faith required of them.

402.    These are just some of the discriminatory policies applied by the City to uphold all but one of the original denials.

403.    Ultimately, the fact that the Citywide Panel arrived at nearly the same result as the original admittedly discriminatory process leads to an inference that the City's reasons were pretextual.

404.    The goal of the Citywide Panel was to try to get out of liability for the

acknowledged original discrimination by upholding nearly all the original discriminatory denials, rather than review them in good faith to remediate the discrimination, as promised.

405.    The history of Defendants' religious accommodation policies also supports the inference that the Citywide Panel's denials were pretextual.

406.    Before the Mandate was implemented, Defendants' religious accommodation policy was to assume that an applicant had sincerely held religious beliefs and focus on whether a request would present an undue hardship.

407.    Denials based on sincerity or adequacy of religious beliefs were rare before the Mandate, both at DOE and at other City agencies.

408.    After the Mandate was implemented, Defendants changed the policy and attempted to circumvent accommodation requirements by issuing blanket undue hardship denials, without individualized analysis, and then categorically excluding whole categories of religious belief as invalid.

409.    Even if there had been a legitimate interest in limiting the number of exemptions given, the government cannot lawfully winnow the number down by discriminating against certain faiths or beliefs it disfavors.

410.    But this is precisely what the City and DOE did, both in the original denials and in the Citywide Panel appeals.

***Defendants extended the Mandates – and the unlawful Stricken Standards***

411.    Continued animus can also be evidenced through the City's failure to rescind or repudiate the original Stricken Standards.

412.    After imposing the DOE Mandate, the City issued hundreds of additional "emergency" executive orders, extending the vaccine mandates to nearly every employee in New

York City.

413.    Tellingly, even after the City's own attorneys admitted in the *Kane* case that the Stricken Standards policy was likely unconstitutional (and the Second Circuit confirmed they were definitely unconstitutional), the City failed to repudiate them.

414.    Instead, the City *extended the use of the Stricken Standards to more agencies* – striking deals and encouraging nearly every City agency to offer the Stricken Standards as one of two options for employees to apply for accommodation.

415.    The City's failure to repudiate the Stricken Standards is yet more evidence of animus, which infects both the mandates and the religious accommodation determinations thereunder.

416.    This issue was not before the Second Circuit in November 2021, when the Court of Appeals first considered whether the Mandate was itself neutral and generally applicable on interlocutory appeal.

417.    Nonetheless, the Second Circuit still ruled that the religious accommodation policies were not neutral or generally applicable.

418.    Perhaps the most telling sign of continued animus occurred in the context of unemployment insurance proceedings.

419.    Months after the Second Circuit chastised Defendants for denying applicants because the Pope was vaccinated and made it very clear that such criteria were blatantly unconstitutional, the DOE continued to argue in appeal after appeal, that former employees denied religious accommodation must be denied benefits too, because the Pope was vaccinated and therefore their religious beliefs did not merit protection.

***The Mandates were not generally applicable***

420.    As more executive orders were issued, it also became apparent that the Mayor exercised unfettered discretion to make carve-outs, exceptions, or new requirements for secular reasons, or for any reason at all.

421.    For example, Mayor Adams issued Emergency Executive Order 62 ("EEO 62") on March 24, 2022, making a carve-out for athletes, entertainers, and their make-up artists and entourages.

422.    On its face, EEO 62 states that the exception was made due to economic reasons, and other reasons not related to stopping the spread of Covid-19.

423.    Some of Mayor Adams' top donors had lobbied for this carve-out.

424.    Mayor Adams announced the controversial carveout at Citi field, the home of the New York Mets.

425.    New York Mets owner Steve Cohen had donated at least 1.5 million dollars to a political action committee supporting Mayor Adams just months before.

426.    Other top donors to the Mayor in the entertainment industry also benefited from the carve-outs.

427.    Due to the carve outs, stars like Kyrie Irving and various entertainers and their make-up artists and entourages could return to work unvaccinated, working in person in enclosed spaces in close proximity to fans and colleagues, but the janitors and minimum wage workers at the fields or theaters, along with most other hard-working people in New York City, were being denied religious accommodation and losing their jobs if they could not take the vaccine.

428.    Significant outcry accompanied the carve outs.

429.    Harry Nespoli, chair of the Municipal Labor Committee ("MLC") said "There can't be one system for the elite and another for the elite and another for the essential workers of

53

our city."

430. Not surprisingly, this favoritism also worried Jay Varma, a physician, epidemiologist, and senior advisor to Mayor Bill de Blasio for public health and COVID-19, who publicly expressed the concern that the new carve-outs would open the City to "legal action" on the basis that its remaining mandates were "arbitrary and capricious."

431. The City was well-aware by March 2022 that there was no public health necessity for the Mandates.

432. The majority of its fully vaccinated staff had by that time caught Covid-19 despite the Mandate.

433. During the 2021-2022 school year, approximately sixty thousand fully vaccinated DOE employees caught Covid-19 *after the mandate was imposed* to exclude unvaccinated staff.

434. Many more had already had Covid-19 before the mandate was imposed.

435. But the City refused to drop the rest of the mandates or accommodate employees who could not be vaccinated due to their religious beliefs in good faith.

436. On August 11, 2022, after over a year of verbal acknowledgments that the vaccine could not stop transmission, the CDC officially revised its guidance to stress that it was not appropriate to differentiated between vaccinated and unvaccinated due to the overwhelming scientific consensus that Covid-19 vaccines cannot stop infection and transmission.

437. Instead of accommodating or reinstating employees who'd been denied religious accommodation, DOE sent out a letter later that August 2022, making a fresh offer to DOE employees who'd been terminated or were on leave due to their vaccine status that they could come back and be reinstated to their old positions – but only if they got vaccinated by September 2022.

438.   Many Plaintiffs asked for religious accommodation, but they were all denied.

439.   Some were able to submit applications through SOLAS, but they received the same vague "undue hardship" denial they'd received before or no response at all.

440.   Others sent in email requests, or mailings asking that they be able to be reinstated as offered but accommodated so that they did not have to violate their religious beliefs.

441.   They were ignored and denied reinstatement.

442.   Defendants also knew, when it sent the letter to each of those employees who'd been previously denied religious accommodation, that the applicants required religious accommodation.

443.   They were obligated, therefore, to offer them an accommodation unless they could prove undue hardship.

444.   There was absolutely no good faith basis to even argue undue hardship at that point, leave aside prove it.

445.   In September 2022, religious employees denied accommodation who were still on leave were all terminated for failing to violate their faith and get vaccinated.

446.   On September 20, 2022, Mayor Adams announced in a press conference that he would repeal the private sector vaccine mandates, and the mandate for students and parents participating in after-school activities but would keep in place the public sector mandates and the DOE mandate for employees.

447.   When asked how he could justify keeping the public sector mandates, the Mayor admitted that there was no reason, stating: "I don't think anything dealing with COVID is [sic] makes sense and there's no logical pathway of one can do [sic]."

448.   Without any logical explanation why, the City kept the DOE Mandate in place

until February 2023, when plaintiffs in related litigation were scheduled to argue their appeals over the unlawful DOE policies before the Second Circuit.

449.    On the eve of those arguments, the City announced it would finally repeal the rest of the mandates, and argued to the Court that this should moot the lawsuits.

450.    But despite the repeal, DOE refuses to hire back most of the fired unvaccinated workers to this day.

*Retaliation*

451.    Not only did Defendants fail to accommodate employees' sincerely held religious beliefs, they also harassed and retaliated against employees with religious objections to the vaccine.

452.    As a threshold matter, there was no basis to impose some of the draconian requirements that DOE imposed on employees denied religious accommodation due to alleged "undue hardship."

453.    For example, employees were coerced to sign a waiver of their right to challenge the determination or face termination "for cause" and lose their good standing, paid time off credits (which belonged to them by law and contract) and health insurance while they waited on leave without pay.

454.    These benefits belonged to the Plaintiffs pursuant to the relevant contracts.

455.    Moreover, finding employees guilty of misconduct for failing to violate their religious beliefs was retaliatory.

456.    Nothing in the Contract requires vaccination as a condition of employment.

457.    Vaccination was not a condition of plaintiffs' employment when they entered into their contracts with the DOE.

458.    Pursuant to the contract, tenured teachers cannot face any of these consequences, including loss of salary, without a 3020a hearing, which was not provided.

459.    Moreover, the Education Law prohibits imposition of a waiver for any DOE employee under such conditions.

460.    Defendants also could easily have at least allowed Plaintiffs with sincere religious beliefs to work elsewhere while they were kept on leave without pay, or to return to their former positions once the mandate was lifted.

461.    Instead, they imposed a condition that they could not work anywhere while suspended from DOE.

462.    Then, DOE attached problem codes to the employee files of those who were separated for failing to get vaccinated.

463.    The problem codes were associated with Plaintiffs' finger-print records, which are shared with the Federal Bureau of Investigation.

464.    These problem codes were also visible to vendors and potential employers outside of the DOE system.

465.    The problem codes continue to this day to prevent many Plaintiffs from getting a job at DOE or elsewhere.

466.    Even after the DOE repealed the vaccine mandate for DOE employees, DOE continues to use these problem codes and other methods to refuse to rehire the vast majority of Plaintiffs and their peers who were denied religious accommodation.

467.    For those that are offered employment, DOE continues to impose an arbitrary waiver requirement on some, but not all employees as a condition of return.

468.    DOE told UFT that *all* employees would need to sign a waiver of their right to sue

to come back, deterring many from trying.

469.   In practice DOE imposes this waiver requirement selectively, forcing some to sign as a condition of return but neglecting to even mention it for others.

470.   Second, DOE refuses to reinstate Plaintiffs or their peers, instead requiring that these mostly tenured teachers and educators apply as new hires.

471.   Third, DOE continues to use the problem code to thwart efforts for those denied religious accommodation to return even as a new hire.

472.   For example, there is a staffing crisis at DOE.

473.   Many Plaintiffs with spotless employment records report that they have interviews and are offered a job, but then this job offer is rescinded after problems with their "security clearance" are reported.

474.   Some employees have been told point blank that the security clearance issue is that they have a problem code attached to their file.

475.   Some have seen the problem code.

476.   These problem codes are typically imposed on employees who are not hirable due to heinous offenses, like child abuse.

477.   DOE has long been aware of this issue, as it has been repeatedly brought up in EEOC complaints and related litigation but refuses to address it.

478.   There is currently a Congressional Investigation into the problem code issue, and members of the United States Congress have demanded answers from the City and DOE.

479.   Neither Defendant has bothered to answer these inquiries even though they are required to do so.

480.   There have also been hearings by the City Council, and many employees from

DOE and the City have testified about the ongoing retaliation and discrimination they face.

481.    Fourth, DOE has attempted to block all efforts at receiving unemployment compensation.

482.    For example, when employees would apply, DOE would routinely object and state that they were fired for misconduct or were ineligible for a "good cause" determination because the Pope or others did not agree with the employee's religious choice.

483.    DOE routinely made these discriminatory arguments even after the Second Circuit chastised them for conditioning access to accommodation on the beliefs of a religious leader like the Pope.

## NAMED PLAINTIFFS' INDIVIDUAL FACTS

484.    Each Plaintiff sets forth additional facts below, which help demonstrate the widespread discriminatory policies and practices, and also support their as-applied individual claims.

**NATALYA HOGAN**

485.    In September 2021, Plaintiff NATALYA HOGAN ("Mrs. Hogan") was a tenured math teacher working in Queens with over eighteen years of service at DOE.

486.    Mrs. Hogan was a teacher in good standing, who had always worked diligently for the benefit of her students and colleagues at DOE.

487.    Mrs. Hogan grew up in the Soviet Union, where it was very common for religious people, like her family, to be persecuted.

488.    Nonetheless, she and her family remained devout Orthodox Christians, belonging to a three-hundred-year-old sect referred to as "Old Believers."

489.    Religion is sacred to her and her family and by necessity has always been private

and personal.

490.    Mrs. Hogan's history also has led her to develop a personal relationship with God.

491.    She routinely prays over medical decisions and has followed such guidance even when it appears to be against personal interest.

492.    For example, there was a time when Mrs. Hogan was told she needed a critical blood transfusion.

493.    But her guidance from prayer was to abstain, though it was against medical advice, and her husband was worried she might die.

494.    She abstained out of her faith in God, and she pulled through.

495.    Similarly, in this case, Mrs. Hogan prayed and found that God was guiding her not to take the Covid-19 vaccine. She will not violate this advice, even though it has cost her dearly.

496.    Mrs. Hogan is also unable to take a Covid-19 vaccine they were developed using aborted fetal cell lines, and she believes it would be a sin to participate in or benefit from this.

497.    The DOE informed Mrs. Hogan that she had to get vaccinated on or before September 27, 2021, or that she would be placed on leave without pay. Later, she received an email stating that the deadline had moved to October 4, 2021.

498.    Mrs. Hogan did not receive any instructions about how to seek religious accommodation, however.

499.    Mrs. Hogan was informed by her supervisor verbally that she needed religious accommodation from the Mandate, but her supervisor did not give her any direction about how to apply.

500.    Plaintiff searched the DOE website after receiving no direction from her

administration about how to apply. On the website, Plaintiff saw a button that directed her to the Self-Service Online Leave Application System ("SOLAS") to apply for religious or medical exemptions, so she submitted a request on or about September 23, 2021.

501.    The DOE acknowledged receipt of the request, and within 36 hours, sent her the same autogenerated "undue hardship" denial sent to all applicants, asserting vaguely that it would be an undue hardship to accommodate her.

502.    No one at the DOE individually reviewed her application before denying her.

503.    Mrs. Hogan could have been accommodated in person or remotely without posing a direct threat or causing undue hardship.

504.    No mention was made of any appeal process.

505.    On or about October 4, 2021, Mrs. Hogan was placed on involuntary leave without pay.

506.    Later, Mrs. Hogan heard from others that there was some kind of appeal offered to some applicants.

507.    Mrs. Hogan tried repeatedly to submit an appeal through SOLAS and through the regular mail when SOLAS would not accept documents from her.

508.    Mrs. Hogan hired an attorney to try to help her appeal.

509.    On multiple occasions, Mrs. Hogan attempted to submit more documentation and request review or cooperative dialogue through the system (which was the only option afforded), but she kept receiving an error message telling her that her application could not be uploaded because she was noncompliant with the Mandate.

510.    Desperate, Mrs. Hogan even mailed her application for religious accommodation to the DOE, through certified mail, but received no response.

511.    After the Second Circuit held that the original religious accommodation policies were unconstitutional, and the City agreed to re-review those denied and reinstate them if their beliefs qualified under lawful standards, Mrs. Hogan tried repeatedly to apply for the City's fresh consideration.

512.    She repeatedly got error messages from "error" messages from the SOLAS system stating that she was noncompliant with the vaccine mandate so was not able to submit documents.

513.    On or about November 30, 2021, Mrs. Hogan was finally able to submit another application, which was accepted by the SOLAS system.

514.    Though her application was deemed submitted on November 30, 2021, Mrs. Hogan never received any determination from the Citywide Panel.

515.    Instead, she waited patiently for almost a year, without any income, and in a state of severe anxiety.

516.    Other than the initial screenshot confirming receipt, neither DOE nor the Citywide Panel ever gave her any confirmation at all that they would even consider her application.

517.    In fact, they provided her with confusing and contradictory statements about the status of her application.

518.    Mrs. Hogan also mailed her application and request for review to the City and the DOE on multiple occasions as backup but did not receive confirmation that it was being reviewed by DOE or the Citywide Panel or when she would receive a determination.

519.    At no time did DOE or the Citywide Panel engage in cooperative dialogue with Mrs. Hogan.

520.    At no time did Mrs. Hogan sign any waiver of her right to sue over the religious discrimination she faced from DOE or the City.

521.    On January 31, 2022, Mrs. Hogan received a notice that she would be terminated on February 11th for failure to comply with the Mandate.

522.    But on February 4, 2022, Mrs. Hogan received a follow-up email stating that the notice of termination was in error, and to please disregard it.

523.    In August 2022, the DOE offered to reinstate employees denied religious accommodation if they were vaccinated by September 6, 2022.

524.    Though the DOE knew Mrs. Hogan required religious accommodation, they did not offer Mrs. Hogan any accommodation.

525.    On or about September 6, 2022, Mrs. Hogan lost access to her DOE email account. The message she received when she tried to login to SOLAS stated that DOE would be "making access to all DOE employees" available again soon.

526.    On or about September 6, 2022, Mrs. Hogan confirmed that she still had health insurance.

527.    However, on or about September 8, 2022, Mrs. Hogan noticed that she might not have insurance anymore after speaking with another insurance representative.

528.    The same day, Mrs. Hogan requested her work history and status, and DOE sent her a work history document stating that she was still on leave without pay as of the date of the notice, September 8, 2022.

529.    On or about February 6, 2023, Mrs. Hogan requested another work history. This new work history form said she had "been voluntarily resigned" and backdated the termination to September 6, 2022. The February 6, 2023 notice was inconsistent with the work history that she'd received on September 8, 2022, showing that she was still on leave without pay on September 8, 2022, not "voluntarily resigned."

530.    The February 2023 notice was the first official notice Mrs. Hogan ever got that she was, in fact, separated from employment.

531.    After the Mandate ended about a week later, DOE refused to reinstate Mrs. Hogan, even though there is a staffing crisis and Mrs. Hogan is well-qualified.

532.    In March 2023, Mrs. Hogan timely filed a notice of claim within ninety days of receiving notice of her termination.

533.    DOE failed to adjust her claim.

534.    Mrs. Hogan had also served the DOE with a similar verified notice, as an addendum to her EEOC complaint filed in May 2022, after it became apparent that the Citywide Panel was likely not going to give her a determination.

535.    This notice listed statutory and constitutional claims, which were never adjusted.

536.    Mrs. Hogan's submissions and the Defendants' submissions to the EEOC provided notice that the issues described were class wide, not limited to a single employee.

537.    On August 29, 2023, Mrs. Hogan received a right to sue letter from the EEOC.

538.    On November 27, 2023, Mrs. Hogan filed a verified complaint against the Defendants in Federal Court of Eastern District New York.

539.    Mrs. Hogan suffered severe financial, emotional, psychological and spiritual harm because of Defendants' discriminatory actions and policies for which she deserves compensation.

**CARLOS CONTRERAS**

540.    In September 2021, Plaintiff CARLOS CONTRERAS ("Mr. Contreras") was a Substance Abuse Prevention Intervention Specialist (SAPIS) working in the Bronx with forty-one years of service at DOE.

541.    Mr. Contreras had a spotless record of service and always went above and beyond

for the students and the DOE.

542.    As a SAPIS Supervisor, his job included training other SAPIS counselors, and doing presentations, group counseling and individual counseling, all of which could have been done remotely and most of which were already being handled remotely in 2021.

543.    Mr. Contreras is a devout Christian and has sincerely held religious objections to the Covid-19 vaccine.

544.    Among other religious reasons, including concerns about the use of aborted fetal cell lines, Mr. Contreras cannot take a Covid-19 vaccine because he believes God directly guided him not to, and so he cannot, despite the devastating consequences that have been inflicted on him for refusing to violate his faith.

545.    Mr. Contreras submitted his first formal request for religious accommodation on September 19, 2021, through the SOLAS portal.

546.    He submitted a heartfelt and personal letter and a clergy letter and submitted twice to ensure it went through.

547.    He received a message both times that his application was "pending."

548.    DOE never engaged in cooperative dialogue with him.

549.    Nor did DOE ever respond to his request for accommodation.

550.    Mr. Contreras also told his supervisor, and multiple other people at the DOE, that he needed religious accommodation.

551.    Everyone in his department, including his supervisors, knew he had applied for religious accommodation.

552.    He also formally alerted his director, Susan Viero, who he had a good relationship with up until that point.

553.   Ms. Viero appeared to get angry at him and made comments that sounded like suggested he was abandoning his job, even though he was simply asking for religious accommodation in accordance with his legal rights.

554.   Despite the multiple channels of notification, no one from DOE engaged in cooperative dialogue, or issued any determination regarding his request for accommodation.

555.   Mr. Contreras could have easily been accommodated in person or remotely.

556.   Most of his job already was remote already, and the rest easily could have been.

557.   Mr. Contreras did not pose a direct threat based on his vaccine status.

558.   No one questioned that Mr. Contreras had sincerely held religious objections to the vaccine.

559.   He has a long history of dedication to his Church and to following the will of God.

560.   Without receiving any determination on his accommodation request, Mr. Contreras was placed on involuntary leave without pay on or about October 4, 2021.

561.   The DOE then asked him to pay them back for alleged "overpayment" on his last check in the fall of 2021.

562.   Soon after, he lost all access to his DOE SOLAS account and was locked out from that point on.

563.   After the Second Circuit held that the original religious accommodation policies were unconstitutional, and the City agreed to re-review those denied and reinstate them if their beliefs qualified under lawful standards, Mr. Contreras wrote to the DOE and the City and asked for fresh consideration of his application.

564.   He did not receive any response.

565.   Mr. Contreras was never informed that he was fired by DOE, but he believes he

was, because in or around February he received a COBRA letter from his health insurance, offering that he could pay for insurance since he had been terminated.

566.     The COBRA letter issued in 2022 listed his termination date as early 2021, during a period when Mr. Contreras was most definitely employed.

567.     In or about August 2022, Mr. Contreras was notified by his supervisor that he could be reinstated, but only if he went and got vaccinated.

568.     He explained that he could not do so without violating his religious beliefs.

569.     Still, the DOE refused to accommodate him.

570.     On or about September 7, 2022, Mr. Contreras emailed decision-makers at DOE to ask for accommodation again, pointing out that there was no undue hardship, especially since there was no good faith basis to argue that the vaccines might stop transmission, and that he was entitled to religious accommodation.

571.     Still, the DOE refused to accommodate him.

572.     Mr. Contreras suffered severe financial, emotional, psychological and spiritual harm because of Defendants' discriminatory actions and policies.

573.     Mr. Contreras contacted his union and asked if he needed to submit his application again, since he had not received an answer.

574.     The union representative told him that DOE confirmed they received his application, and it was pending, so he could not resubmit, but had to wait for a determination.

575.     No determination ever came.

576.     Shortly thereafter, Mr. Contreras lost access to his DOE accounts and could not log on to SOLAS.

577.     After the Second Circuit held that the DOE's religious accommodation policies

were unconstitutional and the City agreed to remediate the problem by re-reviewing the applications and reinstating plaintiffs with back-pay if their beliefs qualified under lawful standards, Mr. Contreras asked the DOE and the Citywide Panel to re-review his application in accordance with the Court's order.

578.    He received no response.

579.    In or around February 2022, Mr. Contreras received a letter from COBRA notifying him that he was eligible to buy insurance, since he had been terminated.

580.    No one at DOE ever told him that he was terminated.

581.    The insurance company letter also stated the wrong date – alleging he'd been terminated over a year before he was placed on leave without pay.

582.    DOE also misreported his tax withholdings to the IRS for the previous year, which caused Mr. Contreras to suffer harm with the IRS.

583.    In or around August 2022, Mr. Contreras' supervisor told him that he could be reinstated if he got vaccinated.

584.    Mr. Contreras explained that he could not violate his religious beliefs.

585.    On or about August 22, 2022, Mr. Contreras received a letter stating that he'd been terminated earlier that year, but the DOE could now offer that he could be reinstated if he got vaccinated on or before September 6, 2022, and was fully vaccinated by October 21, 2022. The letter stated that "former employees who provide such proof will be re-hired within two weeks of providing proof of full vaccination, but no earlier than September 20, 2022."

586.    On or about September 6, 2022, he followed up by emailing decision makers at the DOE and alerting them that he needed a religious accommodation from the new offer of reinstatement, reiterating his religious objections and asking for accommodation from the vaccine

condition in the new reinstatement offer.

587.    Mr. Contreras received no response.

588.    On September 7, 2022, Mr. Contreras wrote to the DOE again, noting that it was discriminatory and unlawful that they were not giving him religious accommodation, and that his family depended on his income to survive.

589.    He received no response.

590.    On or about September 20, 2022, he wrote to the DOE again, asking: "Please advise how the announcement that the pandemic is over by Biden and release of the unconstitutional mandates by Mayor Adams will affect my employment status."

591.    He received no response.

592.    On September 22, 2022, he filed a charge with the EEOC claiming religious discrimination and failure to accommodate.

593.    The DOE responded with a position statement, confirming that the discrimination and failure to accommodate claims were widespread and impacted thousands of employees.

594.    It stated that thousands of employees had applied for accommodation from the vaccine mandate and acknowledged that they had accommodated some employees, but that extending the same accommodation to Mr. Contreras and the thousands of other applicants who were not accommodated under the original (facially discriminatory) policy would constitute an undue hardship.

595.    The position statement explained: "DOE's experience [accommodating those whose beliefs met the discriminatory criteria] has only confirmed that creating such alternative assignments poses an undue hardship" arguing that creating alternative assignments or figuring out how to get in person tasks accomplished through other employees "is arguably unreasonable

in a single case, much less multiplied across the entire school system."

596.    The position statement also admitted, albeit cagily, that the Second Circuit had already held that the original religious accommodation process offered to Mr. Contreras and other DOE employees was unconstitutional.

597.    In the generic position statement, the DOE also admitted that some employees probably could be accommodated. They provided no individualized analysis of why Mr. Contreras was not one of them.

598.    On or about April 26, 2024, the EEOC issued a notice of determination from the EEOC, stating that it made no determination about whether the claims have merit or not but that he had a right to sue within ninety days of receipt of the letter.

599.    This lawsuit is timely filed within that time period.

600.    While the EEOC charges had been pending, back in February 2023, after the Mandate was lifted, Mr. Contreras attempted to get rehired by the DOE.

601.    When he asked his former supervisor, Ms. Viero, whether he could be reinstated, she said that he would have to sign a waiver of his right to sue if he wanted his job back. Ms. Viero was retiring so told him to follow up with her replacement. She encouraged Mr. Contreras to sign the waiver, even though he said he had religious discrimination charges pending with the EEOC, telling him that the pay had increased significantly.

602.    Mr. Contreras followed up with Ms. Viero's replacement but was told he would not be reinstated to his former position even though the Mandate had been lifted, and even though he had so successfully served the DOE in this job for over 41 years.

603.    Mr. Contreras suffered severe financial, emotional, psychological and spiritual harm because of Defendants' discriminatory actions and policies for which he deserves

compensation.

**RICARDO ALEXANDER**

604.    In September 2021, Plaintiff RICARDO ALEXANDER ("Mr. Alexander") was a tenured high school math teacher working in Brooklyn with twenty-one years of service at DOE.

605.    He sometimes also taught physics.

606.    Mr. Alexander was in good standing, well-respected by his peers and supervisors, and beloved by his students.

607.    Due to his sincerely held religious beliefs, Mr. Alexander cannot take any vaccines.

608.    On or about September 20, 2021, he attempted to submit his religious accommodation request through the SOLAS portal, including a letter that he wrote to the DOE, and two previous letters he had submitted to different academic institutions requesting religious accommodation from various vaccine requirements through the years, which were granted.

609.    Mr. Alexander is a deeply spiritual man who follows a personal path to religious salvation.

610.    Due to his sincerely held religious beliefs, in addition to other strict practices, he refrains from taking any vaccines.

611.    As the letter explained, this is a long-standing religious practice. He has received religious accommodation from vaccine requirements at multiple institutions, including, inter alia, Kingsborough Community College, CUNY City College, CUNY Brooklyn College, Columbia University and Adelphi University.

612.    Mr. Alexander had been very conflicted about whether to apply under the Stricken Standards.

613.    The criteria excluded him and others with personally held or unorthodox religious

beliefs on its face.

614.    The Mayor's comments also shocked and disturbed Mr. Alexander, as the Mayor had explained to the press, in no uncertain terms, that people like Mr. Alexander, and really anyone who was not a Christian Scientist or Jehovah's Witness, would not be accommodated.

615.    The UFT President also clarified that the Mayor and the DOE had told him that only Christian Scientists and Jehovah's Witnesses would be accepted when explaining who would qualify.

616.    Mr. Alexander joined others to fundraise and organize *Kane v. de Blasio*, the proposed class action lawsuit that went to the Second Circuit in the fall of 2021.

617.    He donated money to the lawsuit and was an active member of the proposed class.

618.    Though he knew it was futile, he finally decided that he would submit his request through SOLAS in any event.

619.    Mr. Alexander got his letter notarized and tried to upload his application through the SOLAS portal on September 20, 2021, which was the deadline for UFT employees, but the system kept crashing and he was unable to upload his request.

620.    He tried for hours, until finally, he was able to get the system to receive it a few minutes after midnight.

621.    Soon after, he received an autogenerated email, confirming receipt of his request.

622.    Then on September 25, 2021, he received another autogenerated email denying his request, and alleging "undue hardship" on the vague "more than a minimal burden" standard.

623.    No one individually reviewed his application before denying it.

624.    Mr. Alexander was given no option to appeal.

625.    He tried multiple times to login and get help but to no avail.

626. After some time, Michael Sill, from the UFT, determined that it was possible that he was not able to appeal because his application did not hit the system until after midnight.

627. Mr. Alexander was a chapter leader representative for the union.

628. Many employees who had also had trouble with the SOLAS system crashing and refusing to upload documents on September 20, 2021, contacted him.

629. Some, like him, were eventually able to upload documents, albeit after midnight.

630. Others were unable to get documents uploaded at all.

631. Mr. Sill confirmed that he was aware of issues with SOLAS. At first, he thought that the DOE was working on it and that those employees who had had trouble would be given an appeal option.

632. But later, he confirmed that DOE was not providing any appeal option to those who had had trouble with the SOLAS system.

633. Mr. Alexander believes that about sixteen people applied for religious accommodation from his Chapter.

634. But after being worn down by bad faith, refusals to accommodate and no appeal process, only one that he knows of remained unvaccinated.

635. Mr. Alexander was involuntarily placed on leave without pay on or about October 4, 2021.

636. In November or December, just after the Second Circuit held, in *Kane*, that the DOE's original accommodation policies were unconstitutional and ordered the City to provide fresh consideration to those denied thereunder, Mr. Alexander wrote to the DOE and the City asking to receive a review of his application by the Citywide Panel.

637. Defendants each refused to consider his application.

638.    He was told by the UFT representatives that the reason was that Defendants had decided not to give fresh consideration to anyone who had not originally been given an appeal by an arbitrator.

639.    Mr. Alexander was terminated on or about February 11, 2022, for failing to violate his sincerely held religious beliefs.

640.    He could have been accommodated in person without undue hardship.

641.    He also could have been accommodated remotely without undue hardship.

642.    A few days before the announcement that the Mandate would be repealed, Mr. Alexander was contacted by one of the assistant principals at his school who was close to Mayor Adams.

643.    The assistant principal told him that Mr. Alexander had been an exemplary employee and that he could help him get reinstated even though he was unvaccinated and the Mandate was still in effect. There was an inference that he could do this because of his relationship with the Mayor.

644.    Mr. Alexander said that he was in this with all his colleagues. As desperate as he was for work, it did not seem fair to give him a special (and apparently secret) exception while maintaining that the Mandate applied to everyone else.

645.    Mr. Alexander continues to seek relief for himself and all those who were harmed by Defendant's unlawful policies.

646.    After the Mandate ended, DOE refused to reinstate Mr. Alexander or most of his colleagues, even though there is a staffing crisis and Mr. Alexander is well-qualified.

647.    Mr. Alexander suffered severe financial, emotional, psychological and spiritual harm because of Defendants' discriminatory actions and policies for which he deserves

compensation.

**RENEE BUTLER**

648.    In September 2021, Plaintiff RENEE BUTLER ("Ms. Butler") was a tenured early childhood classroom teacher working in Queens with over eight years of service at DOE.

649.    Ms. Butler was in good standing, and well-respected by her colleagues.

650.    Ms. Butler cannot take a Covid-19 vaccine for two reasons.

651.    First, as a devout Catholic, she has sincerely held religious beliefs, including a religious objection to the use of aborted fetal cell lines and that she believes, after prayer, reflection and consultation with her religious conscience, that it goes against God's will to take the vaccines.

652.    Second, she has serious health problems, was undergoing cancer treatment, and had been advised by her physician that it was not safe for her to take a Covid-19 vaccine.

653.    Ms. Butler was instructed that she could not submit a religious and medical exemption at the same time, but would have to submit one, wait for a determination, and then submit the other.

654.    Because the religious accommodation criteria adopted by the DOE expressly excludes all Catholics *on its face* Ms. Butler submitted her medical accommodation request first, on or about September 17, 2021.

655.    She received an autogenerated email (sent to all applicants) stating that her medical exemption was denied but giving her the option to appeal.

656.    Upon information and belief, no one reviewed her medical accommodation request before denying it.

657.    Ms. Butler appealed and had a zoom hearing on or about September 28, 2021.

658.    The arbitrator told her that he did not know if she might be at risk of harm, as her

doctor had attested, but that he was going to require that she take at least one of the shots, and if she was injured then she would not have to take another one. Ms. Butler refused this offer.

659.    Shortly thereafter, she was issued a denial, with no further information than an "x" next to the word "denied." Ms. Butler was then involuntarily placed on leave without pay on or about October 2, 2021.

660.    On October 3, 2021, Ms. Butler submitted a request for religious accommodation.

661.    She was sent the same autogenerated email as all others who applied, claiming undue hardship based on the de minimis standard, but given no option to appeal.

662.    No one individually reviewed Ms. Butler's request for religious accommodation before issuing the denial.

663.    No one engaged in cooperative dialogue with her about possible accommodations or difficulties therewith.

664.    After the *Kane* decision, Ms. Butler sought religious accommodation again, asking that the Citywide Panel review her application.

665.    She was ignored.

666.    When she tried to upload the request into SOLAS, it said she had already been denied.

667.    In or around August 2022, Ms. Butler received a letter informing her that she could come back if she submitted proof of vaccination by September 6, 2022.

668.    DOE would not give her religious and medical accommodation from this requirement, though they knew she needed it.

669.    On or about September 7, 2022, Ms. Butler applied for a restoration of health leave, since she could not get vaccinated due to her medical and religious need.

670.    She received the leave but was not paid.

671.    In or around March 2023, Ms. Butler was finally able to return to working at the DOE.

672.    Ms. Butler suffered severe financial, emotional, psychological and spiritual harm because of Defendants' discriminatory actions and policies for which she deserves compensation.

**KARIN CROWLEY**

673.    In September 2021, Plaintiff KARIN CROWLEY ("Mrs. Crowley") was a tenured high school math teacher working in Staten Island with just under eighteen years of service at DOE.

674.    She had a spotless record, coached varsity softball to win two city championships, and always went above and beyond for the DOE and the students.

675.    Mrs. Crowley has sincerely held religious beliefs that conflict with the Covid-19 vaccines.

676.    She also had a team teacher and could have easily been accommodated remotely.

677.    But in the fall of 2021, she had to get surgery due to blood clotting issues, for which she planned to take a sabbatical medical leave.

678.    Sabbaticals are supposed to be automatic for teachers with seven years of service (she had eighteen years).

679.    But the DOE representative at payroll misunderstood and directed her to get materials for the medical exemption to the vaccine instead of for sabbatical leave.

680.    Mrs. Crowley went back and forth with her doctor, and finally realized that she was being directed to apply for the wrong thing.

681.    There was no time at that point for Mrs. Crowley to apply for her sabbatical leave

before she was placed on leave without pay.

682.    Nor was there time for her to get in a religious accommodation request from the vaccine.

683.    She had thought she was going to be on leave at the time and was scrambling just to figure out how to make arrangements for her surgery in the midst of the denial and her health issues.

684.    She also felt that it was futile to make it a priority to apply, given that it had been made clear that only Christian Scientists and Jehovah's Witnesses would be accommodated.

685.    Moreover, she did not have a clergy letter. Her beliefs were based on guidance from prayer and personal contemplation, and her church, which is very small, does not have staff there during the week and would not be able to get her a letter in the short time she had to apply.

686.    On or about October 2, 2021, Mrs. Crowley was involuntarily placed on leave without pay.

687.    After the dust settled, Mrs. Crowley later tried to go into the system and apply for religious accommodation, but the SOLAS system would not accept her application since she was already marked "inactive" due to the involuntary suspension.

688.    In November 2021, after the Second Circuit issued its order in *Kane*, Mrs. Crowley wrote to the DOE and City representatives requesting religious accommodation from the Citywide Panel and alerting them that she has sincerely held religious beliefs in opposition to the Covid-19 vaccines.

689.    She explained that she had long-standing objections to vaccination, and that, having prayed on the matter, she did not believe, based on the guidance from prayer, that she could take a Covid-19 vaccine without violating her religious beliefs. She also explained that she would not

be able to take one in any event due to the use of aborted fetal cells in production and development of the vaccines.

690.    Based on many of these same beliefs, Mrs. Crowley's daughter had a religious exemption from her college.

691.    Defendants refused to consider Mrs. Crowley's application and sent her no response.

692.    The same fall, Mrs. Crowley applied for unemployment insurance benefits.

693.    She was denied, after DOE asserted that she had committed "misconduct" by not getting vaccinated.

694.    Mrs. Crowley was a tenured teacher, and pursuant to state law, could not be charged with any disciplinary offense like "misconduct" without a 3020a hearing.

695.    But the DOE's policy was to refuse all teachers who had been suspended for failing to get the vaccine a 3020a hearing.

696.    In or around February 2022, Mrs. Crowley was terminated, again, without a 3020a hearing.

697.    She attempted to apply to schools through Indeed.com but was not getting callbacks, despite her qualifications.

698.    After the Mandate ended, DOE refused to reinstate Ms. Crowley even though there is a staffing crisis and Ms. Crowley is well-qualified.

699.    After the Mandate was repealed in February 2023, Mrs. Crowley was told that she had a problem code on her file, flagging her as somehow unfit to work around children, so she filed a notice of claim, alerting the DOE that she and thousands of other employees denied religious accommodation were facing retaliation in the form of the problem code in May 2023.

700.    The DOE failed to adjust her claims within the statutory period.

701.    Mrs. Crowley suffered severe financial, emotional, psychological and spiritual harm because of Defendants' discriminatory actions and policies for which she deserves compensation.

**LUZ CRUZ**

702.    In September 2021, Plaintiff LUZ CRUZ ("Ms. Cruz") was a teaching assistant working in the Bronx with just under twenty-five years of service at DOE.

703.    She is a devout member of the Ministry of Foreign Affairs for Superior Church, a church which shares her sincerely held religious objections to vaccination.

704.    She also has serious medical issues, and her doctor advised her that it was not safe for her to take a Covid-19 vaccine.

705.    Ms. Cruz timely applied for religious accommodation, explaining her sincerely held religious beliefs, but was denied through the same autogenerated response stating that it would be an undue hardship to accommodate due her, which was sent to all employees regardless of whether they were in person or remote at the time.

706.    No one reviewed Ms. Cruz's application for religious accommodation before denying her.

707.    Ms. Cruz could have easily been accommodated, since she worked with a classroom teacher who could be there in person and she had been accommodated to work remotely before.

708.    Ms. Cruz submitted an application for medical accommodation, along with a doctor's letter, but was denied without serious review.

709.    The SOLAS system was crashing repeatedly every time she tried to apply for either

accommodation.

710.   Because of the SOLAS system crashing, she was not able to appeal within the one day allotted.

711.   On or about October 4, 2021, Ms. Cruz was placed on involuntary leave without pay.

712.   She applied for unemployment insurance benefits, but the DOE repeatedly attempted to block her efforts to get it, claiming that she committed misconduct by failing to get vaccinated and that her beliefs did not qualify for a good cause determination.

713.   Ms. Cruz had to expend significant efforts and time to appeal and challenge DOE's retaliatory efforts and was finally awarded unemployment insurance compensation a year after she applied.

714.   After the *Kane* decision was issued in November 2021, Ms. Cruz wrote to Defendants and asked for a review of her sincerely held religious beliefs by the Citywide Panel.

715.   Defendants refused to give her the review.

716.   Ms. Cruz was fired on or about February 11, 2022.

717.   After the Mandate ended, DOE refused to reinstate Ms. Cruz even though there is a staffing crisis and Ms. Cruz is well-qualified.

718.   Upon information and belief, the DOE's retaliatory problem codes are also preventing her from getting work outside of the DOE.

719.   Ms. Cruz has applied to a lot of preschools and daycares, and she is not getting any callbacks despite being highly qualified and despite the staffing crisis in this industry.

720.   Ms. Cruz suffered severe financial, emotional, psychological and spiritual harm because of Defendants' discriminatory actions and policies for which she deserves compensation.

**PATRICIA DECARLO**

721.    Plaintiff PATRICIA DECARLO ("Ms. DeCarlo") is a resident of Richmond County, New York. Prior to being denied religious accommodation, she was a tenured math teacher, working in Brooklyn with over eighteen years of service at DOE.

722.    Ms. DeCarlo had been granted a medical accommodation to work remotely for the 2020-2021 school year, even though her colleagues were working in person.

723.    In September 2021, she attempted to apply for religious and medical accommodation, but the SOLAS system kept crashing.

724.    As soon as the system was back online, she uploaded her request for medical accommodation, which was denied on September 27, 2021.

725.    Even though the year before, the DOE had said that she did qualify for medical accommodation under the ADA, in 2021, the DOE claimed that her medical request would be denied based on "Denial Reason: Other" with "determination Comments: Insufficient medically valid reason to be exempt from being vaccinated."

726.    Ms. DeCarlo also uploaded a religious accommodation request.

727.    Ms. DeCarlo is a devout Catholic and also has sincerely held religious beliefs that preclude vaccination.

728.    The DOE approved her religious accommodation requests for her daughter to be exempt from the school vaccine mandates starting in 2012 and throughout her entire middle school and high school years, based on the same Catholic religious beliefs, after Ms. DeCarlo came to the firm realization that vaccinations went against God's will and stopped vaccinating anyone in her household.

729.    She included with her application in 2021 a short letter explaining that her religious

beliefs were still the same as they were for the past nine years and attaching her religious accommodation requests that had been approved for her daughter by the DOE to the letter.

730.    On or about September 30, 2021, Ms. DeCarlo's request was denied through the same autogenerated email sent to all applicants, vaguely asserting undue hardship based on the "more than a minimal burden" standard.

731.    Ms. DeCarlo was not given an option to appeal.

732.    No one individually reviewed her application for religious accommodation before denying her.

733.    Ms. DeCarlo, who had natural immunity, could have been accommodated in person without undue hardship.

734.    Ms. DeCarlo also could have been accommodated remotely without undue hardship.

735.    Ms. DeCarlo paid towards one of the group lawsuits challenging Defendants' unlawful mandate and policies.

736.    After the Second Circuit held that the *Kane* plaintiffs were likely to succeed, Ms. DeCarlo was denied the right to have a "fresh consideration" by the Citywide Panel, even though Defendants were aware that she needed religious accommodation and had been denied under the original unconstitutional policies.

737.    On December 3, 2021, she sent a letter requesting that the Citywide Panel review her application and reattached her religious exemption request and letters that the DOE had previously accepted for her daughter.

738.    She also provided a longer letter explaining in detail why it was unconstitutional to deny her relief after the Second Circuit's ruling, and providing even more detail about her sincerely

held religious beliefs.

739.   She also tried to upload this application to SOLAS on December 3, 2021, but was not allowed to do so, receiving an error message that stated: "You have been identified as being noncompliant to the vaccine mandate. You can't submit an application for Reasonable Accommodation or COVID-19 Vaccine Related Exemption/Accommodation at this time."

740.   She noted that others were given the right to fresh consideration, and that she should be too, as she also went through the same unfair and unconstitutional process.

741.   She reached out to many lawyers to try to get help, but no one was available to take her case with the crush of thousands of others in a similar situation.

742.   In or around February 11, 2022, she was terminated without any 3020a hearing.

743.   On August 22, 2022, she was sent the new offer letter by the DOE, alerting her that though she had been terminated earlier that year, she could be reinstated if she got vaccinated.

744.   DOE was aware that she needed religious accommodation but refused to provide it to her.

745.   After the Mandate was repealed in February 2023, Ms. DeCarlo wrote multiple emails to the DOE, including emails to Katherin Rodi, the Executive Director of Employee Relations, and Katherin Solimando, from the Office of General Counsel for the DOE, explaining that she'd been wrongfully denied religious accommodation and terminated and asking to be reinstated and/or provided with backpay, tenure and made whole.

746.   They did not respond.

747.   The DOE refused to reinstate or rehire her even though she is well-qualified and there is a staffing crisis at the DOE.

748.   On or about May 10, 2023, Ms. DeCarlo served the DOE and the City with a Notice

of Claim, explaining that the DOE had engaged in widespread religious discrimination, that she had been wrongfully denied religious accommodation through these policies and practices, suspended, and terminated, and that even after the Mandate was repealed, the DOE continued to refuse to reinstate her because of hostility to her religious beliefs, and was retaliating against her through the use of problem codes, and disciplinary findings of "misconduct" without even bothering to give her a 3020a hearing. She wrote, "At present, Claimant remains coded for an unknown act of misconduct, with a career that has been broken and tarnished by the unlawful acts cited herein."

749.    The DOE failed to adjust her claims within the statutory period.

750.    Ms. DeCarlo suffered severe financial, emotional, psychological and spiritual harm because of Defendants' discriminatory actions and policies for which she deserves compensation.

**ABIGAIL GARCIA**

751.    Plaintiff ABIGAIL GARCIA ("Mrs. Garcia") is a resident of Putnam County, New York. Prior to being denied religious accommodation, Mrs. Garcia was a tenured kindergarten teacher working in the Bronx with twenty-nine years of service at DOE.

752.    She was well-respected by her colleagues and beloved by her students and their parents.

753.    Mrs. Garcia has sincere religious beliefs in opposition to vaccination, strengthened after she was born again many years before. Based on these beliefs, she does not even take Tylenol, and prays over medical decisions.

754.    Mrs. Garcia timely submitted a religious accommodation request on or about September 15, 2021.

755.    She was denied with the same generic, autogenerated email that was sent to every

single employee, stating it would be "more than a minimal burden" and thus an undue hardship to accommodate her.

756.   No one individually reviewed her application before denying it.

757.   No one engaged in cooperative dialogue with her either.

758.   Mrs. Garcia could have been accommodated in person or remotely without undue hardship.

759.   The email stated that she had one day to appeal.

760.   She timely submitted her appeal.

761.   She was not given any hearing, but simply received back a denial from the arbitrator with no explanation whatsoever, just an "x" next to the word "denied."

762.   She was then placed on involuntary leave without pay on or about October 2, 2021, for failing to get vaccinated in violation of her sincerely held religious beliefs.

763.   Rather than be terminated, she submitted a letter of resignation under duress, expressly explaining that she was not waiving any of her rights to sue.

764.   After the Second Circuit issued its decision in *Kane*, Mrs. Garcia asked repeatedly for reconsideration by the Citywide Panel, submitting documents and having her husband help her submit documents, but the City refused to consider her appeal even though she'd been denied under the unconstitutional policy that had just been declared unlawful.

765.   She was unable to access SOLAS to try to ask for the appeal.

766.   She emailed and called a whole list of people, but no one could help her.

767.   Finally, she talked to a young man who worked in the Central Office who was willing to try to help her, but he could not figure out how to get the system to work.

768.   She was put on hold because the young man wanted to get some answers to his

inquiry to be able to help her. He suggested she contact Monica Mosquera for help as well.

769.    Mrs. Garcia sent multiple emails to Ms. Mosquera but received no answer. She also called Ms. Mosquera.

770.    Mrs. Garcia also sent emails to a host of other people at DOE asking that she be allowed an appeal, to no avail.

771.    Her husband, Robert Rettino, who was also a DOE employee and who was not shut out of SOLAS, also emailed various people at DOE on her behalf, explaining the situation and asking that she be given an appeal.

772.    In August 2022, when the DOE was offering to reinstate terminated teachers, they refused to reinstate Mrs. Garcia unless she violated her sincerely held religious beliefs, even though they knew she required religious accommodation from the vaccine requirement.

773.    After the Mandate ended, DOE refused to reinstate Mrs. Garcia even though there is a staffing crisis and Mrs. Garcia is well-qualified.

774.    Mrs. Garcia eventually found work in Lincolndale, NY, at a private school where she makes far less money than she was making at the DOE.

775.    The Lincolndale school accepted her religious accommodation request without issue.

776.    Mrs. Garcia suffered severe financial, emotional, psychological and spiritual harm because of Defendants' discriminatory actions and policies for which she deserves compensation.

**DELLA HALEY**

777.    Plaintiff DELLA HALEY ("Ms. Haley") is a resident of Rockland County, New York. Prior to being denied religious accommodation, Ms. Haley was a tenured elementary school teacher working in the Bronx with nearly 22 years of service at DOE.

778.    Ms. Haley has sincerely held religious beliefs that do not allow her to get vaccinated.

779.    A devout Catholic, Ms. Haley has had to apply for religious accommodation in the past for a program involving reiki and other practices that she believed violated her faith.

780.    Her principal at the time would not accommodate her from attending the reiki program. She was forced to attend even though it was against her faith. Finally, she was able to get outside intervention and was granted a religious accommodation.

781.    Though she'd faced retaliation before for requesting religious accommodation, Ms. Haley felt she had no choice but to seek it again.

782.    On September 19, 2021, Ms. applied for religious accommodation through SOLAS, explaining that her Catholic beliefs do not allow her to get vaccinated because the vaccines were developed using aborted fetal cell lines.

783.    She received no response.

784.    On or about October 2, 2021, Ms. Haley was involuntarily placed on leave without pay and told that she could either face disciplinary action or resign if she was not willing to get vaccinated (even though it violated her religious beliefs).

785.    On October 4, 2021, Ms. Haley submitted her request again through SOLAS.

786.    On October 8, 2021, she received the same autogenerated email sent to all applicants claiming undue hardship based on the more than a minimal burden standard.

787.    No one at DOE individually reviewed Ms. Haley's application before denying her relief.

788.    Ms. Haley could have been accommodated, remotely or in person, without presenting a direct threat or undue hardship.

789.     Ms. Haley was not given an option to appeal.

790.     She contacted the union, and they tried to intervene on her behalf, sharing her screenshot showing that her application had gone in on September 19, 2021, and that she'd applied again after receiving no answer on October 4, 2021.

791.     But the DOE refused to allow Ms. Haley to get an administrative appeal.

792.     After the Second Circuit held that the DOE religious accommodation policies were unconstitutional, and plaintiffs were entitled to fresh review, the Citywide Panel refused to review Ms. Haley's application, even though she'd been denied under the same policy.

793.     In August 2022, the DOE offered to reinstate employees who had been denied religious accommodation, but only if they were vaccinated on or before September 6, 2021.

794.     Though the DOE knew Ms. Haley required religious accommodation, they did not offer her any accommodation.

795.     After the Mandate ended, DOE did not offer to reinstate Ms. Haley even though there is a staffing crisis, and she is well-qualified.

796.     Ms. Haley has attempted to get hired as a new hire at DOE since 2023 but has had no success.

797.     She has also made substantial efforts to get work in schools outside of the DOE.

798.     Though upstate schools and schools farther away routinely call her and seem interested, schools that are close by never call her back, despite her qualifications and massive shortages.

799.     Ms. Haley's home is Rockland County, though, and she is not prepared to move further upstate.

800.     Upon information and belief, this is because the DOE has flagged Ms. Haley's

security clearance with a problem code, which would be accessible from New York City area schools.

801.    Ms. Haley suffered severe financial, emotional, psychological and spiritual harm because of Defendants' discriminatory actions and policies for which she deserves compensation.

**STELLA JACK**

802.    Plaintiff STELLA JACK ("Ms. Jack") is a resident of Nassau County, New York. Prior to being denied religious accommodation, Ms. Jack was a special education teacher working in Brooklyn with five years of service at DOE.

803.    She was on the brink of getting tenure when the Mandate was announced.

804.    Ms. Jack is a devout Christian with sincerely held religious beliefs in opposition to vaccination.

805.    In her early twenties, Ms. Jack became an ordained minister.

806.    She leads a non-denominational ministry and has a leadership position in another aligned church where she also worships.

807.    In 2012, Ms. Jack had a revelation and started on a faith journey focused on divine healing.

808.    Since then, due to her faith, Ms. Jack does not take any medication whatsoever, but instead relies on God to keep her healthy and heal her.

809.    Due to her religious beliefs, Ms. Jack is also firmly against abortion, and will not take any products that participate in or benefit from abortion.

810.    On or about September 16, 2021, Ms. Jack submitted a long, heartfelt letter explaining her sincerely held religious beliefs, focusing on the use of aborted fetal cells in the vaccines.

811.    The letter also contained a separate paragraph from her Pastor at Word of God Scriptures, affirming that Ms. Jack's beliefs were sincere and in alignment with the Church's Christian beliefs.

812.    In response, she received the same autogenerated email sent to all employees, vaguely asserting undue hardship under the "more than a minimal burden" standard.

813.    No one reviewed her application individually before sending the denial.

814.    Ms. Jack could have been accommodated in person without undue hardship.

815.    Ms. Jack had worked safely in person the year before without issue and could easily do so again without presenting any danger to students or anyone else based on her vaccine status.

816.    She also could have worked remotely without undue hardship.

817.    Ms. Jack timely appealed through SOLAS, providing a longer letter explaining more bases for her beliefs, including more details about the Divine Healing journey and why it would not be an undue hardship to accommodate her.

818.    Ms. Jack was not given a hearing, just a denial from the arbitrator, Barry Peek, with no explanation, just an "x" next to the word "denied" on or about September 28, 2021.

819.    Ms. Jack was then placed on leave without pay on or about October 4, 2021.

820.    After the Second Circuit's decision in *Kane*, Defendants decided to allow a Citywide Panel review to try to mitigate the acknowledged discrimination, but they only provided the review to those who had been given a decision by the arbitrators.

821.    Ms. Jack fit that criterion, but the Citywide Panel did not offer her a fresh review.

822.    She was not the only person that was denied by the arbitrator but who the City failed to review nonetheless.

823.    Neither DOE nor the City exercised due diligence to give these remedial reviews,

91

which were pretextual in any event.

824.    In February 2022, Ms. Jack was terminated for failing to violate her sincerely held religious beliefs by getting vaccinated.

825.    In or around August 2022, the DOE offered to reinstate terminated employees if they would get vaccinated.

826.    But they did not offer any accommodation from the vaccine requirement to Ms. Jack, even though they knew she needed accommodation and could have accommodated her without undue hardship.

827.    After the Mandate ended, DOE refused to reinstate Ms. Jack even though there is a staffing crisis and Ms. Jack is well-qualified.

828.    Ms. Jack suffered severe financial, emotional, psychological and spiritual harm because of Defendants' discriminatory actions and policies for which she deserves compensation.

**KATHRYN KIESLING**

829.    Plaintiff KATHRYN KIESLING ("Ms. Kiesling") is a resident of Nassau County, New York. Prior to being denied religious accommodation, Ms. Kiesling was a school counselor, working in Queens with over fifteen years of service at DOE.

830.    She has sincerely held religious beliefs that do not allow her to take a Covid-19 vaccine.

831.    She was not told that she had to apply for religious accommodation by any certain date, just that she had to be vaccinated or seek accommodation before October 4, 2021.

832.    She applied in or around September 28, 2021, explaining her sincerely held religious beliefs, including primarily a concern about the link between abortion and the vaccines.

833.    Within hours, she received the same autogenerated email sent to all employees,

vaguely asserting it would be more than a minimal burden to accommodate her so she was denied.

834.    Ms. Kiesling could have easily worked remotely and had done so for many periods during the previous year and a half.

835.    She did not work in classrooms, and counseling is often done remotely as a matter of course, both at the DOE and elsewhere.

836.    Ms. Kiesling attempted to get an appeal, but the DOE refused to let her appeal.

837.    Ms. Kiesling's principal treated her as if she had a scarlet letter after learning that she applied for religious accommodation and was hostile and unhelpful as Ms. Kiesling sought accommodation.

838.    On or about October 4, 2021, Ms. Kiesling was placed on involuntary leave without pay for refusing to violate her religious beliefs.

839.    Ms. Kiesling's supervisors treated her with such hostility as she left the building for the last time before her suspension started, that other employees asked her if she was okay afterwards, expressing shock at the level of hostility directed at her after all these years of faithful service to DOE.

840.    After the Second Circuit held that the DOE's original religious accommodation policies were unconstitutional, Defendants refused to provide Ms. Kiesling with a fresh consideration by the Citywide Panel, even though they knew that she required religious accommodation.

841.    Unable to find work, Ms. Kiesling applied for unemployment insurance benefits.

842.    But even after the Second Circuit's decision, the DOE aggressively argued that she should be denied, and that her religious beliefs did not qualify for a "good cause" determination because the Pope is not vaccinated.

843.    When the DOE offered reinstatement in August 2022, they refused to provide or offer any religious accommodation to Ms. Kiesling, even though they knew she needed it.

844.    After the Mandate ended, DOE refused to reinstate Ms. Kiesling, even though there is a staffing crisis and Ms. Kiesling is well-qualified.

845.    Ms. Kiesling suffered severe financial, emotional, psychological and spiritual harm because of Defendants' discriminatory actions and policies for which she deserves compensation.

**BARBARA KYDD**

846.    Plaintiff BARBARA KYDD ("Mrs. Kydd") is a resident of Queens County, New York. Prior to being denied religious accommodation, Mrs. Kydd was a tenured reading specialist working in Queens, with twenty-four years of service at DOE.

847.    Until 2020, Mrs. Kydd worked in the DOE's Bureau of Nonpublic Schools, teaching reading as a DOE employee at mostly religious private schools.

848.    Around that time, the DOE decided to end the long-standing program, which had been in existence since the 1970's, and the program's employees began working in the public schools.

849.    During the 2020-2021 school year, Mrs. Kydd was granted medical accommodation to teach remotely, which she successfully was able to do without issue.

850.    When the Mandate was announced, Mrs. Kydd applied for religious accommodation on September 16, 2021, through the SOLAS system, and included a clergy letter in her request as instructed.

851.    A devout Seventh Day Adventist, Mrs. Kydd has sincerely held religious beliefs that preclude vaccination.

852.    She believes her body is a temple. Because of these religious beliefs, she follows a

restricted diet, does not eat meat or any animal product, does not drink alcohol or caffeine or use drugs of any kind (including pharmaceutical drugs and over the counter drugs like Tylenol).

853.    Mrs. Kydd takes her religious beliefs so seriously, that after she was diagnosed with breast cancer recently, she declined chemotherapy or radiation against medical advice, rather than violate her religious beliefs.

854.    Mrs. Kydd also prays over all major decisions and received clear guidance from prayer that she could not take a Covid-19 vaccine. She wrote, "The Holy Spirit has moved my heart and conscience that I must not accept the COVID shot. If I were to go against the moving of the Holy Spirit, I would be sinning and jeopardizing my relationship with God and violating my conscience."

855.    The DOE immediately sent her an autogenerated email denial the next day, the same one sent to all employees, claiming "undue hardship" based on the *de minimis* standard.

856.    No one at the DOE reviewed Mrs. Kydd's application before sending the autogenerated denial.

857.    Mrs. Kydd could have been accommodated in person or remotely, as she had been the year before.

858.    The email gave her one school day to appeal. But it was sent to her just as the Sabbath was starting.

859.    As a Seventh Day Adventist, Mrs. Kydd cannot work on the computer on the Sabbath.

860.    Mrs. Kydd attempted to file an appeal on Monday, September 20, 2021, but the SOLAS system was frozen and would not accept any action from her, even though she was still within one school day.

861.    Mrs. Kydd contacted various people at the DOE repeatedly, trying to find out what she should do.

862.    At 1:35 p.m., she received an email from the "Division of Human Capital" stating:

> Dear Colleague,
> Due to a technical error earlier today, you were not able to see an option to appeal your denial of your application for a COVID-19 related exemption or accommodation. That error has been fixed and if you log into SOLAS now, you should be able to see that option (go to SOLAS https://dhrnycaps.nycenet.edu/SOLAS and select the option "I would like to APPEAL"). You will have the appeal option until midnight tonight (9/20/21).

863.    Mrs. Kydd tried again to appeal through the SOLAS system that same day, September 20, 2021, but the system was still frozen, and she still was unable to file any appeal through it.

864.    She emailed her principal and the Human Resources department, explaining that the system was still locked, and attaching her appeal and reiterating that she was requesting accommodation and did want the appeal.

865.    On September 23, 2021, she sent more emails, including contacts listed for SOLAS support, and her principal.

866.    She got another autogenerated denial on September 30, 2021, with the same language from the first one.

867.    No one reviewed her application before sending this autogenerated response out.

868.    This was not an appeal – the system had just glitched and created a second application for her, which resulted in the same autogenerated email sent to all employees.

869.    On October 4, 2021, Mrs. Kydd was involuntarily placed on leave without pay.

870.    Mrs. Kydd was part of a large group of proposed class members supporting the *Kane* lawsuit to try to get relief through the courts.

871.    In or around December 2021, after the Second Circuit held that the DOE's original accommodation policies were unconstitutional and the City agreed to provide fresh consideration, Mrs. Kydd wrote to various decision makers at the DOE, and the City explaining that she needed religious accommodation and required a Citywide Panel review.

872.    She was not given any Citywide Panel review.

873.    On or about August 2022, Mrs. Kydd was offered reinstatement, but only if she got vaccinated in violation of her religious beliefs.

874.    She was allowed to apply for religious accommodation through SOLAS (arbitrarily many others tried and could not).

875.    However, this was meaningless, since once again, she quickly received the same autogenerated email as before, stating that it would be an undue hardship to accommodate her based on the minimal burden standard.

876.    No one reviewed her application individually before sending the denial.

877.    No one individually assessed whether it would be an undue hardship before sending the denial.

878.    Mrs. Kydd had also applied for a leave of absence in or around August 2022, since she was not yet terminated.

879.    Before she was given a determination about the leave, Mrs. Kydd was terminated on or about September 6, 2022, for failing to violate her sincerely held religious beliefs.

880.    Mrs. Kydd reached out repeatedly to find out about her requested leave.

881.    Weeks after her termination, Mrs. Kydd received an email stating that her leave application was denied because she had allegedly applied for the wrong type of leave.

882.    She was not given the option to correct the application and apply for the right type

of leave.

883.   After the Mandate was repealed in February 2023, Mrs. Kydd attempted to get reinstated.

884.   She reached out to her principal, who said she was "not on her galaxy" (which is the budgeting software used by the DOE) so could not be reinstated.

885.   She also reached out to others, like Human Resources, but was unable to get reinstated.

886.   Upon information and belief, the school was at the time looking for reading specialists and did have a budget for reading specialists and English Language Arts teachers, which Mrs. Kydd is certified to teach.

887.   Mrs. Kydd saw on the website that such openings existed at the time but when she reached out, she got no response.

888.   No one would hire her at DOE, despite crushing staffing shortages and the fact that she was highly qualified, with two master's degrees and twenty-four years of service, to fulfill many different roles.

889.   Mrs. Kydd was not getting called back at any private institutions either.

890.   Mrs. Kydd had good relationships with principals and supervisors at the private schools, having worked with them harmoniously for fourteen years before the nonpublic school program was dissolved.

891.   She was aware that there were many openings in all the agencies that contracted with reading specialists and teachers for the private schools.

892.   But they would not hire her, upon information and belief, because of the DOE's problem codes, which were attached to employee files for those denied religious accommodation

and visible to agencies and schools outside of the DOE.

893.    As a result, she was forced to retire just short of her twenty-five years, which required her to take a substantial cut in her pension.

894.    Mrs. Kydd suffered severe financial, emotional, psychological and spiritual harm because of Defendants' discriminatory actions and policies for which she deserves compensation.

**KATHLEEN MAGUIRE**

895.    Plaintiff KATHLEEN MAGUIRE ("Mrs. Maguire") is a resident of Suffolk County, New York. Prior to being denied religious accommodation, Ms. Maguire was a tenured teacher working in Brooklyn, with over twenty-three years of service at DOE.

896.    Mrs. Maguire loved her job, received highly effective ratings and glowing progress reports from the administration, and was never the subject of any discipline.

897.    She worked remotely for two semesters during the pandemic and came back to teach in person (unvaccinated) during the Spring 2021 semester without issue.

898.    Mrs. Maguire has sincerely held religious objections to taking a Covid-19 vaccine.

899.    Mrs. Maguire is a devout Roman Catholic.

900.    Mrs. Maguire consulted her religious conscience, as instructed by the U.S. Conference of Catholic Bishops, and determined that she cannot take a Covid-19 vaccine without violating her sincerely held religious beliefs.

901.    Among many other reasons, Mrs. Maguire had Covid-19 early on and believes God healed her from it and was protecting her from it, and that she would be interfering with God's protection if she were to take the vaccine. She is also religiously opposed to the use of aborted fetal cell lines in the development of the vaccines.

902.    Mrs. Maguire was informed at some point in the fall of 2021, that she would have

to get vaccinated by September 27, 2021, but that the DOE would consider religious and medical accommodation.

903.    She was aware that the date to comply was later pushed back to October 4, 2021.

904.    She was not aware that there was any earlier deadline to apply for religious accommodation, or even how she should apply for religious accommodation.

905.    There was substantial chaos during the weeks before October 4, 2021.

906.    Mrs. Maguire was also placed on a brief quarantine at the time, as there had been exposures in the classroom.

907.    She was instructed that she should wait to submit an application for accommodation until after her quarantine, because if she was positive, she would have a medical accommodation for a certain time period.

908.    Mrs. Maguire had heard that the DOE and the City were not going to accommodate Roman Catholics, only Christian Scientists.

909.    Mrs. Maguire did not test positive for Covid-19, due in part, no doubt, to her robust natural immunity, which is far more durable and effective than vaccine immunity.

910.    She submitted her request for religious accommodation on or about October 2, 2021, through the SOLAS system, and she received confirmation that her application was pending.

911.    On or about October 4, 2021, she was involuntarily placed on leave without pay.

912.    On or about October 13, 2021, she received the standard autogenerated denial sent to all other applicants, stating that her application for religious accommodation was denied because it would be more than a minimal burden to accommodate her.

913.    No one from the DOE individually reviewed Mrs. Maguire's accommodation request before sending the denial.

914.    Mrs. Maguire could have been accommodated in person or remotely without posing a direct threat or causing undue hardship.

915.    Mrs. Maguire was not given any option to appeal.

916.    She wrote dozens of emails and requests for an appeal to various people at the DOE over the course of the next few weeks but received no response.

917.    On or about October 14, 2021, she submitted a notice to the DOE's Office of Equal Opportunity & Diversity Management ("OEO"), explaining that she had been the victim of discrimination. She explained that she has sincerely held religious beliefs that do not allow her to take a Covid-19 vaccine, and that the DOE failed to consider her request for accommodation in good faith, and that she could have easily been accommodated by allowing her to test instead of get vaccinated, as all other teachers in the state were allowed to do, but was denied and not allowed to appeal. She concluded by saying, "The DOE is willfully avoiding making legitimate accommodation by flatly rejecting my religious request. I do not ask that anyone believe the same as I do, I only respectfully request that my beliefs be honored." She pointed out that she was being treated differently and unfairly due to her disfavored religious beliefs.

918.    On or about October 30, 2021, Mrs. Maguire submitted a letter alerting the DOE that she was resigning effective November 30, 2021, under duress and to prevent an unlawful termination, but that she was not waiving her right to sue or seek compensation for the wrongs done to her. She explained that vaccines had never been a condition of her employment, that she has sincerely held religious beliefs, and detailed some of the multiple ways she could be accommodated without undue hardship.

919.    Mrs. Maguire was part of a group of educators who donated money to litigation efforts and supported group lawsuits challenging Defendants' unlawful policies.

101

920.    After the Second Circuit held that the DOE's religious accommodation policies were unconstitutional, and the City agreed to provide fresh consideration and reinstate those wrongfully denied, Mrs. Maguire attempted to get a Citywide Panel review.

921.    She got an error message in SOLAS, which stated that she was non-compliant with the vaccine mandate, so could not apply for Reasonable Accommodation.

922.    On November 30, 2021, she also sent emails to dozens of decision makers from the Citywide Panel and the DOE, explaining that she had been unlawfully denied religious accommodation under the original policy, without any opportunity to appeal, and that she was being forced to resign so that she did not face unlawful disciplinary action. She asked that she receive fresh consideration and attached a heartfelt letter detailing her religious objections to the vaccine.

923.    In August 2022, the DOE offered Mrs. Maguire and any other employee who was removed due to the vaccine mandate, to be reinstated if they got vaccinated by September 6, 2022.

924.    Though the DOE knew Mrs. Maguire required religious accommodation, they did not offer Mrs. Maguire any accommodation.

925.    On or about January 19, 2023, sixteen months after she submitted her complaint, the OEO wrote that they DOE was closing her complaint, alleging: "As you know, you requested an accommodation to the Citywide vaccination mandate and that request was denied. You then did not exercise your right to appeal that denial via the Citywide Appeals Panel or arbitration."

926.    The OEO letter was flatly wrong. Mrs. Maguire was not allowed any opportunity to appeal, either to the arbitrator or the Citywide Panel, despite exhaustive attempts.

927.    The OEO letter concluded by stating that they were closing the complaint, but if she wished to pursue the matter further, she could do so by filing a complaint in court or with an

administrative agency.

928.     On February 10, 2023, Mrs. Maguire wrote to the OEO, reiterating that she had not been given a chance to appeal, and that her denial violated the OEO's policies, which state: "When a final determination to either approve or deny an accommodation request has been rendered, a letter will be mailed to the employee's home.   A copy of the final determination will be…forwarded to the employee's supervisor…" Mrs. Maguire noted that she did not receive a letter nor did her supervisor advise her that she had received a final determination letter. She asked for reconsideration and attached previously submitted emails.

929.     After the Mandate ended, on or about the same week of February 2023, DOE refused to reinstate Mrs. Maguire even though there is a staffing crisis and Mrs. Maguire is well-qualified.

930.     Mrs. Maguire timely submitted a notice of claim, detailing the discrimination and retaliation she faced, including but not limited to the wrongful denial of accommodation, refusal to allow her an appeal, OEO's determination, and the DOE's refusal to reinstate her after the Mandate ended.

931.     The DOE failed to adjust her claims.

932.     Mrs. Maguire suffered severe financial, emotional, psychological and spiritual harm because of Defendants' discriminatory actions and policies for which she deserves compensation.

**KIM MODZELEWSKI**

933.     Plaintiff KIM MODZELEWSKI ("Mrs. Modzelewski") is a resident of Richmond County, New York. Prior to being denied religious accommodation, Mrs. Modzelewski was a secretary working in Staten Island, with ten years of service at DOE.

934.    Mrs. Modzelewski loved her job and had a spotless record of service.

935.    She lived two blocks away from the school, and always gave above and beyond what was asked of her.

936.    Before she started working at the school in Staten Island nine years before, she was a parent and had been President of the PTA.

937.    Before that, she attended the school as a child, as many generations of her family had before that.

938.    Mrs. Modzelewski has sincerely held religious beliefs that do not allow her to take a Covid-19 vaccine.

939.    As a Catholic, she is opposed to participating in abortion. She also received very strong guidance from her religious conscience not to take the vaccines and believes it would have been a sin to do so.

940.    Pope Francis himself had told Catholics that they must consult their religious conscience about whether to take the vaccines, and to follow the guidance they received.

941.    Mrs. Modzelewski did not know what to do. She'd told people that her religious beliefs precluded vaccination, but representatives of the DOE and UFT kept saying that Catholics would not be accommodated.

942.    The Mayor even went to the press, as described above, and stated the same thing.

943.    Mrs. Modzelewski thought it was futile to apply given these clear intentions to exclude her from accommodation.

944.    Instead of applying, she began organizing with her colleagues to support and fundraise for lawsuits.

945.    On or about October 4, 2021, Mrs. Modzelewski was placed on involuntary leave

without pay for failing to violate her sincerely held religious beliefs.

946.    Mrs. Modzelewski decided that she might as well try to apply to make sure there was a written record of her requests for accommodation.

947.    On or about October 12, 2021, she submitted a written application for accommodation from the Covid-19 vaccine through SOLAS.

948.    The system provided confirmation that her request was submitted.

949.    The very next day, she received the same autogenerated denial (based on the "more than a minimal burden" standard) sent to all other applicants.

950.    Mrs. Modzelewski was not given any option to appeal.

951.    No one individually reviewed her application before denying her relief.

952.    Mrs. Modzelewski could have been accommodated in person or remotely without posing a direct threat or causing undue hardship.

953.    Mrs. Modzelewski had her own office at the school and had already worked remotely from home without issue from March 2020 to June 2020 and then again from November 2020 to January 2021.

954.    She handled payroll, purchasing and pupil accounting, all of which were done on the computer, and all of which could have been handled from home as they were before.

955.    After the Second Circuit held that the original accommodation process was unconstitutional and ordered a new review, Mrs. Modzelewski tried to appeal to the Citywide Panel too.

956.    She wrote to decision makers at the DOE and the Citywide Panel, alerting them that she had been unfairly denied accommodation under the old unconstitutional policy, and wanted to have her application considered by the Citywide Panel.

957.     The Citywide Panel refused to consider her application.

958.     In August 2022, Mrs. Modzelewski received notification that she could be reinstated if she got vaccinated by September 6, 2022.

959.     She immediately submitted a request for religious accommodation, which SOLAS allowed her to upload.

960.     She also alerted her supervisor, who stated that she supported the request and agreed that Mrs. Modzelewski could work from home if necessary.

961.     But once more, in September 2022, Mrs. Modzelewski received another of the same autogenerated emails, stating that it would be more than a minimal burden to accommodate her.

962.     Once more, there was no option to appeal.

963.     For weeks, Mrs. Modzelewski emailed everyone she could think of at the DOE, explaining that there was no undue hardship, that even her supervisor agreed she could work remotely, and she wanted an appeal.

964.     After the Mandate ended, DOE refused to reinstate Mrs. Modzelewski even though there is a staffing crisis, and she is well-qualified.

965.     Mrs. Modzelewski suffered severe financial, emotional, psychological and spiritual harm because of Defendants' discriminatory actions and policies for which she deserves compensation.

**ROSE NEWMAN**

966.     Plaintiff ROSE NEWMAN ("Ms. Newman") is a resident of Putnam County, New York. Prior to being denied religious accommodation, Ms. Newman was a tenured art teacher working in Queens with over twenty years of service at DOE.

967.     She also taught other areas of academics, such as science and history, and had a

master's degree in special education and had worked in a district 75 special education school for over twenty years.

968.    Ms. Newman loved her job and was well respected and beloved by students and staff alike.

969.    A devout Catholic, Ms. Newman consulted her conscience and determined that she cannot take a Covid-19 vaccine due to the use of aborted fetal cell lines in their development, among other religious reasons.

970.    Ms. Newman never received any information about how to appeal for religious accommodation.

971.    She contacted her union and her supervisor but was not given information about how to do it.

972.    Finally, Ms. Newman reached out to Teachers for Choice, an advocacy group for teachers not connected to the Defendants and was able to learn through them that there was a September 20, 2021, deadline and that applications should be filed through the SOLAS website.

973.    Ms. Newman raced to meet this deadline, meeting with clergy, preparing and notarizing her personal statement, and putting together her paperwork.

974.    The evening of September 20, 2021, Ms. Newman attempted to upload her application, including a statement that she got notarized that day and a four-page clergy letter explaining in detail how vaccination conflicted with Ms. Newman's faith.

975.    Unfortunately, SOLAS was freezing, and Ms. Newman was not able to get her application uploaded until after midnight.

976.    A few days later, she received an autogenerated denial email asserting undue hardship based on the "more than a minimal burden" standard (the same one sent to all applicants).

977.    No one individually reviewed Ms. Newman's application before she was issued the denial.

978.    Ms. Newman could have been accommodated without undue hardship and without posing a direct threat, either in person or remotely.

979.    The denial did not provide Ms. Newman with an appeal option.

980.    But on September 30, 2021, the SOLAS system allowed her to submit a second request for religious accommodation, which she did.

981.    The next day, she got back another copy of the same autogenerated denial.

982.    Again, no human being reviewed her application before the denial was sent.

983.    On October 4, 2021, Ms. Newman was involuntarily placed on leave without pay for failing to get vaccinated in violation of her sincerely held religious beliefs.

984.    After the Second Circuit held that the *Kane* plaintiffs were likely to succeed, Ms. Newman was not given the right to have a "fresh consideration" by the Citywide Panel, even though Defendants were aware that she needed religious accommodation and had been denied under the original unconstitutional policies.

985.    On August 18, 2022, after the CDC issued guidance officially clarifying that the vaccinated should be treated no differently than the unvaccinated, Ms. Newman submitted a third request for religious accommodation, hoping to get reinstated that fall.

986.    She received back the same autogenerated email that had been sent the first two times she applied back in 2021.

987.    Once more, no one reviewed her application or provided individualized consideration about whether it would be possible to accommodate her before sending the denial.

988.    After the Mandate ended, DOE refused to reinstate Ms. Newman or even hire her

as a new hire, though there is a staffing crisis, and she is well-qualified.

989.     Ms. Newman did not get any confirmation that the full-time teaching positions she qualified for and applied for were received, reviewed or considered at DOE.

990.     Upon information and belief, DOE attached a problem code to Ms. Newman's file that is making it difficult for her to get hired at DOE and at private schools too.

991.     Mrs. Newman suffered severe financial, emotional, psychological and spiritual harm because of Defendants' discriminatory actions and policies for which she deserves compensation.

**SAMUEL PAGAN**

992.     Plaintiff SAMUEL PAGAN ("Mr. Pagan") is a resident of Putnam County, New York. Prior to being denied religious accommodation, Mr. Pagan was a teaching assistant working in the Bronx with sixteen years of service at DOE.

993.     Mr. Pagan has sincerely held religious beliefs that do not allow him to get vaccinated.

994.     On September 14, 2021, he applied, and included a letter from his pastor at the Glory of Christ church.

995.     A devout Pentecostal Christian, Mr. Pagan believed that his body was a Holy Temple and that he could not destroy the Holy Temple of God with any impurity. Among other religious objections to the Covid-19 vaccine, Mr. Pagan objected to the link between the vaccines and abortion, which he believes is a sin.

996.     Shortly after uploading his application, he got the same autogenerated email sent to all applicants claiming undue hardship based on the more than a minimal burden standard.

997.     No one individually reviewed Mr. Pagan's application before denying him.

998.   Mr. Pagan could have been accommodated in person or remotely without undue hardship and without presenting a direct threat to anyone.

999.   Mr. Pagan was given the option to appeal within one day and timely did so.

1000.   Thereafter, he received a denial from the arbitrator, with no opportunity for a zoom hearing, and no explanation other than an "x" next to the word "denied."

1001.   On or about October 2, 2021, Mr. Pagan was involuntarily placed on leave without pay and told that he could either face disciplinary action or resign if he was not willing to get vaccinated (even though it violated his religious beliefs).

1002.   He wrote his own resignation letter and submitted it by hand – confirming he did not agree to any waiver and that he was resigning under duress (effective November 30, 2021) to avoid unlawful disciplinary action that had been threatened against him if he refused to violate his religious practices.

1003.   Before his resignation was effective, the Second Circuit held that the DOE religious accommodation policies were unconstitutional, and DOE employees denied relief under them were entitled to fresh review by the Citywide Panel.

1004.   But the Citywide Panel refused to review Mrs. Pirozzi's application, even though she'd been denied under the same policy.

1005.   He was not allowed to submit anything through SOLAS and asked the Secretary for help.

1006.   The secretary could not figure out how to help him, nor could the help desk. He was given a number that both had already called and did not receive a call back after leaving messages.

1007.   In April 2022, Mr. Pagan was able to get a job in a Catholic school, and was granted

religious accommodation from the vaccine mandate there.

1008.  In August 2022, the DOE offered Mr. Pagan and other employees denied religious accommodation to be reinstated if they got vaccinated by September 6, 2022.

1009.  Though the DOE knew Mr. Pagan required religious accommodation, they did not offer him any accommodation.

1010.  After the Mandate ended, DOE did not reinstate Mr. Pagan even though there is a staffing crisis, and he is well-qualified.

1011.  Mr. Pagan suffered severe financial, emotional, psychological and spiritual harm because of Defendants' discriminatory actions and policies for which he deserves compensation.

**MARIA PIROZZI**

1012.  Plaintiff MARIA PIROZZI ("Mrs. Pirozzi") is a resident of Richmond County, New York. Prior to being denied religious accommodation, Mrs. Pirozzi was a tenured teacher working in Staten Island with over thirty-one years of service at DOE.

1013.  Mrs. Pirozzi taught physical education to special needs children and was beloved by parents and students alike.

1014.  Mrs. Pirozzi has sincerely held religious beliefs that do not allow her to get vaccinated.

1015.  On September 20, 2021, she applied for religious accommodation, explaining that her Christian beliefs do not allow her to get vaccinated, and including a signature from a pastor.

1016.  Among other religious objections, Mrs. Pirozzi, a devout Catholic, believes abortion is a sin and she cannot get vaccinated because the vaccines were developed using aborted fetal cell lines.

1017.  Soon after uploading her application, she got the same autogenerated email sent to

all applicants claiming undue hardship based on the more than a minimal burden standard.

1018.   No one at DOE individually reviewed Mrs. Pirozzi's application before denying her relief.

1019.   Mrs. Pirozzi could have been accommodated, remotely or in person, without presenting a direct threat or undue hardship.

1020.   Mrs. Pirozzi knew many other DOE employees who shared her religious objections and had also submitted religious accommodation requests.

1021.   They were all denied with the same autogenerated email.

1022.   Meanwhile, the Mayor and the UFT and DOE representatives were all saying that only Christian Scientists would be accommodated.

1023.   Mrs. Pirozzi does not recall if she was given the option to appeal but does remember that she felt it was futile to appeal after getting such an impersonal and clearly autogenerated denial, and hearing that every applicant seemed to be getting the same one.

1024.   On or about October 2, 2021, Mrs. Pirozzi was involuntarily placed on leave without pay and told that she could either face disciplinary action or resign if she was not willing to get vaccinated (even though it violated her religious beliefs).

1025.   After the Second Circuit held that the DOE religious accommodation policies were unconstitutional, and plaintiffs were entitled to fresh review, the Citywide Panel refused to review Mrs. Pirozzi's application, even though she'd been denied under the same policy.

1026.   Under the gun, and without money to even buy food or pay her basic expenses, Mrs. Pirozzi resigned and took her retirement early, thereby losing a substantial amount of money.

1027.   In August 2022, the DOE offered to reinstate employees who had been denied religious accommodation, but only if they were vaccinated on or before September 6, 2021.

1028.   Though the DOE knew Mrs. Pirozzi required religious accommodation, they did not offer her any accommodation.

1029.   After the Mandate ended, DOE did not offer to reinstate Mrs. Pirozzi even though there is a staffing crisis, and she is well-qualified and could have rescinded her resignation.

1030.   Mrs. Pirozzi suffered severe financial, emotional, psychological and spiritual harm because of Defendants' discriminatory actions and policies for which she deserves compensation.

**RODNEY EPPS PRESSLEY**

1031.   Plaintiff RODNEY EPPS PRESSLEY ("Mr. Pressley") is a resident of Richland County, South Carolina. Prior to being denied religious accommodation, Mr. Pressley was a tenured high school music teacher working in Queens with twenty one years of service at DOE.

1032.   Mr. Pressley is a devout Lutheran and has sincerely held religious beliefs that do not allow him to take a Covid-19 vaccine.

1033.   He believes that the Holy Spirit guides us and has learned to pray and to listen to guidance when it comes. He received clear guidance that he cannot take a Covid-19 vaccine, and objects to them for many reasons, believing that they pollute God's Holy Temple.

1034.   He submitted an application for religious accommodation on or about September 13, 2021.

1035.   On September 17, 2021, he was denied through the same autogenerated email sent to all applicants.

1036.   No one individually reviewed Mr. Pressley's application before sending the denial.

1037.   Mr. Pressley could have been accommodated without undue hardship and without posing a direct threat, in person or remotely.

1038.   The year before, he had worked in person without issue unvaccinated.

1039.   Prior to that, he had worked remotely without issue.

1040.   Mr. Pressley attempted to appeal his denial within the one day allotted, but he could not. SOLAS was locking him out and freezing.

1041.   With difficulty, he tracked down a telephone number for the support hotline, but no one answered. The hotline message stated that they were experiencing a high volume of applicants and could no longer take any calls.

1042.   He left messages and waited next to the phone the whole day.

1043.   No one called him back.

1044.   While he waited, he tried again and again to get onto SOLAS, and to reach out to anyone who might be able to help.

1045.   Finally, he went to the school and spoke to the Secretary, who seemed disgruntled and could not help him.

1046.   On or about October 4, 2021, Mr. Pressley was placed on involuntary leave without pay.

1047.   After the Second Circuit held that the DOE religious accommodation policies were unconstitutional, and plaintiffs were entitled to fresh review, the Citywide Panel refused to review Mr. Pressley's application, even though he'd been denied under the same policy.

1048.   Mr. Pressley attempted to collect unemployment insurance benefits after he was suspended without pay, but the DOE blocked his application, claiming he had committed "misconduct" for failing to violate his sincerely held religious beliefs.

1049.   Unable to afford to live in New York any longer without a job, Mr. Pressley and his family were forced to move out of state to try to survive.

1050.   In August 2022, the DOE offered to reinstate employees who had been denied

religious accommodation, but only if they were vaccinated on or before September 6, 2022.

1051.   Though the DOE knew Mr. Pressley required religious accommodation, they did not offer him any accommodation.

1052.   Mr. Pressley never received a termination letter at any point, though he assumes he must be terminated.

1053.   After the Mandate ended, DOE refused to reinstate Mr. Pressley even though there is a staffing crisis, and he is well-qualified.

1054.   Mr. Pressley suffered severe financial, emotional, psychological and spiritual harm because of Defendants' discriminatory actions and policies for which he deserves compensation.

**JOSEPH SABATINO**

1055.   Plaintiff JOSEPH SABATINO ("Mr. Sabatino") is a resident of Nassau County, New York. Prior to being denied religious accommodation, Mr. Sabatino was a tenured licensed social studies teacher working in Queens with over eighteen years of service at DOE.

1056.   Mr. Sabatino is a devout Roman Catholic and has sincerely held religious beliefs that do not allow him to take a Covid-19 vaccine.

1057.   Most importantly, he believes abortion is a sin and cannot take a Covid-19 vaccine after learning about their use of aborted fetal cells.

1058.   On or about September 15, 2021, he submitted a request for religious accommodation with a letter from the Catholic priest at the church he attended.

1059.   On or about September 16, 2021, he was denied through the same autogenerated email sent to all applicants.

1060.   No one individually reviewed Mr. Sabatino's application before sending the denial.

1061.   Mr. Sabatino could have been accommodated without undue hardship and without

posing a direct threat, in person or remotely.

1062.    On September 18, 2021, he submitted an appeal through SOLAS, along with a longer letter explaining his religious objections.

1063.    He received no response to his appeal.

1064.    On or about October 2, 2021, Mr. Sabatino was placed on involuntary leave without pay.

1065.    After the Second Circuit held that the DOE religious accommodation policies were unconstitutional in November 2021, and plaintiffs were entitled to fresh review, the Citywide Panel refused to review Mr. Sabatino's application, even though he'd been denied under the same unconstitutional policies as the *Kane* plaintiffs.

1066.    In August 2022, the DOE offered to reinstate employees who had been denied religious accommodation, but only if they were vaccinated on or before September 6, 2022.

1067.    Though the DOE knew Mr. Sabatino required religious accommodation, they did not offer him any accommodation.

1068.    Mr. Sabatino emailed multiple people at the DOE and the UFT asking for religious accommodation from vaccine requirement so that he could return in September 2022.

1069.    He was denied.

1070.    After the Mandate ended, DOE refused to reinstate Mr. Sabatino even though there is a staffing crisis, and he is well-qualified.

1071.    Mr. Sabatino learned about the problem codes in February 2023, and timely filed a notice of claim in March 2023.

1072.    DOE failed to adjust his claims.

1073.    Mr. Sabatino suffered severe financial, emotional, psychological and spiritual harm

116

because of Defendants' discriminatory actions and policies for which he deserves compensation.

**DIANA SALOMON**

1074.   Plaintiff DIANA SALOMON ("Ms. Salomon") is a resident of Suffolk County, New York. Prior to being denied religious accommodation, Ms. Salomon was a paraprofessional working in Queens with five years of service at DOE.

1075.   Ms. Salomon is a devout Catholic and has sincerely held religious beliefs that do not allow her to take a Covid-19 vaccine.

1076.   Among other religious concerns, she believes abortion is a sin and cannot take a Covid-19 vaccine because of their use of aborted fetal cell lines.

1077.   Ms. Salomon was appalled to hear about the discriminatory religious accommodation policy, which excluded Catholics like her from accommodation.

1078.   She believed it would be futile to apply, given that the Mayor, DOE and UFT had all announced that Catholics would not be accommodated, and she put most of her energy into fundraising and helping to organize the group lawsuits.

1079.   On or about the date that she was supposed to get vaccinated, Ms. Salomon decided to submit a request for religious accommodation through SOLAS.

1080.   The SOLAS system accepted her appeal for consideration.

1081.   She was placed on leave without pay before receiving any response.

1082.   A few days later, she was denied religious accommodation through the same autogenerated email sent to all applicants.

1083.   No one individually reviewed Ms. Salomon's application before sending the denial.

1084.   Ms. Salomon could have been accommodated without undue hardship and without posing a direct threat, in person or remotely.

1085.   Ms. Salomon was not provided with any appeal option.

1086.   She emailed various people attempting to get one, to no avail.

1087.   After the Second Circuit held that the DOE religious accommodation policies were unconstitutional in November 2021, and that plaintiffs were entitled to fresh review, Ms. Salomon made extensive attempts to get a Citywide Panel review.

1088.   The Citywide Panel refused to review Ms. Salomon's application, even though she'd been denied under the same unconstitutional policies as the *Kane* plaintiffs.

1089.   Ms. Salomon spoke to someone at DOE or the union who prepared a file for her, acknowledging that it looked like she might have been denied due process. He connected her with someone from the Human Resources department at the DOE.

1090.   The Human Resources representative told her that she filed too late and therefore was not allowed an appeal from the arbitrator or the Citywide Panel. She did note that there were some discussions about whether to apply the Citywide Panel review more broadly, and said, "so you have to wait until they decide who can refile and appeal." She suggested that Ms. Salomon contact the UFT.

1091.   Ms. Salomon emailed Beth Norton, General Counsel for the UFT repeatedly, asking if they were making progress to get Citywide Panel review for her and the thousands of others being denied the right to receive fresh consideration under lawful standards as ordered by the Second Circuit.

1092.   Ms. Norton said that they were trying to broaden those eligible for fresh consideration, but eventually it became clear that the City and DOE were unwilling to cooperate, and no fresh review would be given to Ms. Salomon.

1093.   Out of work, with several children to feed and a baby on the way, Ms. Salomon

applied for unemployment insurance benefits.

1094.   She was denied after the DOE claimed she had committed "misconduct" for failing to get vaccinated and was ineligible for a good cause determination because the Pope was unvaccinated.

1095.   Ms. Salomon appealed, and a hearing was held on or about February 18, 2022.

1096.   At the hearing, the DOE representative aggressively argued that Ms. Salomon did not qualify for religious accommodation, even if she had submitted a timely request, because the Pope is vaccinated. Because the Pope is vaccinated, the DOE argued that Ms. Salomon's religion did not prohibit her from taking a Covid-19 vaccine.

1097.   This argument was made almost *three months after* the Second Circuit held that the DOE had likely violated the First Amendment, and that it was blatantly unconstitutional to deny an applicant's religious belief because the Pope or another religious leader believes differently.

1098.   Shockingly, the ALJ adopted the argument almost verbatim, writing: "even if the claimant's exemption request was timely, she knew or should have known that her exemption request would be denied since the Pope, the Catholic leader, has spoken in favor of the vaccination [*sic*]. While the claimant contended…that she was against the vaccine because she believed that it was made using aborted fetal cells, her doctor did not advise her against COVID-19 vaccination; nor did her religion prohibited [*sic*] her from receiving the vaccine. Under the circumstances, I find that the claimant voluntarily resigned from her job without good cause…"

1099.   In the meantime, unable to work anywhere or receive unemployment compensation, Ms. Salomon applied and got into a master's degree program at Stonybrook University, where she also works part time in person with students.

1100.   The University granted her religious accommodation request, finding that her

religious beliefs merited protection and she could be exempted from the Covid-19 vaccine requirement without undue hardship.

1101.  Ms. Salomon filed her first notice of claim for religious discrimination against the DOE on or about May 2022.

1102.  The DOE failed to adjust her claims and did not respond.

1103.  In August 2022, the DOE offered to reinstate employees who had been denied religious accommodation, but only if they were vaccinated on or before September 6, 2022.

1104.  Though the DOE knew Ms. Salomon required religious accommodation, they did not offer her any accommodation.

1105.  After the Mandate ended, DOE refused to reinstate Ms. Salomon even though there is a staffing crisis, and she is well-qualified.

1106.  Ms. Salomon learned about the problem codes in February 2023, and timely filed another notice of claim in March 2023, explaining that there was a continuing pattern of discrimination and retaliation.

1107.  DOE failed to adjust her claims.

1108.  Ms. Salomon suffered severe financial, emotional, psychological and spiritual harm because of Defendants' discriminatory actions and policies for which she deserves compensation.

**NICOLE ANN SCHMIDT**

1109.  Plaintiff NICOLE ANN SCHMIDT ("Mrs. Schmidt") is a resident of Suffolk County. Prior to being denied religious accommodation, Mrs. Schmidt was a tenured special education teacher working in Queens with seventeen years of service at DOE.

1110.  Ms. Schmidt is a devout Catholic and has sincerely held religious beliefs that do not allow her to take a Covid-19 vaccine.

120

1111.   Among other religious concerns, she believes abortion is a sin and cannot take a Covid-19 vaccine because of their use of aborted fetal cell lines.

1112.   She also has serious health issues and was advised by her doctor not to take the vaccine.

1113.   Ms. Schmidt was informed that there was a deadline to get vaccinated and that she could apply for religious and medical accommodation but was not told that there was any deadline to apply for religious accommodation.

1114.   She was not able to submit both her religious and medical accommodation requests at the same time, so she chose to submit her religious accommodation application first.

1115.   She submitted a request for religious accommodation on or about October 4, 2021, which was the last day to submit proof of vaccination.

1116.   The SOLAS system accepted her appeal for consideration.

1117.   She was placed on leave without pay before receiving any response.

1118.   A few days later, she was denied religious accommodation through the same autogenerated email sent to all applicants.

1119.   No one individually reviewed Ms. Schmidt's application before sending the denial.

1120.   Ms. Schmidt could have been accommodated without undue hardship and without posing a direct threat, in person or remotely.

1121.   In fact, the year before, she had been granted a medical accommodation, and had worked remotely the whole year.

1122.   Ms. Schmidt was not provided with any option to appeal her bad-faith denial or submit her medical accommodation request.

1123.   She emailed various people attempting to get one, to no avail.

121

1124.   After the Second Circuit held that the DOE religious accommodation policies were unconstitutional in November 2021, and that plaintiffs were entitled to fresh review, Ms. Schmidt made extensive attempts to get a Citywide Panel review.

1125.   The Citywide Panel refused to review Ms. Schmidt's application, even though she'd been denied under the same unconstitutional policies as the *Kane* plaintiffs.

1126.   On February 7, 2022, Ms. Schmidt was terminated for failing to get vaccinated in violation of her sincerely held religious beliefs and medical need.

1127.   Ms. Schmidt filed her first notice of claim for religious discrimination against the DOE within ninety days of this date.

1128.   The DOE failed to adjust her claims and did not respond.

1129.   In August 2022, the DOE offered to reinstate employees who had been denied religious accommodation, but only if they were vaccinated on or before September 6, 2022.

1130.   Though the DOE knew Ms. Schmidt required religious accommodation, they did not offer her any accommodation.

1131.   After the Mandate ended, DOE refused to reinstate Ms. Schmidt even though there is a staffing crisis, and she is well-qualified.

1132.   Ms. Schmidt learned about the problem codes in February 2023, and timely filed another notice of claim in March 2023, explaining that there was a continuing pattern of discrimination and retaliation.

1133.   DOE failed to adjust her claims.

1134.   Ms. Schmidt suffered severe financial, emotional, psychological and spiritual harm because of Defendants' discriminatory actions and policies for which she deserves compensation.

**MARIA VASILIOU**

1135.   Plaintiff MARIA VASILIOU ("Mrs. Vasiliou") is a resident of Suffolk County, New York. Prior to being denied religious accommodation, Mrs. Vasiliou was a tenured teacher working in Queens with over fifteen years of service at DOE.

1136.   Mrs. Vasiliou has sincerely held religious beliefs that do not allow her to take a Covid-19 vaccine based on her Greek Orthodox Christian faith.

1137.   Among other religious concerns, she believes abortion is a sin and cannot take a Covid-19 vaccine because of their use of aborted fetal cell lines.

1138.   On or about September 16, 2021, Mrs. Vasiliou submitted an application for religious accommodation through SOLAS, including: a letter from her priest, attesting to her need for accommodation; a heartfelt personal letter; and a letter from her attorney, explaining why it was illegal to reject her beliefs if they were not dictated by the leader of the Orthodox faith, as long as she sincerely believed them, and why it was not an undue hardship to accommodate her, especially given her recent Covid-19 infection.

1139.   The next day, Mrs. Vasiliou received the autogenerated email sent to all applicants automatically, stating that she was denied because it would be more than a minimal burden to accommodate her.

1140.   No one individually reviewed Mrs. Vasiliou's application before sending the denial.

1141.   Mrs. Vasiliou could have been accommodated without undue hardship and without posing a direct threat, in person or remotely.

1142.   Mrs. Vasiliou immediately appealed her denial through SOLAS.

1143.   On or about September 29, 2021, Mrs. Vasiliou received a determination from arbitrator Barry Peek.

1144.    The determination offered three possible outcomes – granted, denied or other.

1145.    Mrs. Vasiliou's award had an "x" next to the word "Other", with no further explanation on the blank lines following it than "Exempt until 12/15/2021."

1146.    Mrs. Vasiliou was thus allowed to continue working on the payroll until December 15, 2021, though she was required to work remotely.

1147.    The DOE accommodated at least 163 employees after appeal.

1148.    Upon information and belief, no other religious accommodation was temporary in nature.

1149.    To the extent that any other religious exemptions were temporarily granted, the vast majority did not expire during the 2021-2022 school year.

1150.    Absolutely no explanation was given for why Mrs. Vasiliou's accommodation was only temporary and expired on December 15, 2021.

1151.    After the Second Circuit held that the DOE religious accommodation policies were unconstitutional in November 2021, and that plaintiffs were entitled to fresh review, the Citywide Panel refused to review Mrs. Vasiliou's application, even though her temporary religious accommodation request was expiring on December 15, 2021.

1152.    On or about December 15, 2021, Mrs. Vasiliou was placed on leave without pay for failing to get vaccinated when her temporary religious accommodation inexplicably expired.

1153.    Before she was placed on leave without pay, Mrs. Vasiliou submitted another request for accommodation through the SOLAS portal on or about December 2, 2021.

1154.    The Citywide Panel did not review her application.

1155.    Instead, Defendants bizarrely sent it to Scheinman Arbitration Services again.

1156.    She was denied on January 28, 2022. This time, the same arbitrator from Scheinman

Arbitration, Barry Peek wrote: "Employee first requested a religious exemption and then presented medical evidence which resulted in an award granting a temporary exemption on both issues until December 15, 2021.Upon receipt of additional medical evidence which does not establish an entitlement to an exemption within the Scheinman Award, both requests are now denied."

1157.   Mrs. Vasiliou could have continued to be accommodated without undue hardship, and without posing a direct threat, in person or remotely.

1158.   In August 2022, the DOE offered to reinstate employees who had been denied religious accommodation, but only if they were vaccinated on or before September 6, 2022.

1159.   The DOE allowed Mrs. Vasiliou to submit another religious accommodation request through SOLAS that same month.

1160.   Mrs. Vasiliou promptly requested religious accommodation through SOLAS on August 18, 2022.

1161.   She was denied with the same generic undue hardship denial, stating that it would be "more than a minimal burden" to accommodate her, that she had been initially sent in September 2021.

1162.   She applied again on September 9, 2022 through SOLAS, but does not know if she ever received a response.

1163.   Mrs. Vasiliou was terminated.

1164.   After the Mandate ended, DOE refused to reinstate Mrs. Vasiliou even though there is a staffing crisis, and she is well-qualified.

1165.   Mrs. Vasiliou suffered severe financial, emotional, psychological and spiritual harm because of Defendants' discriminatory actions and policies for which she deserves compensation.

## FIRST CAUSE OF ACTION

**(Failure to Accommodate in Violation of Title VII)**

*Class and all Plaintiffs against all Defendants*

1166.   Plaintiff incorporates all other paragraphs of this Complaint as if fully set forth herein.

1167.   As and for a First Cause of Action, Plaintiffs assert that both Defendants failed to accommodate their religious beliefs in violation of Title VII.

1168.   Title VII imposes an affirmative obligation on employers to make reasonable accommodations for their employees' (or potential employees') religious beliefs and practices. 42 U.S.C §2000e(j); 20 C.F.R. §1605.2(b).

1169.   Plaintiffs were entitled to accommodation, but were denied religious accommodation, first by the DOE and then the City, in violation of Title VII.

1170.   After the City was forced by a temporary restraining order to amend the Mandate to allow for religious exemptions, and the DOE was forced by an arbitrator to provide religious accommodations, each responded by pretending to offer it, but conspiring to deny as many applicants as possible in reality.

1171.   First, the DOE and the City conspired to get the arbitrator, who was a major donor to the Mayor, to adopt their proposed criteria for what qualified for religious accommodation, which was blatantly unconstitutional.

1172.   Among other discriminatory classifications, the criteria categorically unconstitutionally conditioned access to accommodation on membership in a preferred religious organization, whose leaders, according to the DOE, had never expressed support for vaccination, and were willing to provide a clergy letter.

1173.   Personally held views were categorically excluded, and the City and DOE admitted that they intended to exclude all Catholics and most other religions than Christian Scientists relief.

1174.   The DOE then participated in the appeals to zealously argue for discriminatory reasons to deny applicants, for example, because the Pope did not share their views, resulting in the denial of over 90% of the appeals to the arbitrator.

1175.   Second, though the arbitrator's award required accommodation without regard to undue hardship (at least for those who qualified under the discriminatory criteria), DOE denied every single applicant on the pretextual claim of "undue hardship" based on the unlawful "more than a minimal burden" without ever assessing in good faith whether they could have accommodated any employee.

1176.   These determinations were pretextual.

1177.   These determinations were also infected with the same animus that infected the appeals and the entire religious accommodation policy adopted, enforced and implemented by the Defendants.

1178.   Defendants did not individually review the applications before sending out the denials.

1179.   The same denial was sent out to employees who already worked remotely or easily could have done so.

1180.   The denials stated on their face that the standard used was the "more than a minimal burden" or *de minimis* standard, which was found unlawful by the United States Supreme Court.

1181.   The denials also stated on their face that they were issued in accordance with the Stricken Standards, which were found unconstitutional by the Second Circuit.

1182.   The DOE did not consider the required statutory factors before denying relief

based on undue hardship.

1183.    It would not have been an undue hardship to accommodate any of the applicants.

1184.    <u>Third</u>, Defendants knew that the SOLAS system, which was the method given to DOE employees to apply for accommodation, was crashing and glitching and shutting many people out of being able to apply by DOE's arbitrary deadlines or appeal.

1185.    Yet, even when employees alerted supervisors and others responsible for ensuring reasonable accommodation at DOE that they needed religious accommodation and were unable to apply through SOLAS, DOE refused to individually consider their applications.

1186.    The goal was never to actually assess reasonable religious objections in good faith.

1187.    Defendants' shared goal was to find a pretext to deny as many people as possible.

1188.    TO that end, DOE made arbitrary distinctions to shut employees out of access to accommodation at every possible turn.

1189.    Those that did get a review by an arbitrator were typically denied with no explanation, just an "x" next to the word "denied."

1190.    <u>Fourth</u>, after the Second Circuit held that the DOE's religious accommodation policies were not neutral or generally applicable, and were blatantly violative of the First Amendment, Defendants failed to remediate the harm as the City had promised the Second Circuit they would.

1191.    Instead, the City refused to consider thousands of employees denied religious accommodation under the original admittedly unconstitutional scheme, including the Named Plaintiffs and their proposed class members, even though they knew that these employees were seeking religious accommodation, and the DOE aided and abetted this refusal.

1192.    <u>Fifth</u> in August 2022, the DOE offered to reinstate those employees it had

terminated or forced out after failing to accommodate them. But even though the CDC had just issued guidance affirming the long known scientific consensus that the vaccinated and unvaccinated posed the same level of risk of transmission, the DOE failed to provide accommodation to those it knew, or should have known, was seeking religious accommodation, and denied every application on pretextual "undue hardship" again based on the de minimis standard.

1193.   After they were denied religious accommodation, Plaintiffs were each placed on leave without pay for failing to violate their faith by taking a Covid-19 vaccine and eventually terminated, forced to resign, forced to go on extended unpaid leaves, and/or forced to get violate their sincerely held religious beliefs.

1194.   To the extent that Defendants claim "undue hardship" as a defense, Plaintiffs reserve the right to rebut such allegations in more detail and with further evidence, as undue hardship is an affirmative defense and cannot give rise to dismissal for failure to state a claim.

1195.   Under Title VII, the burden is on the employer to demonstrate "that he is unable to reasonably accommodate an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employers' business." 42 U.S.C. §2000e(j).

1196.   For a Title VII claim, undue hardship is shown "when a burden is substantial in the overall context of an employer's business". *Groff v DeJoy*, 143 S Ct 2279, 2294 (2023). "[A]n employer must show that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business." *Id*. at 2295 (internal citations omitted).

1197.   To prevail on this defense, Defendants must show they considered all options for accommodation in good faith and proved, prior to denial, that such options were untenable

according to statutory factors and analysis of objective evidence assessed against each individual's circumstances.

1198.   Defendants did not meet their undue hardship burden, and the denials on this basis were pretextual.

1199.   To the extent that Defendants truly could not accommodate Plaintiffs in person or remotely without substantial hardship, Defendants could have provided other accommodations, such as allowing Plaintiffs to return without waiving their seniority or tenure, providing leave with health insurance not tied to coercive waivers, allowing them to work at other jobs during the leave, and refraining from attaching problem codes and/or accusing the employees of misconduct and attempting to block their efforts to collect unemployment insurance while they waited for the "emergency" to subside so they could return to work.

1200.   The DOE did not assess any of these potential accommodations to determine whether they would have posed a substantial hardship.

1201.   Instead, Defendants denied 100% of applicants, and then, argued for and enforced a discriminatory policy on appeal to categorically uphold most of the denials based on impermissible criteria, such as whether a person belonged to a preferred religion, or whether their supposed religious leader was vaccinated.

1202.   Tellingly, after the appeals, the DOE *did accommodate* at least 163 employees, some of them teachers, who posed no different threat than Plaintiffs and the thousands denied.

1203.   They made this determination based on criteria having nothing to do with safety or economic differences, and only to do with impermissible criteria such as membership in a preferred religious organization.

1204.   As a direct and proximate result of Defendants' failure to accommodate them,

Plaintiffs suffered, and continue to suffer economic damages, including but not limited to high interest on debt, penalties and fines for measures taken to try to survive after they were wrongfully deprived of income, medical debt, loss of homes and assets, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, including physical symptoms, for which they are entitled to an award of monetary damages in an amount to be determined at trial.

1205.   Plaintiffs are also entitled to injunctive and other equitable relief, including reinstatement with no break in service, front pay and back pay in salary and all benefits and employment terms, including retirement credits, compensatory damages, including pain and suffering, nominal damages at an amount to be determined at trial, and attorney's fees. 42 U.S.C. §§ 1981a(a)(1), 2000e-5(g)(1), (k).

1206.   Plaintiffs are also entitled to punitive damages in an amount to be determined at trial. Under Title VII, Plaintiffs can "recover punitive damages . . . [by] demonstrat[ing] that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1).

1207.   And Plaintiffs are entitled to reasonable attorneys' fees and costs.

1208.   Pursuant to the single filing rule, Plaintiffs are entitled to join this lawsuit because at least two of the named Plaintiffs in this lawsuit (Ms. Hogan and Mr. Contreras) timely filed complaints with the EEOC alerting the DOE and the City about class-wide discrimination and failure to accommodate, and this lawsuit was timely commenced within ninety days of these Plaintiffs' receipt of a right to sue letter.

1209.    Pursuant to the same rule, all members of the proposed class are entitled to Title VII relief on the same basis without individually exhausting administrative remedies. *See Tolliver v. Xerox Corp.,* 918 F.2d 1052 (2d Cir. 1990).

1210.    The claims of the administrative claimants and the rest of the proposed class and group all arise out of the same circumstances and within the same time frame. This is sufficient to allow the entire class to join in this claim pursuant to the single-filing rule. *Id.* at 1058.

1211.    Additionally, though they need not have in this action, the administrative claims and responses from Defendants provided notice that the issues were class wide.

1212.    Defendants and the EEOC were also on notice that the issues were class wide through the filing of hundreds of other claims from similarly situated DOE employees, and multiple related proposed class-action lawsuits referencing the widespread violation of Title VII and anticipated actions regarding same.

1213.    Plaintiffs each individually and as a class have asserted failure to accommodate claims under Title VII.

## SECOND CAUSE OF ACTION

### (Discrimination in Violation of Title VII)

*Class and all Plaintiffs against all Defendants*

1214.    Plaintiffs reincorporate all paragraphs of this Complaint as if fully written herein.

1215.    In addition to failure accommodate claims, Plaintiffs assert religious discrimination claims against both Defendants – both pattern and practice and as applied.

1216.    Title VII was enacted with the purpose of prohibiting employment discrimination based on religion, among other protected characteristics. 42 U.S.C § 2000e et seq. 71.

1217.    Under Title VII, it is an unlawful employment practice for an employer: (1) to fail

or to refuse to hire or discharge any individual, or to otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin; or (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin. 42 U.S.C §2000e-2(a).

1218.   Plaintiffs and their proposed class are all members of a protected class – specifically, they all have protected religious beliefs.

1219.   Each was qualified to hold their position, as evidenced by the fact that they were all DOE employees in good standing before they were denied religious accommodation.

1220.   The fact that accommodation was offered shows that it was not an employment qualification to be vaccinated, since employees could receive religious accommodation and still be qualified to work, and at least 163 employees did receive such accommodation to work unvaccinated.

1221.   Moreover, related litigation has already held that the City lacked the authority to require vaccination as a condition of employment for DOE employees, and Defendants are precluded from relitigating that issue here.

1222.   Plaintiffs each suffered an adverse employment condition, including, *inter alia*, being denied religious accommodation, suspended without pay, charged with "misconduct", denied unemployment compensation, having problem codes placed in their files, and for most, being terminated and barred from return to the DOE or in many cases, private employers too.

1223.   These adverse actions occurred under circumstances giving rise to an inference of discrimination.

1224.   In fact, the evidence in this case raises much more than just an *inference* of discrimination, which is the most that is required under notice pleading standards.

1225.   Defendants' adoption, implementation, ratification and enforcement of a facially discriminatory religious accommodation policy, which conditioned access to accommodation on membership in a preferred religious organization, and excluded access to those with unorthodox religious beliefs, shows discrimination as a matter of law.

1226.   The Supreme Court has held that an employer's adoption of a policy that makes express classifications based on a protected characteristic constitutes "direct evidence of discrimination," which is sufficient as a matter of law to win relief absent an affirmative defense. *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111 (1985).

1227.   In so holding, the Supreme Court explained that "the *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination." *Id.* at 121 (referencing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973)).

1228.   Use of such classifications demonstrates a discriminatory purpose as a matter of law, without regard to the decision-makers' animus or subjective intent. *See Miller v. Johnson*, 515 U.S. 900, 904–05 (1995); *see also Hassan v. City of New York*, 804 F.3d 277, 295 (3d Cir. 2015) ("Put another way, direct evidence of intent is 'supplied by the policy itself.'").

1229.   The Plaintiff's case here is even stronger than *TWA*, because unlike the age discrimination statutes, there is no affirmative defense to a policy that discriminates between orthodox and unorthodox religious beliefs.

1230.   The Stricken Standard policy made express classifications based on protected characteristics – to wit – membership in a disfavored religious group and defined all other religious beliefs as somehow not meriting the same protection as those the policy favored.

1231.   Contrary to the Stricken Standards' unlawful criteria, the term "religion" includes all aspects of religious observance and practice, as well as belief. 42 U.S.C §2000e(j).

1232.   Protected religious beliefs also include "moral or ethical beliefs as to what is right and wrong which are sincerely held with the strength of traditional religious views." 29 C.F.R. 1605.1; 42 U.S.C §2000e(j).

1233.   It is well-settled law, acknowledged by the Supreme Court of the United States all the way down to the district courts and administrative agencies as well as state court systems, that an individual seeking to demonstrate a sincerely held religious belief under New York State or federal statutory or constitutional standards need not prove that his belief is part of the recognized dogma of a religious sect. *See, e.g., Widmar v. Vincent*, 454 U.S. 263 (1981) ("The beliefs need not be consistent with the dogma of any organized religion, whether to not the plaintiffs belong to any recognized religious organization.")

1234.   "The fact that the religious group to which the individual professes to belong may not accept such belief will not determine whether the belief is a religious belief of the employee." 29 C.F.R. 1605.1.

1235.   An employee's belief or practice can be "religious" under Title VII even if the employee is affiliated with a religious group that does not espouse or recognize that individual's belief or practice, or if few – or no – other people adhere to it. *Welsh v. U.S.*, 398 U.S. 333, 343 (finding that petitioner's beliefs were religious in nature although the church to which he belonged did not teach those beliefs); *Thomas v. Rev. Bd. Of Ind. Emp't Sec. Div.*, 450 U.S. 707, 715 (1981) (disagreement among sect workers as to whether their religion made it sinful to work in an armaments factory irrelevant to whether belief was religious in nature because "[t]he guarantee of free exercise is not limited to beliefs which are shared by all of the members of a religious sect.").

1236.   Employers, especially government employers, must not entangle themselves in religious questions when assessing a request for religious accommodation.

1237.   Employers, especially government employers, cannot substitute judgment for the employee about whether the belief is religious in nature.

1238.   Nor can employers, especially government employers, deny an applicant because her religious beliefs overlap with similar secular concerns – religious employees are entitled to have both religious and secular concerns, and this does not diminish protection of the employee's religious practices.

1239.   The Supreme Court of the United States cautions: "it must be remembered that, in resolving these exemption problems, one deals with the beliefs of different individuals who will articulate them in a multitude of ways. In such an intensely personal area, of course, the claim of the registrant that his belief is an essential part of a religious faith must be given great weight." *U.S. v. Seeger*, 85 S.Ct. 850, 863 (1965); *See also EEOC v. United Health Programs of Am., Inc.*, 213 F. Supp. 3d 377, 393 (E.D.N.Y. 2016) ("Delineating the meaning of 'religion' for purposes of Title VII often requires resort to First Amendment cases, where nontraditional religious practices are a frequent source of litigation.").

1240.   It is impermissible "to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds." *Hernandez v. Comm'r*, 490 U.S. 680, 699 (1989).

1241.   Defendants violated each of these basic rules and more.

1242.   In addition to adopting a written policy that makes express classifications and favors certain religions over others, hostile comments by high-level City actors' and DOE agents about the invalidity of sincere religious objections grounded in concerns about abortion or

personal prayer, or derived from religions other than Christian Science, constitute further direct evidence of discrimination.

1243.   As and for another count of direct evidence of discrimination, the City and DOE further discriminated against Plaintiffs by subjecting those who did not qualify under the Stricken Standards to a more onerous undue hardship standard than those who were favored under the unconstitutional criteria.

1244.   Under the Stricken Standards, those who met the discriminatory definition "shall be accommodated" and no provision was made for an undue hardship defense. Pursuant to that policy, at least 163 people were accommodated.

1245.   But when the Citywide Panel gave supposed "fresh consideration" to the applications of some of those denied under the original Stricken Standards, they applied a blanket undue hardship ban on accommodation for any teacher and most other employees – thus imposing a less generous standard.

1246.   By adopting a substantially different undue hardship standard for those who were deemed to meet the discriminatory criteria of the Stricken Standards, both DOE and the City showed direct discrimination against unorthodox religious beliefs.

1247.   Moreover, they continued to apply the same unconstitutional bar against accommodation of personally held religious beliefs and beliefs grounded in concerns about abortion.

1248.   Under the direct evidence standard of review, it must be presumed that the adverse employment actions were pretextual and discriminatory, and, under this framework, Defendants cannot survive summary judgment without asserting an affirmative defense.

1249.   No such defense is available because it is black letter law that the government may

not target religious minorities for disparate treatment, no matter how well-intentioned the subject regulation may be. *Trump v. Hawaii*, 138 S. Ct. 2392, 2423 (2018).

1250.   In the alternative Plaintiff sets forth a prima facie case under the *McDonnell Douglas* framework or any other framework that is permissible to apply.

1251.   Plaintiffs were each qualified for employment at the time they were denied, and each could have been accommodated without undue hardship, but they were denied and subjected to adverse employment actions, including, as one of many examples, being suspended without pay.

1252.   Plaintiffs have more than established an inference of discriminatory intent, as DOE representatives and the City's representatives have repeatedly made public comments and official comments dismissing and showing animus towards religious opposition to vaccination (other than supposedly for Christian Scientists).

1253.   Plaintiffs also provided ample evidence that gives rise to an inference of further discrimination.

1254.   For example, even though they'd been ordered to make religious accommodations (by a court and by an arbitrator), Defendants denied 100% of all applicants immediately upon receipt of their application, leading to the unavoidable conclusion that the denials were pretextual, and based on discrimination rather than a good faith undue hardship finding.

1255.   The DOE's representatives then argued repeatedly that applicants should be denied for discriminatory reasons in the appeal hearings before an arbitrator provided under the Stricken Standards, claiming all Jews, Muslims, Catholics and Buddhists, should be presumptively disqualified based on their religion, among other discriminatory policies.

1256.   This leads to an inference that all aspects of the religious accommodation policies

were infected by the same animus.

1257.   The evidence also leads to an inference that the Citywide Panel's affirmance of all denials except one were infected by the same animus and were also pretextual.

1258.   This is compounded by hostile and dismissive comments made by the Mayor and Mr. Eichenholtz, who was placed in charge of the Citywide Panel process by the Mayor.

1259.   It is also shown by the email sent to Mr. Eichenholtz by a trainee on the panel, who confirmed that Mr. Eichenholtz had told her that beliefs related to a concern about abortion would not be accommodated.

1260.   It is also shown by the Citywide Panel's notations received in related discovery, which show that the Citywide Panel continued to reject personally held beliefs, such as guidance from prayer, unlawfully substituting judgment to find that such beliefs, while sincere, are somehow "not religious in nature" or "do not preclude the applicant from getting vaccinated."

1261.   Defendants' discrimination impacted all applicants for religious accommodation, including Plaintiffs, many of whom were told, point blank told that they were being denied relief because their religious "leader" allegedly did not share their beliefs, among other discriminatory reasons.

1262.   Plaintiff should also prevail under a disparate impact theory of discrimination.

1263.   Disparate impact discrimination is also barred by Title VII, and "occurs when an employer uses facially neutral policies or practices that a have a disproportionately adverse effect on protected groups." *Ricci v. DeStefano*, 557 U.S. 557, 577–78 (2009).

1264.   "Disparate-impact claims do not require a showing of discriminatory intent." *United States v. Brennan*, 650 F.3d 65, 90 (2d Cir. 2011). Rather, "a plaintiff establishes a prima facie violation by showing that an employer uses 'a particular employment practice that causes a

disparate impact on the basis of race, color, religion, sex, or national origin.'" *Ricci v. DeStefano*, 557 U.S. 557, 578 (2009) (citing 42 U.S.C. § 2000e–2(k)(1)(A)(i)).

1265.   An employer can rebut a prima facie case "by demonstrating that the practice is 'job related for the position in question and consistent with business necessity.'" *Id*.

1266.   The plaintiff, in turn, can rebut that showing by "showing that the employer refuses to adopt an available alternative employment practice that has less disparate impact and serves the employer's legitimate needs." *Id*. (citing §§ 2000e–2(k)(1)(A)(ii) and (C)).

1267.   "The basis for a successful disparate impact claim involves a comparison between two groups—those affected and those unaffected by the facially neutral policy." *Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 575 (2d Cir.2003).

1268.   Most people can take a Covid-19 vaccine without violating their religious beliefs.

1269.   But a recognized minority of people cannot.

1270.   Those who cannot were disparately impacted by the Covid-19 vaccine policy, and the draconian religious accommodation policies that were imposed as a result.

1271.   The employers cannot show that imposing the Mandate was consistent with business necessity, as the vaccines do not stop transmission.

1272.   But even if they could, the DOE could have been far less punitive with those employees who were unable to take the vaccine.

1273.   DOE did not have to put a scarlet letter on people's files, or strip them of tenure, or coerce them into signing waivers, or try to prevent them from getting work anywhere – at the DOE or elsewhere, or refuse to do 3020a hearings, which by law, they were required to provide to all tenured employees before making any change to conditions or benefits.

1274.   And the DOE could have come up with ways to accommodate employees, like

weekly testing, which was sufficient at every other school district in the state and could have worked at the DOE too.

1275.   And there is of course a disparate impact claim among religions, as some religions and types of religious beliefs were preferred over others during the religious accommodation process.

1276.   As a direct and proximate result of each Defendants' discrimination, Plaintiffs suffered harms, including but not limited to those set forth in the first cause of action.

1277.   Plaintiffs seek injunctive and declaratory relief, and damages, including nominal, actual, compensatory, and punitive damages, along with attorneys' fees pursuant to this cause of action.

1278.   Plaintiffs are also entitled to reasonable attorneys' fees and costs.

### THIRD CAUSE OF ACTION

### (Retaliation and Harassment in Violation of Title VII)

*Class and all Plaintiffs against all Defendants*

1279.   Plaintiffs incorporate all other paragraphs of this Complaint as if fully set forth herein.

1280.   Pursuant to the single filing rule, Plaintiffs also assert retaliation and harassment claims in violation of Title VII.

1281.   Plaintiffs each sought religious accommodation from the vaccine mandate, which is protected activity pursuant to statute.

1282.   Defendants were aware that Plaintiffs sought to protect their religious rights, as each Plaintiff applied for accommodation and each Defendant acknowledged receipt of their application and indicated that it would be considered.

1283. Rather than accommodate Plaintiffs, Defendants denied accommodation, terminated them, attached damaging problem codes to their files, and then blocked their efforts to get unemployment insurance, asserting that they'd engaged in misconduct for being unable to violate their sincerely held religious beliefs and/or that they'd "voluntarily" quit when in reality they were terminated against their will.

1284. Defendants used many of the discriminatory and unconstitutional arguments they already knew were unlawful – such as that applicants had to be denied unemployment insurance because the Pope did not agree with their beliefs.

1285. Defendants also denied Plaintiffs a 3020a hearing, even though it is illegal to take adverse action against a tenured employee or attach a finding of "misconduct" to their files without such hearing.

1286. Defendants also refuse to rehire most Plaintiffs without coercive and unnecessary conditions not imposed on new hires.

1287. Defendants also harassed and denigrated Plaintiffs in the arbitration hearings and made dismissive and derogatory comments about their faith to the press and to their face.

1288. As a direct and proximate result of each Defendants' discrimination, Plaintiffs suffered harms, including but not limited to those set forth in the first cause of action.

1289. Plaintiffs seek injunctive and declaratory relief, and damages, including nominal, actual, compensatory, and punitive damages, along with attorneys' fees pursuant to this cause of action.

1290. Plaintiffs are also entitled to reasonable attorneys' fees and costs.

## FOURTH CAUSE OF ACTION

### (Violation of SHRL)

*Class and all Plaintiffs against all Defendants*

1291.   Plaintiffs repeat and realleges all paragraphs of this Complaint as if fully set forth herein.

1292.   For the reasons set forth in the first three causes of action, *supra*, Plaintiffs assert claims under the SRHL against both defendants for failure to accommodate, discrimination, harassment, retaliation and aiding and abetting discrimination in violation of the SHRL.

1293.   At all relevant times, the SHRL has been in full force and effect, and has applied to both Defendants' conduct.

1294.   Defendants worked in concert to deprive Plaintiffs of reasonable accommodation.

1295.   The SHRL provides:

> It shall be an unlawful discriminatory practice for an employer, or an employee or agent thereof, to impose upon a person as a condition of obtaining or retaining employment, including opportunities for promotion, advancement or transfers, any terms or conditions that would require such person to violate or forego a sincerely held practice of his or her religion…unless, after engaging in a bona fide effort, the employer demonstrates that it is unable to reasonably accommodate the employee's or prospective employee's sincerely held religious observance or practice without undue hardship on the conduct of the employer's business.

N.Y. Executive Law § 296(10(a).

1296.   It is also a violation of the SHRL for any party to aid or abet another in the violation of rights guaranteed thereunder.

1297.   Undue hardship is defined under the SHRL as "an accommodation requiring significant expense or difficulty (including significant interference with the safe or efficient operation of the workplace…)." N.Y. Executive Law § 296(10(d)

1298.   If the undue hardship is alleged based on a safety concern, "the employer must make an individualized assessment, based on reasonable judgment that relies on current medical knowledge or the best available objective information to ascertain: the nature, duration and

severity of the risk; the probability that the potential injury will actually occur, and whether reasonable accommodations, such as modification of policies, practices or procedures, will mitigate the risk." 9 CRR-NY 466.11.

1299.  At all relevant times, Defendants were Plaintiff's employer, or potential employer, as defined by the SHRL.

1300.  The City was also the DOE's agent, in the Citywide Panel reviews, and controlled the DOE, directing, aiding and abetting the discriminatory practices at every level of review.

1301.  For the same reasons set forth above in the First Claim, Defendants violated the SHRL by failing to accommodate Plaintiffs.

1302.  The same standards which define protected religious beliefs under federal standards govern state and local statutory accommodation requests, though the SHRL and CHRL are more generous and expressly include creed as a protected category of religious belief.

1303.  Similar standards govern the undue hardship determination, though there is a heightened burden on employers under the SHRL to show a *significant* burden and to assess specific factors using the most current objective evidence prior to denial of relief.

1304.  Failure to engage in cooperative dialogue about undue hardship also leads to a strong presumption of discrimination under the state statutory requirements.

1305.  Accommodating Plaintiffs would not have required significant expense or difficulty from DOE.

1306.  Accommodating Plaintiffs would not significantly interfere with the safe or efficient operation of the DOE's workplaces.

1307.  Accommodating Plaintiffs would not require the DOE to violate a bona fide seniority system.

1308.  Defendants failed to engage in any interactive process with Plaintiff regarding potential accommodations or the difficulties posed by any prior to denial.

1309.  Defendants violated the SHRL by denying Plaintiffs' request for reasonable accommodation without first engaging in an interactive process and assessing the statutory factors.

1310.  Instead of accommodating Plaintiffs' religious beliefs, Defendants retaliated against Plaintiffs by suspending them, and terminating them if they would not violate their religious beliefs.

1311.  For the same reasons set forth in the preceding claims, and herein, Defendants also are liable under the SHRL for discrimination, harassment and retaliation based on religion.

1312.  The SHRL adopts the same frameworks for assessing discrimination, retaliation and harassment claims but is governed by a standard even more generous to Plaintiffs.

1313.  Aiding and abetting discrimination is expressly also listed as a standalone violation of the statute even if the colluder is not the employer.

1314.  Plaintiffs seek relief on behalf of themselves and all others similarly situated to address widespread discriminatory practices.

1315.  This goal meets the public interest exception to the notice of claim requirements applicable to the DOE.

1316.  There are no notice of claim requirements attaching to claims under the SHRL against the City.

1317.  Moreover, most plaintiffs did file notices of claims with the DOE within three months of the occurrence, and these claims alerted Defendants that these claims were class wide.

1318.   And the functional notice requirements were met in any event by timely EEOC complaints of the administrative plaintiffs and other notifications providing the DOE with notice of class wide discrimination.

1319.   As a direct and proximate result of each Defendants' discrimination, retaliation and harassment, Plaintiffs suffered harms, including but not limited to those set forth in the first cause of action.

1320.   Plaintiffs seek injunctive and declaratory relief, and damages, including nominal, actual, compensatory, and punitive damages, along with attorneys' fees pursuant to this cause of action.

1321.   And Plaintiffs are entitled to reasonable attorneys' fees and costs under the SHRL. Executive Law § 297(10).

### FIFTH CAUSE OF ACTION

**(Violation of CHRL)**

*Class and all Plaintiffs against all Defendants*

1322.   For the reasons set forth in the first four causes of action, *supra*, Plaintiffs assert claims under the CHRL against both defendants for failure to accommodate, discrimination, harassment, retaliation and aiding and abetting discrimination in violation of the CHRL.

1323.   Plaintiffs repeat and realleges all paragraphs of this Complaint as if fully set forth herein.

1324.   At all relevant times, the CHRL has been in full force and effect and has applied to Defendants' conduct.

1325.   Pursuant to the CHRL:

It shall be an unlawful discriminatory practice for an employer or an employee or agent thereof to impose upon a person as a condition of obtaining or retaining employment any

146

terms or conditions, compliance with which would require such person to violate, or forego, a practice of, such person's creed or religion,…and the employer shall make reasonable accommodation to the religious needs of such person.

N.Y.C. Admin Code § 8-107(3)(a).

1326.  Like the SHRL, the CHRL also prohibits encouraging, aiding or abetting the violation of any rights provided therein.

1327.  As set forth in Claims 1-4, Defendants colluded to deny accommodation to Plaintiffs and their similarly situated class members.

1328.  As a result of each Defendants' actions, Plaintiffs were each suspended and/or terminated, and in some instances forced to submit to vaccination in violation of their sincerely held religious beliefs.

1329.  Both Defendants actions violated Plaintiffs' rights and proximately caused their adverse employment consequences.

1330.  Both Defendants also failed to engage in the required cooperative dialogue with Plaintiffs before denying their accommodation requests, which is a separate and independent act of discrimination under the CHRL.

1331.  The CHRL prohibits denial of accommodation until the employer engages in a cooperative dialogue.

The determination that no reasonable accommodation would enable the person requesting an accommodation to satisfy the essential requisites of a job or enjoy the right or rights in question may only be made after the parties have engaged, or the covered entity has attempted to engage, in a cooperative dialogue.

N.Y.C. Admin. Code § 8-107(28)(2).

1332.  Pursuant to statute, the cooperative dialogue must include analysis and discussion about any possible accommodation and the challenges they might face, so that the employee has a chance to engage with the process and offer suggestions too which can be considered in good

faith before denial.

1333.   This amendment was made in response to a Court of Appeals holding that the failure to engage in cooperative dialogue, while very important and indicative of whether an employer acted in good faith, was not enough to result in a summary judgment determination absent more.

1334.   The legislative history of the CHRL amendment notes that the amendment was meant to cure this holding, and to make failure to engage in cooperative dialogue an independent basis for finding summary judgment against the employer, even if undue hardship could have ultimately been proven.

1335.   Other important amendments are relevant too.

1336.   In 2005, the New York City Council amended the CHRL by passing the Local Civil Rights Restoration Act of 2005 (the "Restoration Act"), N.Y.C. Local L. No. 85.

1337.   "In amending the []CHRL, the City Council expressed the view that the []CHRL had been 'construed too narrowly' and therefore 'underscore[d[ that he provisions of New York City's Human Rights Law are to be construed independently from similar or identical provisions of New York state or federal statutes.'" Restoration Act § 1.

1338.   To bring about the change, the Act established two new rules of construction. First, it created a "one way ratchet" by which interpretations of state and federal civil rights statutes can serve only "'as a *floor* below which the City's Human Rights law cannot fall.'" Restoration Act § 1. Second, it amended the CHRL to require that its provisions "be construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof, regardless of whether federal or New York State civil and human rights laws, including those laws with provisions comparably-worded to provisions of this title[,] have been so construed." Restoration Act § 7

(amending N.Y.C. Admin. Code § 8-130).

1339.   In 2011, New York City enacted the Workplace Religious Freedom Act, amending sections 8-102 and 8-107, to adopt a stiffer standard for assessing undue hardship. The committee report noted that the City Council's intention was "to provide greater protection to workers under the City Human Rights Law than the federal, and even the State, human rights provisions provide." N.Y.C. Council, Report of Committee on Civil Rights on Proposed Int. No. 632, Aug. 16, 2011.

1340.   Under the CHRL, undue hardship is defined:

"Reasonable accommodation" as used in this subdivision, shall mean such accommodation to an employee's or prospective employee's religious observance or practice as shall not cause undue hardship in the conduct of the employer's business. The employer shall have the burden of proof to show such hardship. "Undue hardship" as used in this subdivision shall mean an accommodation requiring significant expense or difficulty (including a significant interference with the safe or efficient operation of the workplace or a violation of a bona fide seniority system.)

N.Y.C. Admin. Code § 8-107(3)(b).

1341.   Plaintiffs were able to perform the essential duties of their job with reasonable accommodation.

1342.   Accommodating Plaintiffs would not require significant expense or difficulty from the Defendants.

1343.   Accommodating Plaintiffs would not require the Defendants to violate a bona fide seniority system.

1344.   Accommodating Plaintiffs would not significantly interfere with the safe or efficient operation of Defendant's workplace.

1345.   Plaintiffs and their colleagues each asserted sincere religious objections and there was no basis to question their sincerity.

1346.   Defendants did not establish that Plaintiffs posed a direct threat because of their vaccine status, nor can they do so, as set forth more fully above.

1347.   Plaintiffs also assert discrimination, harassment, and retaliation claims pursuant to CHRL, as more fully described in the SHRL and Title VII causes of action, which apply the same standards, though the CHRL is to be the most favorably construed towards Plaintiffs.

1348.   As a direct and proximate result of Defendants' unlawful discriminatory practices, Plaintiff has suffered and continues to suffer substantial losses, for which she is entitled to an award of monetary damages which exceeds the jurisdiction limits of all lower courts, along with reinstatement, declaratory nominal, compensatory and other relief.

1349.   As a direct and proximate result of Defendants' failure to accommodate Plaintiff, Plaintiff suffered, and continues to suffer, severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages in an amount to be determined at trial.

1350.   As a direct and proximate result of Defendants' failure to accommodate, Plaintiff is also entitled to injunctive and declaratory relief, nominal and compensatory damages, pain and suffering and punitive damages.

1351.   As set forth above, Defendants' conduct was willful and showed a reckless disregard for Plaintiff's rights, and the rights of all of her similarly situated colleagues. In denying accommodation, Defendants violated their own policies as well as well-established law, all while flouting multiple court orders.

1352.   Plaintiff is also entitled to attorneys' fees, expert fees, and other costs under the CHRL N.Y.C. Admin Code §8-502(g).

## SIXTH CAUSE OF ACTION

### (Violation of the U.S. Constitution - Equal Protection Clause)

*Class and all Plaintiffs against all Defendants*

1353.   Plaintiffs reincorporate all paragraphs of this Complaint as if fully written herein.

1354.   Plaintiffs asserts that DOE's adoption of a facially discriminatory religious accommodation policy, which conditioned access to accommodation on membership in a preferred religious organization, and excluded access to those with unorthodox religious beliefs, constitutes direct evidence of discrimination in violation of the Equal Protection Clause of the United States Constitution.

1355.   Defendants are judicially and collaterally estopped from arguing that the Stricken Standards policy is non-discriminatory. As the Second Circuit already noted: "The City concedes that the Arbitration Award…'may' have been 'constitutionally suspect,' [] and its defense of that process is half-hearted at best. Indeed, it offers no real defense of the Accommodation Standards at all." *Kane v. de Blasio,* 19 F.4th 152, 167 (2d Cir. 2021). "We confirm the City's 'susp[icion]' …" *Id.*

1356.   First, the Court held that the written policy is not neutral, because on its face, it singles out unorthodox beliefs and faiths for disparate and unequal treatment: "We conclude, first, that the procedures specified in the Arbitration Award and applied to Plaintiffs are not neutral. The Supreme Court has explained that 'the government, if it is to respect the Constitution's guarantee of free exercise, cannot impose regulations that are hostile to religious beliefs of affected citizens and cannot act in a manner that passes judgment upon or presupposes the illegitimacy of religious beliefs and practices.' *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n,* ---U.S.---, 138 S. Ct. 1719, 1731 (2018)." *Id.* at 168. Moreover, hostile comments by

high-level City actors' and DOE agents about the invalidity of sincere religious objections grounded in concerns about abortion or personal prayer, or derived from religions other than Christian Science, constitute additional direct evidence of discrimination.

1357.   Next, the Court also acknowledged additional direct evidence of discrimination in the application of DOE's facially unlawful standards, for example, through DOE's pattern of recharacterizing people's beliefs as personal rather than religious. "Denying an individual a religious accommodation based on someone else's publicly expressed religious views – even the leader of her faith – runs afoul of the Supreme Court's teaching that [i]t is not within the judicial ken to question the centrality of particular beliefs or practices of faith, *or the validity of particular litigants' interpretation of those creeds." Id.* at 168-169 (emphasis in original).

1358.   Because Defendants adopted written and de facto policies with express classifications based on which religion a person belonged to, and because of the other Direct Evidence of discrimination set forth above, Plaintiffs' denials of accommodation must be presumed to be pretextual and discriminatory under this framework, and Defendants cannot survive summary judgment since there is no affirmative defense.

1359.   As set forth more fully in the complaint, Defendants' religious animus infected every level of review and every policy choice Defendants applied to religious accommodation decisions or consequences after denial to Plaintiff and the Proposed Class.

1360.   As a direct and proximate result of Defendants' discrimination, Plaintiffs suffered, and continue to suffer damages and harm.

1361.   Plaintiffs are entitled to injunctive and other equitable relief, including reinstatement with no break in service, front pay and back pay in salary and all benefits and employment terms, including retirement credits, compensatory damages, including pain and

suffering, nominal damages at an amount to be determined at trial, and attorney's fees. 42 U.S.C. §§ 1981a(a)(1), 2000e-5(g)(1), (k).

1362.   Plaintiffs also seek declaratory relief along with nominal damages. *Id.*

## SEVENTH CAUSE OF ACTION

**(Infringement of Free Exercise Clause – United States Constitution)**

*Class and all Plaintiffs against all Defendants*

1363.   Plaintiffs repeat and reallege all paragraphs of this Complaint as if fully set forth herein.

1364.   The Free Exercise Clause of the First Amendment to the United States Constitution prohibits the government from burdening the free exercise of religion.

1365.    The First Amendment provides, in pertinent part, that "Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof…" U.S. Const. amend. I.

1366.   The Supreme Court has held that "a law burdening religious practice that is not neutral or not of general application must undergo the most rigorous of scrutiny." *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 546 (1993).

1367.   Where there is evidence of animus, or where there is a mechanism for exemption or lack of general neutrality requirements, an infringement must be strictly scrutinized, and the Defendants bear the burden of showing that they applied a law or policy using the least restrictive means available to further a compelling state interest.

1368.   Plaintiffs' sincerely held religious beliefs prohibit them from taking a Covid-19 vaccine.

1369.   Defendants' denials of accommodation substantially burdened Plaintiffs' free exercise of religion, in that they were forced to violate their faith if they wanted to keep her job and avoid serious consequences.

1370.   Defendants' refusal to accommodate Plaintiffs' religious practices created coercive pressure on them to change or violate their sincerely held religious beliefs.

1371.   The Mandate, which Defendants used to justify the denial of accommodation, was not neutral nor was it generally applicable.

1372.   The Mandate is not generally applicable, because the Mayor and other members of the Executive Branch is empowered to make exceptions to the Mandates in their sole discretion.

1373.   Since the DOE Mandate was issued, the Mayor has issued over a hundred executive orders, extending and expanding coverage of the City's vaccine mandates to various different groups, and then making carve-outs and exceptions according to secular reasons that undermine the Government's stated reason the same way that a religious carve out would.

1374.   The Mandate is also not generally applicable because it makes exceptions for secular reasons that defeat the purpose of the Mandate in the same manner.

1375.   For example, the DOE Mandate allows bus drivers to remain unvaccinated, even though they are in enclosed busses with unvaccinated children, and it allows students to remain unvaccinated and attending class in person, though they are just as able to spread Covid-19 to their peers as teachers, but it requires teachers to be vaccinated.

1376.   The Mandate is also not generally applicable, because, on its face, it allows employers to exercise a mechanism for individualized exception – to wit, medical or religious accommodation.

1377.  Pursuant to state and municipal law, discretionary mechanisms for exemption existed whereby each of the Defendants was not only allowed but required to consider whether to grant religious or medical accommodation when an employee applies.

1378.  These exemption reviews are defined to be individualized processes, which are, like the "good cause" standard, open to interpretation and not a ministerial act, like determining whether a person has a doctor's note. Thereby, discretion is routinely applied in deciding whether to accept or deny an application for accommodation.

1379.  The DOE also adopted a policy for religious accommodations, thereby defeating any argument that the Mandates were general applicable without a mechanism for accommodation, as applied, and the City also added an express provision, coupled by a promise to a state court, that religious accommodation and exemption would be allowed.

1380.  The religious accommodation policies implemented and enforced by the DOE and the City were also themselves government policies that burdened religion, and they were not neutral nor generally applicable either.

1381.  As recognized by the Second Circuit, DOE's adoption of a discriminatory written policy defeats neutrality.

1382.  Comments by decision-makers also defeat neutrality.

1383.  Because the policies were not neutral, strict scrutiny applies.

1384.  The Second Circuit also already held that the Defendants' religious accommodation policies were not generally applicable, because decision-makers exercised discretion about whether to grant or deny accommodation, thereby evidencing a mechanism for individualized exemption.

1385.  Because the policies were not generally applicable, strict scrutiny applies.

1386.   Defendants, who are each state actors, did not have a compelling interest in requiring Plaintiffs to be vaccinated.

1387.   The vaccine cannot stop transmission, and there is therefore outside of the state's police powers.

1388.   To the extent that the Defendants could prove that any significant danger existed because of Plaintiff's vaccine status, reasonable accommodations such as weekly testing, daily symptom checks, mask use or allowing remote or off-site meetings could have been implemented without undue hardship.

1389.   In refusing to accommodate Plaintiff's sincerely held religious beliefs, Defendants did not use the least restrictive means of furthering any compelling state interest.

1390.   More importantly, as the Second Circuit pointed out, Defendants did not have a compelling interest in any event in conditioning access to accommodation on membership in a favored religious organization.

1391.   Nor do Defendants have a compelling interest in applying a more favorable undue hardship analysis to those found to meet the criteria for the impermissibly favored religions.

1392.   Defendants' actions injured and continue to injure Plaintiffs, by chilling their right to practice their religion and imposing lasting consequences and harm to their emotional, psychological, physical, and financial wellbeing, as well as their reputation.

1393.   As a direct result of the violation of their First Amendment rights, most Plaintiffs are still unlawfully removed from their jobs.

1394.   Plaintiffs seek, and are entitled to, declaratory relief and nominal damages stating that the denial of their religious accommodation and subsequent employment consequences are void ab initio and violated their First Amendment right to freely practice their religion.

1395.   Plaintiffs are entitled to, and seek, reinstatement with no break in service, and full compensation for front and back pay of salary, benefits, retirement credits and all employment benefits, including anticipated raises, as if they had never been denied religious accommodation, along with compensatory damages, including pain and suffering and emotional damages, along with punitive damages and attorney's fees. *Tanzin v. Tanvir*, 141 S. Ct. 486 (2020).

## **EIGHTH CAUSE OF ACTION**

### **(Violation of the Establishment Clause of the United States Constitution)**

*Class and all Plaintiffs against all Defendants*

1396.   Plaintiffs repeat and reallege all paragraphs of this Complaint as if fully set forth herein.

1397.   The Establishment Clause of the First Amendment to the United States Constitution prohibits the State from preferencing any particular religion or religious dogma or belief, or abridging Plaintiffs' rights to free exercise of religion.

1398.   Defendants each violated the Establishment Clause by expressing a preference for certain faiths and leaders over others and by expressing animus towards religious objection to vaccination.

1399.   The DOE took this so far as to adopt a facially discriminatory policy, which favors Christian Scientists on its face, and requires discrimination against minority and unorthodox faiths.

1400.   The various preferences expressed by the state actors for some religions and religious leaders or religious beliefs over others trigger strict scrutiny of Defendants' denial of Plaintiffs' religious beliefs as a violation of the Establishment Clause.

1401.   Defendants cannot meet the burden of proof to show that their denial of accommodation was narrowly tailored to further a compelling state interest.

1402.   Plaintiffs seek and are entitled to declaratory relief and nominal damages, injunctive relief including reinstatement with no break in service, back and front pay and benefits, actual, compensatory and punitive damages, along with attorneys' fees, costs and expenses.

## NINTH CAUSE OF ACTION

### (Substantive Due Process Violation – United States Constitution)

*Class and all Plaintiffs except DiCapua against all Defendants*

1403.   Plaintiffs repeat and reallege each paragraph in the Complaint as if fully set forth herein.

1404.   Plaintiffs also bring a claim to enforce fundamental rights under the Substantive Due Process Clause.

1405.   Plaintiffs have a fundamental right to refuse medicine.

1406.   Many Plaintiffs and class members also had medical conditions that placed them at heightened risk of harm from a vaccination.

1407.   Some submitted medical accommodation requests from their doctors and were denied relief without any good reason.

1408.   In addition to the fundamental right to refuse even life-saving medicine, the Supreme Court has articulated multiple fundamental rights safeguarding the doctor-patient relationship, and the right to make medical decisions in accordance with one's chosen physician absent state interference.

1409.   There is also a fundamental right to protect oneself against harm.

1410.   This right rises to the level of a *jus cogens* right where, as here, the medical product mandated is still experimental.

1411.   At the time that the Mandate was enforced, the only vaccines available against Covid-19 in the United States were those allowed under experimental use authorization ("EUA"), which, by the terms of the EUA, could not be mandated or coerced.

1412.   A different Pfizer product had been licensed just before the Mandate was imposed, but Pfizer did not make it available in the United States at any time before Plaintiffs were denied accommodation and placed on unpaid leave.

1413.   At the time of the Mandate, and continuing today, there were inadequate studies available to determine the risks and benefits of the vaccine for any individual, leave aside those with serious health conditions that put them at greater risk of harm.

1414.   Defendants had no compelling or even legitimate reason to mandate the vaccines or to deny religious or medical accommodation.

1415.   The vaccines cannot stop transmission of disease, and it is therefore not within the police powers of the state to mandate them.

**WHEREFORE,** for all causes of action pleaded above, Plaintiff prays that this Court grant judgment to her containing the following relief:

A.      A declaratory judgment that the Defendants' failure to accommodate Plaintiffs' sincerely held religious beliefs and all actions arising therefrom are void ab initio and constitute unlawful discriminatory practices pursuant to Title VII along with nominal damages and attorneys' fees and costs; and

B.      A declaratory judgment that the Defendants' failure to accommodate Plaintiffs' sincerely held religious beliefs and all actions arising therefrom are void ab initio and constitute unlawful discriminatory practices pursuant to the New York City Human Rights Law along with nominal damages and attorneys' fees and costs; and

C.      A declaratory judgment that the Defendants' failure to accommodate Plaintiffs' sincerely held religious beliefs and all actions arising therefrom are void ab initio and constitute unlawful discriminatory practices pursuant to the New York State Human Rights Law along with nominal damages and attorneys' fees and costs; and

D.      A declaratory judgment that the Defendants' failure to accommodate Plaintiffs' sincerely held religious beliefs and all actions arising therefrom are void ab initio and constitute unlawful discriminatory practices pursuant to the Equal Protection Clause of the United States Constitution along with nominal damages and attorneys' fees and costs; and

E.      A declaratory judgment that the Defendants' failure to accommodate Plaintiffs' sincerely held religious beliefs and all actions arising therefrom are void ab initio because and violate the Free Exercise Clause of the First Amendment of the United States Constitution along with nominal damages and attorneys' fees and costs; and

F.      A declaratory judgment that the Defendants' failure to accommodate Plaintiffs' sincerely held religious beliefs and all actions arising therefrom are void ab initio because and violate the Establishment Clause of the First Amendment of the United States Constitution along with nominal damages and attorneys' fees and costs; and

G.      A declaratory judgment that the Mandate, as applied, is unconstitutional because it violates Plaintiffs' fundamental rights, along with nominal damages and attorneys' fees and costs; and

H.      An order that Defendants reinstate Plaintiffs to their former positions with full seniority, no break in service, status, retirement credits, salary increments, bonuses and benefits as if the denials of accommodation had never occurred; and

I.      An award of actual and compensatory damages in an amount to be determined at trial; and

J.      An award of costs in this action and any appeals, including reasonable attorney's fees; and

K.      An award to Plaintiff for punitive damages in an amount to be determined at trial; and

L.      An order for civil fines and penalties pursuant to New York Executive Law §297(9); and

M.      An award of pre- and post-judgment interest on all amounts awarded to Plaintiffs and the class at the highest rates and from the earliest dates allowed by law on all causes of action; and

N.      Such other and further relief as this Court may deem just and proper.

**JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure and Rule 38(b) of the Local Rules, Plaintiffs demand trial by jury for all the issues pleaded herein so triable.

Dated: Ithaca, New York
        July 25, 2024

Respectfully Submitted,
Gibson Law Firm, PLLC

By:     */s/ Sujata S. Gibson*
        Sujata S. Gibson
        120 E Buffalo Street, Suite 201
        Ithaca, NY 14850
        (607) 327-4125
        sujata@gibsonfirm.law

        **Attorneys for the Plaintiffs**

161