# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF NEW YORK

NATALYA HOGAN, CARLOS CONTRERAS, RICARDO ALEXANDER, RENEE BUTLER, KARIN CROWLEY, LUZ CRUZ, PATRICIA DECARLO, ABIGAIL GARCIA, DELLA HALEY, STELLA JACK, KATHRYN KIESLING, BARBARA KYDD, KATHLEEN MAGUIRE, KIM MODZELEWSKI, ROSE NEWMAN, SAMUEL PAGAN, MARIA ANN PIROZZI, RODNEY EPPS PRESSLEY, JOSEPH SABATINO, DIANA SALOMON, NICOLE ANN SCHMIDT, MARIA VASILIOU, and all others similarly situated,

CASE NO. 23-cv-8727 (RER) (PK)

Plaintiffs,

-against -

CITY OF NEW YORK and the NEW YORK CITY DEPARTMENT OF EDUCATION,

Defendants.

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

**GIBSON LAW FIRM, PLLC**
*Attorneys for Plaintiffs*
Sujata S. Gibson, Esq., Of Counsel
120 E. Buffalo St, Suite 2
Ithaca, New York 14850
(607) 327-4125

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ...................................................................................1

STATEMENT OF FACTS ..........................................................................................2

STANDARD OF REVIEW .........................................................................................8

ARGUMENT .............................................................................................................9

I.   The City is a proper party to this action.................................................9
II.  Plaintiffs adequately plead that both Defendants failed to accommodate their sincerely held religious beliefs ........................................................13
  A. Plaintiffs state prima facie statutory claims for failure to accommodate..............13
    1. Each Plaintiff asserts bone fide religious beliefs ............................14
  B. Defendants are not entitled to the undue hardship defense "as a matter of law"...17
III. Plaintiffs articulated free exercise claims .......................................23
  A. The Stricken Standards policy was not neutral on its face or as applied..............23
  B. The Stricken Standards policy was not generally applicable.................................25
  C. Defendants' policies cannot survive strict scrutiny ........................................26
IV.  Plaintiffs articulated discrimination claims .......................................26
  A. Plaintiffs assert establishment clause claims .........................................27
  B. Plaintiffs asserted equal protection claims..............................................28
  C. Plaintiffs pleaded statutory discrimination claims.....................................29
  D. Plaintiffs pleaded retaliation claims..........................................................30
  E. Plaintiffs properly alleged harassment claims ........................................32
  F. Plaintiffs asserted equal protection claims...............................................28
V.   Plaintiffs' claims are not limited to Article 78 proceedings and are not time-barred.....................................................................................32
VI.  Plaintiff Modzelewski's claims are not barred by res judicata or collateral estoppel ..........................................................................................34
VII. Plaintiffs' state law claims are not barred by Notice of Claim requirements ...........36
  A. Notice requirements do not apply to claims against the City ...............................36
  B. Notice requirements do not apply to claims against the DOE ...........................36
  C. Plaintiffs met the Notice of Claim requirements in any event...............................38
    1. Functional notice suffices ...................................................................38
    2. Plaintiffs provided timely and proper functional notice ..............................38
      a. Defendants' specific allegations are disputed and premature .................39
      b. Plaintiffs' post-Kane letters provided functional notice ..........................40
VIII. Plaintiffs' Title VII claims are not barred by failure to exhaust ................................41
  A. Plaintiffs Hogan and Contreras timely filed EEOC charges and this lawsuit.......41
  B. The single filing rule permits other Plaintiffs to join this action .........................42
  C. Plaintiffs were not required to "exhaust" the Stricken Standards appeals............44
IX.  The Amended Complaint complies with Rule 8, and Defendants' arguments are procedurally improper, substantively meritless, and irrelevant ................................45

CONCLUSION...................................................................................................................46

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Abbas v. Dixon,*
　　480 F.3d 636, 640 (2d Cir. 2007)........................................................................18

*Ashcroft v. Iqbal,*
　　556 U.S. 662, 678 (2009) ...................................................................................9

*Baker v. The Home Depot,*
　　445 F.3d 541, 546 (2d Cir. 2006)........................................................................14

*Bell Atl. Corp. v. Twombly,*
　　550 U.S. 544, 570 (2007)...................................................................................9

*Berkowitz v. E. Ramapo Cent. Sch. Dist.,*
　　932 F. Supp. 2d 513, 527 (S.D.N.Y. 2013)...............................................20, 40, 41

*Borkowski v. Valley Cent. Sch. Dist.,*
　　63 F.3d 131, 143 (2d Cir. 1995).....................................................................18, 19

*Brtalik v. S. Huntington Union Free Sch. Dist.,*
　　2010 WL 3958430, (E.D.N.Y. Oct. 6, 2010) .........................................................38

*Buon v. Spindler,*
　　65 F.4th 64 (2d Cir. 2023) ................................................................................30

*Caputo v. Copiague Union Free Sch. Dist.,*
　　218 F. Supp. 3d 186 (E.D.N.Y. 2016) ..................................................................36

*Carter v. State of New York,*
　　95 N.Y.2d 267, 270 (2000) ................................................................................39

*Chinchilla v. New York City Police Dep't.,*
　　No. 23 Civ. 8986 (DEH), 2024 WL 3400526 (S.D.N.Y. July 12, 2024) ...............18, 19, 22

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
　　508 U.S. 520, 533 (1993) ...............................................................................23, 24

*City of New Orleans v. Dukes,*
　　427 U.S. 297, 303 (1976) ..................................................................................28

*City of St. Louis v. Praprotnik,*
　　485 U.S. 112, 123 (1988) ..................................................................................10

*Colorado River Water Conservation Dist. v. United States,*
    424 U.S. 800, 817 (1976) ........................................................................... 34

*Connick v. Thompson,*
    563 U.S. 51, 61-62 (2011) .......................................................................... 12

*Davidson v. Capuano,*
    792 F. 2d 275, 278 (2d Cir. 1986) .............................................................. 35

*D'Cunha v. Northwell Health Sys.,*
    No. 23-476-cv, 2023 U.S. App. LEXIS 30612 (2d Cir. Nov. 17, 2023) ........... 18

*Deposit Cent. Sch. Dist. v. PERB,*
    214 A.D.2d at 292 (1995) ........................................................................... 38

*Does 1-11 v. Bd. of Regents of University of Colorado,*
    100 F.4th 1251 (10th Cir.) .......................................................................... 25

*Employment Div., Dept. of Human Resources of Oregon v. Smith,*
    494 U.S. 872, 877 (1990) ........................................................................ 25, 28

*Fulton v. City of Philadelphia,*
    593 U.S. 522 (2021) ................................................................................... 26

*Gunn v. Beschler,*
    No. 22-971, 2023 U.S. App. LEXIS 8082, (2d Cir. Apr. 5, 2023) .................... 35

*Hassan v. City of New York,*
    804 F.3d. 277, 295 (3d Cir. 2015) ............................................................... 29

*Holowecki v. Fed. Express Corp.,*
    440 F.3d 558, 564 (2d Cir. 2006) ............................................................ 42, 43

*Hosking v. Mem. Sloan-Kettering Cancer Ctr.,*
    186 A.D.3d 58 (1st Dep't 2020) ............................................................... 21, 22

*Jacobsen v. New York City Health & Hosps. Corp.,*
    22 N.Y.3d 824, 838 (2014) .......................................................................... 21

*Jana-Rock Constr., Inc. v. N.Y. State Dep't of Econ. Dev.,*
    438 F.3d 195, 204-05 (2d Cir. 2006) ........................................................... 29

*Kadrmas v. Dickinson Pub. Schs.,*
    487 U.S. 450, 457-58 (1988) ....................................................................... 28

*Kahn v. New York City Dep't of Educ.*,
  79 A.D.3d 521, 522 (1st Dep't 2010)........................................................37

*Kane v. de Blasio*,
  19 F.4th 152, (2d Cir. 2021) .......................................................... *passim*

*Kern v. Joyce*,
  857 F. App'x 691 (2d Cir. 2021) ..............................................................34

*Knight v. Connecticut Dep't of Public Health*,
  275 F.3d. 156 (2d Cir. 2001) ....................................................................18

*Kushner v. Valenti*,
  285 F. Supp. 2d 314, 316 (E.D.N.Y. 2003) .............................................38

*Langsford v. Yale Univ. Sch. of Med.*,
  39 F. App'x 683, 685 (2d Cir. 2002)........................................................39

*Larson v. Valente*,
  456 U.S. 228, 244 (1982)....................................................................27, 28

*Lingfei Sun v. City of New York*,
  App'x 469, 471 n.3 (2d Cir. 2020)...........................................................35

*Littlejohn v. City of New York*,
  795 F.3d 297, 311 (2d Cir. 2015) .................................................... *passim*

*Lynch v. City of New York*,
  952 F.3d 67, 74 (2d Cir. 2020) ...............................................................8, 9

*Marte v. Montefiore Med. Ctr.*,
  No. 22-cv-03491, 2022 U.S. Dist. LEXIS 186884, (S.D.N.Y. Oct. 12, 2022) ..................14

*Masterpiece Cakeshop v. Colorado C.R. Comm'n*,
  584 U.S. 617, 618 (2018) .................................................................13, 24

*Med. Pros. for Informed Consent v. Bassett*,
  78 Misc. 3d 482, 185 N.Y.S.3d 578 (N.Y. Sup. Ct. 2023)...................2

*Med. Pros. for Informed Consent v. Bassett*,
  228 A.D.3d 1353, 213 N.Y.S.3d 845 (4th Dep't 2024)........................2

*Mennella v. Uniondale Union Free S.D.*,
  287 A.D.2d at 636-37 (2001) .................................................................38

vi

*Miller v. Johnson,*
    515 U.S. 900, 904-05 (1995) ..................................................................................29

*Mills v. County of Monroe,*
    59 N.Y.2d 307, 311 (1987) .....................................................................................37

*Monell v. Department of Social Services,*
    436 U.S. 658, 691–94 (1978) .............................................................................9, 10

*Mozzochi v. Borden,*
    959 F.2d 1174, 1179 (2d Cir. 1992) ......................................................................32

*Nat'l R.R. Passenger Corp. v. Morgan,*
    536 U.S. 101, 113 (2002) .......................................................................................43

*Ne. Fla. Chapter of the Associated Gen. Contractors of Am. v. City of Jacksonville,*
    508 U.S. 656, 666 (1993) .......................................................................................29

*New Yorkers for Religious Liberty, Inc. v. City of New York,*
    121 F.4th 448, 463–64 (2d Cir. 2024) ........................................................... *passim*

*Patrick v. LeFevre,*
    745 F.2d 153, 157 (2d Cir. 1984) ..........................................................................15

*Patsy v. Bd. of Regents of State of Fla.,*
    457 U.S. 496, 516 (1982) .......................................................................................45

*Pembaur v. City of Cincinnati,*
    475 U.S. 469, 479–80 (1986) .................................................................................10

*Phillips v. City of New York,*
    66 A.D.3d 170, 182 (2009) ....................................................................................19

*Razzano v. Remsenburg-Speonk Union Free Sch. Dist.,*
    751 F. App'x 24, 27 (2d Cir. 2018) .......................................................................35

*Riccardo v. N.Y.C. Dep't of Educ.,*
    2016 WL 7106048, (S.D.N.Y. Dec. 2, 2016) ........................................................39

*Richard v. NYC Dep't of Educ.,*
    2022 WL 4280561, (E.D.N.Y. Sept. 15, 2022) ....................................................38

*Rizzo v. N.Y.C. Dep't of Sanitation,*
    No. 23-cv-7190 (JMF), 2024 U.S. Dist. LEXIS 116666, (S.D.N.Y. July 2, 2024) ............22

*Ruocco v. Doyle,*
    38 A.D.2d 132, 133-34 (2d Dep't 1972)...........................................................38

*Sch. Bd. of Nassau Cnty., Fla. v. Arline,*
    480 U.S. 273, 287–89 (1987)...........................................................29

*Snell v. Suffolk County,*
    782 F.2d 1094, 1101 (2d Cir. 1986)...........................................................43

*Sotomayor v. City of New York,*
    862 F. Supp. 2d 226, 248 (E.D.N.Y. 2012)...........................................................9

*Spivack v. City of Philadelphia,*
    109 F.4th 158 (3d Cir.)...........................................................25

*Spoleta Const. v. Bd. of Educ.,*
    221 A.D.2d at 928 (1995)...........................................................38

*Thorne-Long v. City of New York,*
    No. 14-CV-0835 (E.D.N.Y. 2014)...........................................................13

*Tolliver v. Xerox Corp.,*
    918 F.2d 1052, 1058 (2d Cir. 1990)...........................................................42, 43, 44

*Town of Oyster Bay v. Kirkland,*
    19 N.Y.3d 1035, 1038 (2012)...........................................................44

*Trump v. Hawaii,*
    138 S. Ct. 2392, 2423 (2018)...........................................................30

*TWA v. Thurston,*
    469 U.S. 111, 121 (1985)...........................................................30

*Union Free Sch. Dist. No. 6 v. N.Y. State Human Rights Appeal Bd.,*
    35 N.Y.2d 371 (1974)...........................................................36, 37

*Vega v. Hempstead Union Free Sch. Dist.,*
    801 F.3d 72, 86-87 (2d Cir. 2015)...........................................................9, 27, 30

*Whitfield v. City of New York,*
    96 F.4th 504, 528-29 (2d Cir. 2024)...........................................................33, 35

**Statutes**

Civil Rights Act of 1964 § 7, 42 U.S.C. § 2000 et seq.........................................................*passim*

Fed. R. Civ. P. ..................................................................................................... 18

Fed. R. Civ. P, Rule 8(a)(2) ............................................................................. 45, 46

NYCHRL .................................................................................................... *passim*

NYSHRL ..................................................................................................... *passim*

New York Education Law § 2590-h ......................................................................... 10

New York Education Law § 3813(1)............................................................... 37, 38, 40

New York Executive Law § 296(10(a) ..................................................................... 14

N.Y.C. Admin. Code § 8-102. ................................................................................. 22

N.Y.C. Admin. Code § 8-107(3)(a). ........................................................................ 14

N.Y.C. Admin. Code § 8-107(28)(2). ...................................................................... 21

20 C.F.R. §1605.2(b) ........................................................................................... 14

U.S. Constitution Amend, I.............................................................................. *passim*

U.S. Constitution Amend. XIV, § 1 ................................................................. *passim*

28 U.S.C. §§ 1331 and 1343 ................................................................................. 33

42 U.S.C. § 1983 ........................................................................................... 33, 34

<u>**PRELIMINARY STATEMENT**</u>

Plaintiffs, twenty-two current and former New York City Department of Education ("DOE") employees, respectfully submit this memorandum of law in opposition to Defendants' motion to dismiss the Amended Complaint ("FAC"). This case arises from Defendants' systemic religious discrimination in enforcing a COVID-19 vaccine mandate that unlawfully favored certain religious beliefs while targeting others to limit accommodations, violating Plaintiffs' rights under the First Amendment, Title VII of the Civil Rights Act of 1964 ("Title VII"), the New York State Human Rights Law ("SHRL"), and the New York City Human Rights Law ("CHRL").[1]

The Second Circuit has twice confirmed the unconstitutionality of Defendants' original religious accommodation policies (the only ones Plaintiffs were ever offered). In *Kane v. De Blasio*, 19 F.4th 152, 168–69 (2d Cir. 2021), the court held that these policies were likely unconstitutional and ordered remedial review by a Citywide Panel with reinstatement and back pay for qualifying employees. In *New Yorkers for Religious Liberty, Inc. v. City of New York*, 121 F.4th 448, 463–64 (2d Cir. 2024), the court reversed the dismissal of a DOE employee's claims because she, like all Plaintiffs here, was denied Citywide Panel review and subjected only to the unconstitutional original policies. These precedents preclude dismissal of Plaintiffs' constitutional claims and support their statutory claims, which require only a minimal inference of discriminatory intent. *Littlejohn v. City of New York*, 795 F.3d 297, 311 (2d Cir. 2015).

Defendants' motion offers on sparse merits arguments, misrepresenting the law on religious beliefs and undue hardship, and instead leans on baseless procedural objections and an

---

[1] With Defendants' consent, Plaintiffs withdraw their substantive due process claim (FAC ¶¶ 1405–1412) and will file a stipulation to formalize this withdrawal. This memorandum addresses only the remaining claims under the First Amendment, Equal Protection CLause, Title VII, SHRL, and CHRL.

1

irrelevant defense of the vaccine mandate's legality—a claim Plaintiffs do not raise. As detailed below, Defendants' motion fails, and the Court should deny it in its entirety.

## STATEMENT OF FACTS

A comprehensive statement of the relevant facts is contained within the Amended Complaint, incorporated herein by reference. Certain key facts are set forth here.

### The Mandate and Discriminatory Religious Accommodation Policy

On August 24, 2021, Defendants imposed a COVID-19 vaccine mandate requiring all DOE employees to show proof of vaccination by September 27, 2021, despite having previously allowed DOE employees to work in person with students unvaccinated throughout the entire 2020-2021 school year. FAC ¶¶ 50–51, 58. The reasoning was vague, asserting that the Delta variant was spreading and referencing a healthcare worker mandate. FAC ¶¶ 51, 69. This healthcare mandate was later struck down as arbitrary and capricious after the New York State Department of Health admitted that the COVID-19 vaccines cannot stop transmission. *Med. Pros. for Informed Consent v. Bassett*, 78 Misc. 3d 482, 185 N.Y.S.3d 578 (N.Y. Sup. Ct. 2023), appeal dismissed, *Med. Pros. for Informed Consent v. Bassett*, 228 A.D.3d 1353, 213 N.Y.S.3d 845 (4th Dep't 2024).

Defendants initially informed employees that it would not consider any religious or medical accommodation requests but was later forced by court order to amend the Mandate to allow for such accommodations in person or remotely. FAC ¶¶ 58–59, 93–95. In a parallel labor proceeding by various unions against both the DOE and the City, an impasse order was issued by Arbitrator Martin A. Scheinman ordering not just the DOE but also the City to provide DOE employees with religious accommodation from the vaccine mandate, and providing: "[a]s an alternative to any statutory reasonable accommodation process, the City, the Board of Education of the City School District for the City of New York (the 'DOE') shall be subject to the following

2

Expedited Review Process to be implemented immediately." ECF 18-1 at 6–7, Arbitration Award; FAC ¶¶ 97–98.

The "Expedited Review Process" in the Arbitration Award (hereinafter the "Stricken Standards") set forth blatantly unconstitutional criteria for how to determine who received religious accommodation. On its face, it: (1) Favored Christian Scientists while excluding most other faiths; (2) Rejected beliefs from personal prayer or faith-based guidance; (3) Denied requests if a religious leader had publicly supported vaccines; (4) Required membership in an "established" religious organization with longstanding documented opposition to vaccines verified by clergy, and no religious leaders that had publicly supported vaccines. ECF 18-1 at 9; FAC ¶¶ 105–121.

The award held that the DOE was to make the initial determination under these criteria, and then employees were offered an appeal to a panel of arbitrators, also bound by the criteria. ECF 18-1 at 9–10. The one concession the Stricken Standards made in employees' favor was that the policy did not allow for denial based on undue hardship. Rather, it ordered that anyone qualifying under its discriminatory criteria "shall be permitted the opportunity to remain on payroll." ECF 18-1 at 12.

Essentially, the compromise was that Defendants had to provide religious accommodation but could use the discriminatory standards to preemptively narrow who was eligible by picking a few favored religions and categorically denying all others, regardless of a lawful undue hardship showing. In large part, this scheme, and the discriminatory criteria, were proposed and drafted by Law Department employees, acting under the City's direction. FAC ¶ 106. Though the government is forbidden from adopting, enforcing, or encouraging policies that allow religious discrimination, Defendants swiftly adopted and implemented the Stricken Standards, later struck down by the Second Circuit as unconstitutional, both in the written terms and how they were applied. *Kane*, 19

3

F.4th at 168-171.

Though the Stricken Standards did not provide for denial based on undue hardship, DOE ignored the one boon and denied 100% of the applications for religious accommodation through an automated email anyway, vaguely claiming that each applicant "failed to meet the criteria for religious based accommodation" and that any accommodation would pose "an undue hardship (i.e., more than a minimal burden)" on the DOE and its operations. FAC ¶¶ 123–129. The autogenerated denial emails falsely asserted that the Mandate did not allow for in-person accommodation (that is not true, since it was amended to expressly allow for that) and, without individualized analysis, claimed it would be "more than a minimal burden" (the wrong legal standard) to accommodate employees, even though many employees (including many of the Plaintiffs in this lawsuit) had previously worked remotely or could have been accommodated in other ways. FAC ¶¶ 136–144. The denials stated that the decisions were made in accordance with the Stricken Standards. No cooperative dialogue was offered or conducted prior to the denials, and no one at DOE even individually reviewed the applications prior to issuing the denials. FAC ¶¶ 130–132.

The DOE imposed unreasonable procedural barriers that hindered religious accommodation applications. Employees were given only 24 hours to appeal denials through the SOLAS online system, which frequently crashed or froze, locking out applicants during critical deadlines. FAC ¶¶ 202–217, 218. Some plaintiffs were unable to submit appeals due to system failures, or arbitrary bars for employees who submitted medical exemptions, or were on leave. FAC ¶¶ 220–222. The DOE's unclear communication of deadlines, compounded by the 24-hour window's conflict with religious observances like the Sabbath, further prevented timely appeals. FAC ¶¶ 203–204, 209–217. The United Federation of Teachers and other unions acknowledged

4

these systemic issues, yet the DOE failed to remedy them. FAC ¶ 214.

***Defendants Directly Discriminated Against Multiple Faiths During this Process***

Even when employees were able to appeal, many were denied without a hearing, and those who received hearings were subjected to numerous unlawful attacks on their faith and beliefs as somehow heretical or wrong. FAC ¶¶ 229–246. In these arbitration hearings, DOE agents openly admitted to policies that categorically denied accommodations based on employees' religious affiliations, going beyond the already discriminatory Stricken Standards. For example, DOE representatives argued that all Jews, Muslims, Hindus, Buddhists, Catholics, and non-denominational Christians (other than Christian Scientists) should be presumptively disqualified because their religious "leaders" had publicly supported vaccination, regardless of the employees' sincerely held personal beliefs. FAC ¶¶ 120–121, 255. DOE agents argued that Catholics were ineligible because "the Pope supports vaccination," and similar blanket denials were applied to Muslims and Jews based on statements from religious figures, without any individualized assessment of the applicants' beliefs. FAC ¶¶ 255, 261. Additionally, DOE dismissed beliefs grounded in personal prayer or concerns about abortion as "not religious in nature," despite clear legal protections for such beliefs under Title VII, SHRL, and CHRL. FAC ¶¶ 259–261.

The DOE's arguments in these hearings relied on unconstitutional criteria in the written Stricken Standards, such as requiring clergy verification or membership in an "established" religion, further entrenching the discriminatory scheme. FAC ¶¶ 115–118, 255. These policies in turn reflected the directives of Mayor de Blasio, who publicly stated that religious accommodations would be limited to members of "a very few religions that have a long, long, long-standing history of not just opposition to a particular vaccine, but opposition to vaccination in general," explicitly dismissing personally held beliefs as insufficient for exemption and singling

5

out Christian Scientists for favored treatment. FAC ¶ 286. This directive shaped the Stricken Standards' preference for certain established religions, such as Christian Scientists, while categorically excluding personally held beliefs and other faiths, aligning with the DOE's discriminatory enforcement. FAC ¶¶ 105–108, 112–114.

As a result of this process, DOE elected to accommodate at least 163 employees, many of them teachers, whose beliefs were found to qualify under the discriminatory policy. The only material difference between the employees who were accommodated (and remained accommodated until the mandate was lifted in February 2023) and Plaintiffs was that their religious beliefs were preferred under the discriminatory scheme. FAC ¶¶ 139, 244–245. This revealed that it was not an undue hardship to accommodate teachers or other DOE employees. FAC ¶ 139. It further set up a two-track system that unlawfully burdened Plaintiffs because of their disfavored religious beliefs.

### *The Second Circuit's Ruling in Kane and the City's Failure to Remediate*

Lawsuits commenced as soon as the Stricken Standards policy was issued. In November 2021, the Second Circuit Court of Appeals held in *Kane* that DOE's religious accommodation policies were likely unconstitutional, finding they were neither neutral nor generally applicable. FAC ¶¶ 304–306. The Court especially criticized Defendants' practice of denying applicants because the Pope or another religious leader was vaccinated and their rejection of personally held beliefs. FAC ¶ 307. The City was ordered to provide a remedial process, providing fresh review to the plaintiffs and reinstating them with back pay if they qualified under Title VII, SHRL, and CHRL. To avoid a threatened class-wide judicial order, the City promised to provide "fresh consideration" of denied accommodation requests through a new "Citywide Panel" more broadly than just to the named Kane plaintiffs. FAC ¶¶ 314–318.

An inference of animus can derive from the way the City handled the "remediation." Though Defendants had grudgingly admitted in oral arguments that the Stricken Standards and related policies were at least "constitutionally suspect" (and the Second Circuit "confirmed their suspicion"), Defendants failed to offer any review to most of those denied under the admittedly unlawful policy. By their own admission, the City only reviewed approximately 500 of the estimated 5,000–7,000 applicants denied under the original policy, and of those reviewed, only reversed one denial. FAC ¶¶ 319–327. Moreover, the Panel further entrenched the two-track system because the City applied a different undue hardship standard to those seeking remedial Panel review than to those who had been deemed to qualify under the original discriminatory policy (who were accommodated if their beliefs were found to qualify under the Stricken Standards). Additionally, on the less favorable remedial Citywide Panel track, The City made blanket determinations without individualized assessment and continued to apply discriminatory criteria in evaluating religious beliefs. FAC ¶¶ 323–402. The legality of the Citywide Panel reviews is still being litigated. But this history is not relevant here, since Plaintiffs in this case were never given any remedial review at all.

Though all Plaintiffs attempted to get a Citywide Panel review, none were given one. FAC ¶¶ 321–322. For most, this was because the City decided to limit remedial review to employees who had "exhausted" their appeals under the Stricken Standards, despite the standards being discriminatory and futile and admittedly unlawful, and despite the fact that many employees were unable to access the appeal due to systemwide crashes. FAC ¶¶ 320–321, 214, 218. The City refused review even when employees submitted certified mailings to the City and DOE, alerting them that the *Kane* decision held the original process unconstitutional and seeking to receive a lawful review explicitly. Further illustrating bad faith, after the first dozen *Kane* reviews (made

7

promptly while the matter was subjudice), the Panel slowed reviews down to a trickle, failing to review hundreds of applications for employees who had been told they would get a review, as they had "properly" exhausted under the Stricken Standards. Left without a decision, many such Plaintiffs were terminated or forced to vaccinated without ever having received the remedial review. FAC ¶¶ 321–322.

Rather than denounce the original Stricken Standards and reinstate those denied under them, Defendants reacted to the Second Circuit's holding by expanding the use of these unlawful standards as an option in nearly every City department. FAC ¶ 330. When the Mandate was repealed in February 2023, DOE refused to reinstate most Plaintiffs, attached problem codes to their files (typically reserved for employees who committed misconduct such as child abuse), and blocked their efforts to collect unemployment benefits by falsely claiming they committed "misconduct" for refusing to violate their sincerely held religious beliefs. FAC ¶¶ 451–480. In unemployment hearings, Defendants, including the Law Department, continued to rely on discriminatory arguments to deny benefits, asserting that Plaintiffs' refusal to vaccinate constituted misconduct, despite their protected religious objections. For example, Defendants argued that Plaintiffs' religious beliefs were invalid, echoing the unconstitutional Stricken Standards' criteria, such as denying accommodations based on the public stances of religious leaders like the Pope. FAC ¶¶ 255, 1283–1284. These arguments perpetuated the same discriminatory animus seen in the accommodation process, targeting at least one Plaintiff's Catholic faith among others. FAC ¶¶ 244, 248. Many Plaintiffs are still unable to get rehired to this day.

## STANDARD OF REVIEW

On a motion to dismiss under Rule 12(b)(6), the court must accept as true all well-pleaded factual allegations and draw all reasonable inferences in favor of the plaintiff. *Lynch v. City of New York*, 952 F.3d 67, 74 (2d Cir. 2020); *Littlejohn v. City of New York*, 795 F.3d 297, 306 (2d Cir.

2015). To survive a motion to dismiss, a complaint need only "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This standard "does not require 'detailed factual allegations,'" but demands "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The assessment 'does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal' conduct. *Twombly*, 550 U.S. at 556, 127 S.Ct. 1955; *see Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937." *Lynch,* 952 F.3d at 75. A complaint should not be dismissed simply because it appears recovery is remote or unlikely. *Twombly*, 550 U.S. at 556. Where, as here, a plaintiff brings claims of employment discrimination, the facts "alleged in the complaint need not give plausible support to the ultimate question of whether the adverse employment action was attributable to discrimination.  They need only give plausible support to a minimal inference of discriminatory motivation."  *Littlejohn*, 795 F.3d at 311; see also *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 86-87 (2d Cir. 2015).

## ARGUMENT

### POINT I
### THE CITY IS A PROPER PARTY TO THIS ACTION

The City is a proper party because the FAC alleges extensive facts demonstrating the City actively participated in, directed, and controlled the discriminatory religious accommodation policies that violated Plaintiffs' rights. Defendants' reliance on *Sotomayor v. City of New York*, 862 F. Supp. 2d 226, 248 (E.D.N.Y. 2012), is misplaced as that case addresses liability for employee torts based on respondeat superior, not municipal policy liability. Here, the City's liability rests on its own policies and customs as a joint principal with the DOE, satisfying the requirements for municipal liability under *Monell v. Department of Social Services*, 436 U.S. 658, 691–94 (1978).

Under *Monell*, a municipality can be held liable when its official "policy or custom,

9

whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy," directly contributes to a constitutional violation. *Id*. at 694. "*Monell* established that alleging that a municipal policy or ordinance is itself unconstitutional is always sufficient to establish the necessary causal connection between the municipality and the constitutional deprivation, because an employee's act of enforcing an unconstitutional municipal policy may be considered the act of the municipality itself." Id. at 694; see also *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479–80 (1986). A municipal policy need not be written or formally adopted to create liability; it may be inferred from widespread practice (*Patterson v. County of Oneida*, 375 F.3d 206, 226 (2d Cir. 2004)) or from a single decision by a municipal policymaker with final authority in that area. *Pembaur*, 475 U.S. at 480. Here, Plaintiffs allege (and the Second Circuit has confirmed) that the Stricken Standards policy that Defendants applied to deny Plaintiffs religious accommodation was unconstitutional on its face and in its application. *Kane*, 19 F.4th at 168–69.

The FAC pleads specific facts showing the City adopted an official and de facto policy of religious discrimination, implemented through the Mayor, Health Commissioner and their attorneys in coordination with the DOE, including but not limited to the following City-specific allegations:

- The City exercises mayoral control over the DOE, with the Mayor holding final policymaking authority under New York Education Law § 2590-h [FAC ¶¶ 28-29, 275-276]. This establishes the Mayor's actions and directives to DOE as binding City policy and creates liability not just for widespread acts but even isolated acts or directives. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988) ("an unconstitutional governmental policy could be inferred from a single decision taken by the highest officials responsible for setting policy in that area of the government's business.")

- The Mayor's office initially directed the DOE to offer no religious accommodations to the vaccine mandate, regardless of undue hardship, in violation of state and federal accommodation statutes. [FAC ¶ 278].

- When it became apparent the City would have to provide reasonable accommodation, drafted and proposed the discriminatory "Stricken Standards" limiting accommodations to a few preferred religions. [FAC ¶¶ 279–83].

- The Mayor admitted to the press that the discriminatory criteria that the "ground rules were 100 percent set through an arbitration process that involved the city..."[2] [FAC ¶ 286 fn].

- The Arbitration Award required both Defendants to accommodate the religious beliefs of DOE employees from the mandate either using the Stricken Standards or another statutory review process [Stricken Standards ECF 18-1 at 6]. This explicitly binds the City to provide accommodations and makes them liable for adopting and enforcing the Stricken Standards.

- Mayor de Blasio publicly endorsed this discriminatory policy, bragging that only "two well-established religions, Christian Science and Jehovah's Witnesses" would be accommodated and "we are saying very clearly, it's not something someone can make up individually. It has to be, you're a standing member of a faith that has a very, very specific long-standing objection." [FAC ¶ 286].

- The Mayor's office and City attorneys working under his direction then supplied the DOE with materials to support their directive to categorically deny accommodations to most religions, including a Jerusalem Post letter to reject Jewish applicants and directives to exclude Buddhists, Muslims, Catholics and most Christians based on articles about

---

[2] Office of the Mayor, NYC. (2021, September 23). *Transcript: Mayor de Blasio Holds Media Availability* [Press release]. https://www.nyc.gov/office-of-the-mayor/news/644-21/transcriptmayorde-blasio-holds-media-availability [Cited in FAC ¶¶ 286-87].

religious stances of various religious "leaders" belonging to these religions. [FAC ¶¶ 291–298].

- City Health Commissioner Dave Chokshi, who issued the Mandate, then prepared and sent a letter to the arbitrators, DOE and then the Panel, instructing them to also deny accommodations based on objections to aborted fetal cell lines, regardless of the person's religion, based on his interpretation of the Pope's position on this issue. [FAC ¶¶ 261–65, 297].

- When it was clear that the unconstitutional scheme would be struck down by the Second Circuit after strong rebukes at oral arguments, the City created and controlled the Citywide Panel, designed and supervised by their defense attorney Eric Eichenholtz, to "remediate" the harm, voluntarily assuming liability for remediation of the original unconstitutional scheme. But then it failed to provide the "fresh review" promised to the Second Circuit [FAC ¶¶ 314–18, 340–43].

These facts collectively and individually create City liability. The City had a duty to ensure the religious accommodation decisions were lawful. At minimum, the City's deliberate indifference to the use of unconstitutional standards imposes liability. "[W]hen city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program. The city's policy of inaction in light of notice that its program will cause constitutional violations is the functional equivalent of a decision by the city itself to violate the Constitution." *Connick v. Thompson,* 563 U.S. 51, 61-62 (2011) (cleaned up). The FAC plausibly alleges the City was on notice, and more, as the City drafted and proposed an unconstitutional policy, directed DOE to use it, endorsed the discriminatory criteria in press

12

conferences, ignored the *Kane* complaint detailing the constitutional violations, admitted to the Second Circuit the policies were likely unconstitutional, which the Court confirmed, volunteered to remediate the harm and yet failed to do so for Plaintiffs and many others.

Rather than remediate the harm at any of these stages, the City never even bothered to repudiate the Stricken Standards, instead openly advocating for them at every level, and expanding the use of these unconstitutional standards to nearly every City department after the Second Circuit held they are unconstitutional. The failure to disavow, alone, shows joint liability and animus by the City. *See, e.g., Masterpiece Cakeshop v. Colorado C.R. Comm'n*, 584 U.S. 617, 618 (2018) (failure to renounce subjects all levels of review to strict scrutiny, even state court affirmance). Defendants' argument that the City is not a proper party ignores this substantial involvement and encouragement.

*Thorne-Long v. City of New York*, No. 14-CV-0835 (E.D.N.Y. 2014) (unpublished), cited by Defendants, is inapposite, as that plaintiff offered merely conclusory claims, unlike here where the FAC's detailed allegations clearly meet Iqbal's plausibility standard. 556 U.S. 662, 678 (2009). Moreover, the Second Circuit has already held that DOE employees were likely to succeed on their claims against both the City and the DOE for these constitutional violations. *Kane*, 19 F.4th at 166; FAC ¶ 304. Given the robust factual allegations demonstrating the City's direct involvement, which far exceeds the allegations in *Kane*, this Court must follow the Second Circuit's precedent.

## POINT II
## PLAINTIFFS ADEQUATELY PLEAD THAT BOTH DEFENDANTS FAILED TO ACCOMMODATE THEIR SINCERELY HELD RELIGIOUS BELIEFS

### A. Plaintiffs State Prima Facie Statutory Claims for Failure to Accommodate

As set forth above, the Stricken Standards required both the City and DOE to provide religious accommodation to DOE employees and the Second Circuit's rebuke ordered both parties to remediate their original harm and reinstate employees who qualify under statutory standards.

13

Defendants failed in that duty.

Title VII, SHRL and CHRL each impose an affirmative obligation to make reasonable accommodations for employees' (or potential employees') religious beliefs and practices. 42 U.S.C §2000e(j); 20 C.F.R. §1605.2(b); N.Y. Executive Law § 296(10(a). Under the CHRL, the burden is even higher, as it is not just a violation to deny accommodation, but is also an act of discrimination to "impose upon a person as a condition of obtaining or retaining employment terms or conditions, compliance with which would require such person to violate, or forego, a practice of, such person's creed or religion,…and the employer shall make reasonable accommodation to the religious needs of such person." N.Y.C. Admin Code § 8-107(3)(a).

To make out a prima facie case of religious discrimination under Title VII, employees had to show "(1) [they] held a bona fide religious belief conflicting with an employment requirement; (2) [they] informed [their] employers of this belief; and (3) [they were] disciplined for failure to comply with the conflicting employment requirement." *Baker v. The Home Depot*, 445 F.3d 541, 546 (2d Cir. 2006). The state and local statutory elements are substantially similar. *See Marte v. Montefiore Med. Ctr.*, No. 22-cv-03491, 2022 U.S. Dist. LEXIS 186884, at *19 (S.D.N.Y. Oct. 12, 2022). Defendants concede elements 2 and 3 but assert that no Plaintiff asserted a sincerely held religious belief. [MOL at 37].

### 1. Each Plaintiff Asserts Bona Fide Religious Beliefs

Contrary to Defendants' conclusory assertion, Plaintiffs met their light burden of asserting sincerely held religious beliefs. The EEOC instructs that employers should ordinarily assume that an employee's request for religious accommodation is based on a sincerely held religious belief. EEOC Compliance Manual on Religious Discrimination § 12-I(A)(3) (2021). Courts repeatedly affirm this standard and hold that the government is "singularly ill-equipped to sit in judgment on

14

the verity of an adherent's religious beliefs," with their competence extending "only to determining whether the beliefs professed are sincerely held and religious in nature." *Patrick v. LeFevre*, 745 F.2d 153, 157 (2d Cir. 1984) (citing cases).

The Court is respectfully referred to the FAC, which clearly meets the pleading standard to show that each of the Plaintiffs has asserted a bona fide religious belief. *See, e.g.*, Hogan, FAC ¶¶ 488-97; Contreras, FAC ¶¶ 543-44; Alexander, FAC ¶¶ 607-09; Butler, FAC ¶¶ 651-52; Crowley, FAC ¶¶ 673-75; Cruz, FAC ¶¶ 703-04; DeCarlo, FAC ¶¶ 727-29; Garcia, FAC ¶¶ 751-53; Haley, FAC ¶¶ 779-80; Jack, FAC ¶¶ 804-08; Kiesling, FAC ¶ 830; Kydd, FAC ¶¶ 851-54; Maguire, FAC ¶¶ 898-901; Modzelewski, FAC ¶¶ 938-40; Newman, FAC ¶¶ 969-73; Pagan, FAC ¶¶ 993-95; Pirozzi, FAC ¶¶ 1014-16; Pressley, FAC ¶¶ 1032-34; Salomon, FAC ¶¶ 1075-77; Sabatino, FAC ¶¶ 1056-57; Schmidt, FAC ¶¶ 1110-12; Vasiliou, FAC ¶ 1136-37. As the Court will see, the FAC provides detailed, individualized accounts of these beliefs, grounded in long-standing religious practices, personal sacrifices, and consistent adherence to faith-based principles, often at great personal cost. As a few examples:

- Natalya Hogan, describes how she and her family, Orthodox Christians from an ancient 300-year-old sect called the "Old Believers" faced religious persecution in the Soviet Union, and came to the states so they could practice their beliefs in peace. [¶¶ 487-491]. Her commitment to her beliefs is exemplified by her refusal of a medically necessary blood transfusion during a life-threatening emergency, choosing instead to follow religious guidance obtained through prayer, even at the risk of death. [FAC ¶¶ 492-94]. This same guidance led her to object to the COVID-19 vaccine, a decision she upheld despite severe professional consequences. FAC ¶¶ 494-95.

- Barbara Kydd, a breast cancer survivor, declined chemotherapy and radiation against

15

medical advice to adhere to her Seventh Day Adventist beliefs, which mandate a strict religious diet (no alcohol, caffeine, meat, or animal products) and prohibit all pharmaceutical drugs, including over-the-counter medications like Tylenol. FAC ¶¶ 851-54. Her refusal of the COVID-19 vaccine is a direct extension of these principles, which she has upheld at significant personal risk along with her devout practice of receiving guidance from prayer.

- Patricia DeCarlo's Catholic beliefs, which oppose vaccines developed or tested with fetal cell lines, were previously recognized by the DOE when it granted her religious exemptions from her daughter's school vaccine mandates for nine consecutive years. FAC ¶¶ 727-29. She included these previously approved exemption documents in her accommodation request, making Defendants' denial particularly egregious. FAC ¶ 729.

- Della Haley is a devout Catholic, who, after significant efforts and harassment, was previously granted religious accommodation from the DOE for a Reiki requirement imposed some years earlier that violates her strict interpretation of her faith. [FAC ¶¶ 780-781]. She also has sincerely held religious objections to the use of aborted fetal cell lines in the development and testing of the vaccines.

- Ms. Jack is an ordained minister who leads a non-denomination ministry. [FAC ¶ 805] She had a revelation in 2012 and started a faith journey of divine healing. Since, then, due to her faith, Ms. Jack does not take any medication whatsoever but instead relies on God to keep her healthy and heal her. Due to her religious beliefs, Ms. Jack is also firmly against abortion and will not take any products that participate in or benefit from abortion. [FAC ¶¶ 807-809].

Defendants fail to offer any explanation why "none of the Plaintiffs sufficiently pleaded

16

that they had a bona fide religious belief or practice that conflicted with the vaccine mandate. [MOL 39]. Their only individualized criticisms are that Plaintiffs Alexander and Kiesling cannot receive relief because they appear to have personally held religious beliefs and did not identify which orthodox religion they belong to, if any.

Defendants' attempt to dismiss Mr. Alexander's and Ms. Kiesling's beliefs for not stating which religion they belong to (Def. MOL at 37) is both factually baseless and legally indefensible. Mr. Alexander has a personal spiritual practice and a well-documented history of receiving religious exemptions from vaccine requirements at multiple academic institutions including Kingsborough Community College, CUNY City College, CUNY Brooklyn College, Columbia University, and Adelphi University, spanning nearly a decade (FAC ¶¶ 609-11)—making Defendants' challenge particularly absurd. Ms. Kiesling similarly articulated sincerely held religious objections to vaccination based on concerns about abortion, which Defendants offer no reason to doubt (FAC ¶¶ 830-832).

As detailed in Point III, the Second Circuit has twice rebuked the City for discriminating against personally held religious beliefs. *Kane*, 19 F.4th at 168–69; *New Yorkers for Religious Liberty, Inc.*, 121 F.4th at 463–64. Yet, the Law Department, which oversees the remedial Citywide Panel, persists in arguing that beliefs like those of Plaintiffs Alexander and Kiesling are not protected, contrary to clear established precedent. FAC ¶¶ 607–11, 830–32. This ongoing pattern of discrimination, unremedied is particularly concerning considering the Law Department's role in overseeing and conducting the Citywide Panel reviews, and underscores Defendants' failure to comply with court-ordered reforms.

**B. Defendants Are Not Entitled to the Undue Hardship Defense "as a Matter of Law"**

"If employees establish a prima facie case of religious discrimination under Title VII, the

17

burden then shifts to the employer to show it could not accommodate the employees' religious beliefs without undue hardship." *Knight v. Connecticut Dep't of Public Health*, 275 F.3d. 156 (2d Cir. 2001). Contrary to Defendants' assertion, the facts in this case do not justify dismissal based on undue hardship "as a matter of law." Undue hardship is an affirmative defense. In *Chinchilla,* which Defendants heavily rely on, the court rejected Defendants' similar arguments on undue hardship, stating: "The pleading requirements in the Federal Rules of Civil Procedure…do not compel a litigant to anticipate potential affirmative defenses…and to affirmatively plead facts in avoidance of such defenses." *Chinchilla v. New York City Police Dep't,* No. 23 CIV. 8986 (DEH), 2024 WL 3400526, at *10 (S.D.N.Y. July 12, 2024) (citing *Abbas v. Dixon*, 480 F.3d 636, 640 (2d Cir. 2007).

Defendants acknowledge that undue hardship, an affirmative defense, is not typically available on a motion to dismiss, as Defendants bear the burden of proof. See *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 143 (2d Cir. 1995). However, they claim that this is one of the rare cases where they can prevail on undue hardship "as a matter of law" because it is "clear that the defense appears on the face of the complaint." [MOL at 39, citing *D'Cunha v. Northwell Health Sys.*, No. 23-476-cv, 2023 U.S. App. LEXIS 30612 (2d Cir. Nov. 17, 2023)]. This argument fundamentally misapplies the law.

First, *D'Cunha* is inapposite as it involved a healthcare setting where the vaccine mandate at issue did not allow for any religious accommodation. By stark contrast, the Mandate here was amended to expressly allow for religious accommodation on its face, FAC ¶¶ 94-95. And DOE provided religious accommodation to "at least 163 persons in this manner, some of them teachers," FAC ¶ 139. They even allowed "one or more unvaccinated teachers... to go back in person to teach their class while the Mandate was in effect." FAC ¶ 140. These accommodated workers kept their

18

accommodations after the Second Circuit struck down the policy that favored them and were still being accommodated while Defendants continued to refuse to provide the same relief to those who had been prejudiced under the unlawful policy. On such facts, undue hardship "as a matter of law" is impossible. Similarly, in *Chinchilla,* Judge Ho rejected Defendants' undue hardship argument, holding that where, as here, the FAC had allegations that some employees were accommodated, "this would tend to demonstrate the feasibility of offering this accommodation to Plaintiff" and thus precluded any finding of undue hardship as a matter of law. *Id.* at 10. The same argument applies here.

Second, absent a per se bar on a particular accommodation, courts cannot presume that accommodation would present a particular hardship as a matter of law. It is per se unlawful to find undue hardship as a matter of law under the CHRL. Under that liberal standard, "there is no accommodation (whether it be indefinite leave time or any other need []) that is categorically excluded from the universe of reasonable accommodation." *Phillips v. City of New York*, 66 A.D.3d 170, 182 (2009) (courts must "deem all accommodations reasonable except for those a defendant proves constitute an undue hardship.") State and Federal standards also preclude assumptions about hardship absent proof and objective evidence. For example, in *Borkowski*, the Second Circuit held that providing an aide to a teacher with disabilities could not constitute an undue hardship "as a matter of law" even on summary judgment. The Court emphasized that "there is nothing inherently unreasonable or undue in the burden that an employer would assume by providing [an accommodation]" absent a concrete showing by the employer. *Id*. Rather, the Court held that a failure to present specific evidence about "costs, budgets, organizational impact, and other relevant factors" from the administrative record precludes summary judgment. 63 F.3d at 142.

19

Here, like in *Berkowitz v. E. Ramapo Cent. Sch. Dist.*, 932 F. Supp. 2d 513, 527 (S.D.N.Y. 2013)*, Defendants not only fail to present objective evidence, but admit they never assessed any. Mr. Eichenholtz, who supervised the Citywide Panel and drafted and oversaw the implementation of the Stricken Standards, admitted under oath that "neither the City nor the DOE analyzed any of the statutory factors before denying applicants" (FAC ¶ 342) and "neither the City nor the DOE ever assessed any objective evidence to determine that employees could not safely be accommodated before issuing the undue hardship denials" (FAC ¶ 343). He further admitted that DOE never provided or reviewed information "as to the number of employees it could afford to employ without causing undue hardship" (FAC ¶ 345), and that the "inability to pay employees" who were not able to work in person "has not come up" (FAC ¶ 346). Regarding safety concerns, Mr. Eichenholtz admitted he "was not aware of any direct threat analysis conducted for any employee" (FAC ¶ 348) and "could not recall any panel member assessing whether Covid-19 vaccination could limit the spread of Covid-19" (FAC ¶ 349). These admissions preclude undue hardship to be found as a matter of law, and instead establish that Defendants cannot meet their burden on undue hardship even on the merits. *See, Sch. Bd. of Nassau Cnty., Fla. v. Arline*, 480 U.S. 273, 287–89 (1987) (rejecting undue hardship defense where Defendants failed to assess or present evidence of the statutory factors to prove that plaintiff was a direct threat, holding "[s]uch an inquiry is essential [to protect individuals] from deprivations based on prejudice, stereotypes, or unfounded fear, while giving appropriate weight to such legitimate concerns of grantees as avoiding exposing others to significant health and safety risks.")

Third, Defendants' failure to engage in cooperative dialogue prior to denial legally precludes dismissal as a matter of law. Defendants cite to First Department decisions assessing cooperative dialogue in article 78 claims (subject to different burdens and standard of review). But in plenary

claims, such as here, the Court of Appeals has clearly articulated that "the lack of a good faith interactive process forecloses summary judgment in favor of the employer." *Jacobsen v. New York City Health & Hosps. Corp.,* 22 N.Y.3d 824, 838 (2014).

The issue at play in the state courts is not about the highest court's clear holding that lack of cooperative dialogue precludes judgment as a matter of law in favor of employers, but rather, about whether and under what claims the 2018 amendments to the CHRL allow summary judgment against an employer when it is absent. The 2018 amendments define failure to engage in cooperative dialogue as a standalone act of employment discrimination. N.Y.C. Admin. Code § 8-107(28)(2). The First Department examined the impact of this amendment in *Hosking v. Mem. Sloan-Kettering Cancer Ctr.*, 186 A.D.3d 58 (1st Dep't 2020), detailing how amendments "legislatively modif[ied]" *Jacobsen* to create a "nonwaivable, robust, and individualized" dialogue requirement, and rejecting the cancer hospitals' denial of undue hardship, even during the height of the pandemic, absent proof of robust individualized interactive discussions with employees about all possible accommodations. *Id.* at 63-64.

The amended CHRL states, "the determination that no reasonable accommodation would enable the person requesting an accommodation to satisfy the essential requisites of a job or enjoy the right or rights in question may only be made after the parties have engaged, or the covered entity has attempted to engage, in a cooperative dialogue." N.Y.C. Admin. Code § 8-107(28)(2). Cooperative dialogue is defined by the statute and requires good faith discussion of specific topics. According to the CHRL: "The term "cooperative dialogue" means the process by which a covered entity and a person entitled to an accommodation, or who may be entitled to an accommodation under the law, engage in good faith in a written or oral dialogue concerning the person's accommodation needs; potential accommodations that may address the person's accommodation

21

needs, including alternatives to a requested accommodation; and the difficulties that such potential accommodations may pose for the covered entity." N.Y.C. Admin. Code § 8-102.

On a plenary claim, this is a fact-based determination. Here, the FAC explicitly alleges that "No one at the DOE individually reviewed [Plaintiffs'] applications before denying them" (FAC ¶¶ 129, 501, 756, 833, 997, 1036, 1060, 1119, etc.) and that "No one engaged in cooperative dialogue with [them]" (FAC ¶¶ 133, 519, 756, etc.). Plaintiffs' facts support these assertions, as they allege they received identical autogenerated denial emails without any human review or discussion whatsoever. These allegations are a separate basis to preclude Defendants from claiming undue hardship "as a matter of law" at the motion to dismiss stage. Defendants' reliance on *Chinchilla* is misplaced. There, the plaintiff had pleaded cooperative dialogue as a standalone cause of action, which is not the case in this action. On the facts in that case, which are distinguishable, the court held that Plaintiff did not have a standalone cooperative dialogue claim, but upheld her failure to accommodate claim. *Chinchilla, 2024 WL 3400526, at *11.* In *Chinchilla*, undue hardship was not at issue, rendering the required subject matter inapplicable. In a related case, *Rizzo v. N.Y.C. Dep't of Sanitation*, No. 23-cv-7190 (JMF), 2024 U.S. Dist. LEXIS 116666, (S.D.N.Y. July 2, 2024),where undue hardship is at issue, the district court sustained the plaintiff's standalone CHRL cooperative dialogue claim, finding that the plaintiff had adequately alleged that "Defendants failed to engage in a cooperative dialogue about his religious accommodation needs." Id. at *15. Citing *Hosking,* the court held that the CHRL "clearly requires a more rigorous process" than the one alleged by Rizzo here. Accordingly, the City's motion to dismiss Rizzo's cooperative dialogue claim must be and is denied." *Id.* at 9.

Here there is no standalone cooperative dialogue claim, so the Court need not decide the issue now, and this case is even worse than *Rizzo*. Like in *Rizzo*, plaintiffs were all denied prior to any

22

cooperative dialogue. Unlike in *Rizzo*, they were never allowed an appeal, so had no additional chances to discuss hardship. Ultimately, whether Defendants' failure to engage in cooperative dialogue constitutes a standalone CHRL violation is a question properly raised at summary judgment. For purposes of this motion to dismiss, it is sufficient that this failure forecloses any attempt by Defendants to claim undue hardship "as a matter of law."

## POINT III
## PLAINTIFFS ARTICULATED FREE EXERCISE CLAIMS

The Second Circuit's decision in *Kane* and *New Yorkers for Religious Liberty, Inc.* establish that Plaintiffs' free exercise claims should not be dismissed. In *Kane*, the Second Circuit held that similarly situated DOE plaintiffs were likely to succeed on their free exercise claims, holding "[w]e confirm the City's 'susp[icion]' that the [Stricken Standards] procedures likely violated the First Amendment as applied to these Plaintiffs." *Kane*, 19 F.4th at 167. In *New Yorkers for Religious Liberty*, the Second Circuit confirmed that this holding applies to all employees who did not receive a Citywide Panel review. *New Yorkers for Religious Liberty, Inc. v. City of New York*, 121 F.4th at 464 (reversing dismissal of Solon's claims because "she never even had an opportunity to appeal the denial of her religious exemption or to have her exemption considered by the Citywide Panel" and noting that "without the opportunity to submit to the Citywide Panel for fresh review, Solon's religious exemption request can only have been considered under the same framework that we held was likely unconstitutional in *Kane*").

### A.  The Stricken Standards Policy Was Not Neutral on its Face or As Applied

Plaintiffs free exercise claims must be assessed under strict scrutiny because the policies offered to Plaintiffs were discriminatory on their face. "The minimum requirement of neutrality is that a law not discriminate on its face." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993). Facial neutrality, of course, will not result in a finding of neutrality, as

even "subtle departures" from religious neutrality as well as "the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question and the legislative or administrative history, including contemporaneous statements made by members of the decision-making body" can defeat neutrality and trigger strict scrutiny. *Id.* at 534, 430. Here, those factors also defeat neutrality.

In *Kane,* the Second Circuit held that "the procedures specified in the Arbitration Award and applied to Plaintiffs are not neutral" because they are hostile and "presuppose[s] the illegitimacy of religious beliefs and practices." *Kane,* 19 F.4th at 168 (citing *Masterpiece Cakeshop,* 138 S. Ct. at 1731). Holding that the Stricken Standards violated this standard on its face by requiring that "[e]xemption requests shall be considered for recognized and established religious organizations" and that "requests shall be denied where the leader of the religious organization has spoken publicly in favor of the vaccine, where the documentation is readily available (e.g., from an online source), or where the objection is personal, political, or philosophical in nature." The Court also addressed further direct discrimination in the application of the standards, stating "Moreover, Plaintiffs have offered evidence that arbitrators applied the Accommodation Standards to their applications by, for example, telling Plaintiff Keil that his religious beliefs "were merely personal, [because] there are other Orthodox Christians who choose to get vaccinated." *Id.*

The Second Circuit concluded that "Denying an individual a religious accommodation based on someone else's publicly expressed religious views — even the leader of her faith —runs afoul of the Supreme Court's teaching that '[i]t is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, *or the validity of particular litigants' interpretations of those creeds*.' Accordingly, we conclude that based on the record developed to date, the Accommodation Standards as applied here were not neutral, triggering the application of strict

24

scrutiny." *Id.* at 169 (emphasis in original) (citing cases).

The Second Circuit applied this holding to all plaintiffs' claims, including those like Trinidad Smith, who did not apply for accommodation because she felt it was futile given the discriminatory criteria and was never offered a non-discriminatory process. *Id.* So too here, where the FAC alleges that all plaintiffs were denied under the same unlawful policy struck down in *Kane* and were never provided a fresh review and provides substantially more detailed allegations of direct discrimination by City and DOE participants than the early undeveloped record in *Kane* did.

**B. The Stricken Standards Policy Was Not Generally Applicable.**

Strict scrutiny also applies because the religious accommodation policies were not generally applicable. The facts show general applicability was defeated in multiple ways, including the Mayor's unfettered discretion to make carve-outs to the City's mandates (FAC ¶¶ 420-425, regarding EEO 62 creating exceptions for athletes and performers), and Defendants' admission that it accommodated at least 163 employees, including teachers, under the original process (FAC ¶ 1244; MTD at 8 ¶ 139), while applying "a more onerous undue hardship standard" to others (FAC ¶¶ 1243-1246).

Moreover, the Second Circuit has already held that the original accommodation process was not generally applicable, because the Stricken Standards allowed for "individualized government assessment of the reasons for the relevant conduct, the process was not generally applicable." *Id.* at 169, quoting *Employment Div., Dept. of Human Resources of Oregon v. Smith,* 494 U.S. 872, 877 (1990). Multiple circuits have followed *Kane* to strictly scrutinize government denials of religious exemptions, which are bound by statute to individually consider reasons for seeking accommodation. *Does 1-11 v. Bd. of Regents of University of Colorado*, 100 F.4th 1251 (10th Cir.); *Spivack v. City of Philadelphia*, 109 F.4th 158 (3d Cir.). Indeed, the Supreme Court holds

25

that if there is *any* mechanism for individualized accommodation, even if never utilized, the law is not generally applicable. *Fulton v. City of Philadelphia, Pennsylvania*, 593 U.S. 522 (2021). Here, state law clearly articulates a mechanism for individualized exemption, in fact, requiring individualized analysis under the SHRL and CHRL, and the Defendants' own policies also provided such a mechanism, resulting in the accommodation of 163 employees whose religious beliefs were deemed acceptable under the unconstitutional policies. This cannot be said to be a "generally applicable" policy which should not be subjected to scrutiny.

### C. Defendants' Policies Cannot Survive Strict Scrutiny

Applying strict scrutiny (triggered once either neutrality or general applicability is defeated)*,* the Second Circuit held in *Kane* that the original religious accommodation policy, which is the only one Plaintiffs were ever offered accommodation under, could not survive. After assessing whether the policies were "narrowly tailored" to serve a "compelling state  interest" (*Kane,* 19 F.4th at 169), the Court held: "These procedures cannot survive strict scrutiny because denying religious accommodations based on the criteria outlined in the Accommodation Standards, such as whether an applicant can produce a letter from a religious official, is not narrowly tailored to serve the government's interest in preventing the spread of COVID-19. The City offers no meaningful argument otherwise." *Id.* This Court must follow that precedent, especially on a motion to dismiss, under which Defendants bear the burden.

### POINT IV
### PLAINTIFFS ARTICULATED DISCRIMINATION CLAIMS

The FAC shows rampant religious discrimination six ways from Sunday. Whether analyzed under the Equal Protection Clause, Establishment Clause, or Statutory Standards, there can be no doubt that Plaintiffs have asserted facts which give rise to liability under these claims. As a threshold matter, at the pleading stage, Plaintiffs need only establish facts that give rise to a

minimal inference of discriminatory motivation to survive a motion to dismiss. *Littlejohn*, 795 F.3d 311 (2d Cir. 2015) (holding that "the allegations in the complaint need be sufficient only to give plausible support to a minimal inference of discriminatory motivation"). This "reduced prima facie burden" is appropriate because "the facts necessarily are within the defendant's knowledge" at this early stage. *Id*. at 310-13; see also *Vega*., 801 F.3d at 87 (confirming that "a plaintiff is not required to plead a prima facie case under McDonnell Douglas" to survive a motion to dismiss). Here, Plaintiffs have far exceeded this minimal burden by alleging specific facts showing facially discriminatory policies, statements from decision-makers showing religious animus, and disparate treatment of different religious groups

### A. Plaintiffs Assert Establishment Clause Claims

Plaintiffs asserted straightforward claims under the Establishment Clause. Government officials violate the Establishment Clauses when adopting express classifications that create denominational preferences. "The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." *Larson v. Valente*, 456 U.S. 228, 244 (1982). "This principle of denominational neutrality has been restated on many occasions… [S]tated unambiguously: The State may not adopt programs or practices which aid or oppose any religion. This prohibition is absolute." *Id.* (cleaned up).

In *Larson*, the Supreme Court struck down a regulation requiring registration for religious organizations that solicited more than 50% of their funds from nonmembers, holding that it effectively distinguished between well-established churches and churches which are new and lacking constituency which "clearly granted denominational preferences." *Larson,* 456 U.S. at 228. Having found a free exercise violation, the *Kane* decision did not have to assess whether the Stricken Standards policy violated Equal Protection or the Establishment Clause. But it is self-

27

evident. This case is *Larson* on steroids. Here, the preference for "established" religious organizations is not just implicit, it was explicitly stated in the Stricken Standards as the criteria upon which accommodation rested (among other denominational preferences).

Multiple other Establishment Clause violations have also been alleged. One particularly fatal fact alleged here, that was not known or alleged in *Kane* or *New Yorkers for Religious Liberty, Inc.*, is that Commissioner Chokshi, who issued the Mandate, wrote a letter to the DOE, arbitrators and Citywide Panel, instructing them to deny religious beliefs involving abortion despite the well-documented use of aborted fetal cell lines in vaccine development (FAC ¶¶ 261-265, 297). This letter was repeatedly used by DOE in accommodation hearings to dismiss sincere religious objections (FAC ¶ 265). The Citywide Panel continued this discriminatory practice by imposing "a blanket ban on anyone whose religious belief included objection to the connection between the vaccines and abortion" (FAC ¶ 380-381). It is black letter law that the "government may not compel affirmation of religious belief, punish expression of religious doctrine it believes to be false, impose special disabilities on basis of religious views or religious status, or lend its power to one or other side in controversies over religious authority or dogma." *Smith*, 494 U.S. 872 at 110. Given that Chokshi issued the Mandate, this evidence likely renders the entire Mandate subject to strict scrutiny, but certainly, at minimum, requires strict scrutiny of all religious accommodation policies, including any assertions about alleged hardship.

### B. Plaintiffs Asserted Equal Protection Claims

For similar reasons, Plaintiffs pleaded Equal Protection Claims. The Equal Protection Clause prohibits the government from classifying people based on suspect classes unless the classification satisfies strict scrutiny. *Kadrmas v. Dickinson Pub. Schs.*, 487 U.S. 450, 457-58 (1988). Religion is a suspect class. *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976) (per curiam). When the

28

government expressly classifies persons based on a suspect class, its action is automatically subject to strict scrutiny. As this Circuit recognizes, "[a] plaintiff in such a lawsuit need not make an extrinsic showing of discriminatory animus or a discriminatory effect to trigger strict scrutiny." *Jana-Rock Constr., Inc. v. N.Y. State Dep't of Econ. Dev.,* 438 F.3d 195, 204-05 (2d Cir. 2006) (citing cases). Use of such classifications demonstrates a discriminatory purpose as a matter of law, without regard to the decision-makers' animus or subjective intent. *Miller v. Johnson,* 515 U.S. 900, 904-05 (1995); *Hassan v. City of New York,* 804 F.3d. 277, 295 (3d Cir. 2015) ("Put another way, direct evidence of intent is 'supplied by the policy itself.'") (citation omitted).

Under Equal Protection and Establishment Clause analysis it matters not if the Government could have denied any Plaintiff based on undue hardship or another reason as well. All that matters is that they were subjected to different barriers based on their disfavored religious beliefs. "When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier" to state a claim. *Ne. Fla. Chapter of the Associated Gen. Contractors of Am. v. City of Jacksonville,* 508 U.S. 656, 666 (1993). Rather, the injury in fact is "the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit." *Id.*

### C. Plaintiffs Pleaded Statutory Discrimination Claims

For the same reasons set forth above, Plaintiffs have alleged statutory discrimination claims. Pleading standards on any discrimination claim, even those without direct evidence of discrimination, are lenient, and it is well settled in this Circuit that at the motion-to-dismiss stage, the complaint benefits from a temporary presumption and must be viewed in light of the plaintiff's minimal burden to show discriminatory intent. *Littlejohn,* 795 F.3d 297. Plaintiffs bringing

29

statutory discrimination claims are "not required to plead prima facie case of discrimination in [their] complaint but rather [are] only required to give plausible support to minimal inference of discriminatory motivation." *Vega*, 801 F.3d 72 (2d Cir. 2015)

There are several frameworks to assess discrimination. In this case, where there is a written policy that expressly favors certain religions over others, the case must be assessed under the "direct evidence" discrimination standard. Under this standard, the employer cannot "rebut" a claim by demonstrating the existence of a non-discriminatory reason for reaching the same result – rather, they are subject to summary judgment unless they can present a valid affirmative defense. *TWA v. Thurston*, 469 U.S. 111, 121 (1985). None are available here, as religious discrimination is *per se* unconstitutional. *See generally* Melissa L. Saunders, *Equal Protection, Class Legislation, and Colorblindness*, 96 Mich. L. Rev. 245, 262 (1997); *Trump v. Hawaii*, 138 S. Ct. 2392, 2423 (2018) (overruling *Korematsu v. United States*, 323 U.S. 214 (1944)).

Thus, even if Defendants could prove undue hardship, this would not allow for denial of claims. Moreover, Plaintiffs pled that the undue hardship denials violated the statute by applying the wrong de minimis standard, failing to assess required factors or provide any evidentiary support, and failing to engage in cooperative dialogue (see Section IIB) and that the determinations were pretextual. This Circuit holds that courts cannot resolve the question of pretext against employees on summary judgment of a discrimination claim (so clearly cannot do so on a motion to dismiss). *Buon v. Spindler,* 65 F.4th 64 (2d Cir. 2023). And the well-pleaded allegations here more than state a claim of pretext. For example, the City incanted "undue hardship" to deny accommodations even of employees whose non-classroom jobs could have easily been done 100% remotely, such as Plaintiffs Modzelewsky and Contreras. Moreover, Defendants have yet to provide a non-discriminatory reason why they could accommodate teachers and others accommodated under the

30

Stricken Standards but not Plaintiffs.

### D. Plaintiffs Pleaded Retaliation Claims

Defendants' contention that Plaintiffs failed to adequately plead retaliation claims is without merit. The FAC details specific retaliatory actions that satisfy the required elements under Title VII and corresponding state laws. The most egregious form of retaliation involves Defendants' attachment of "problem codes" to Plaintiffs' personnel and fingerprint records - codes typically reserved for employees who committed serious offenses like child abuse (FAC ¶ 477). These codes are shared with outside agencies including the FBI (FAC ¶¶ 463-464) and have effectively blacklisted Plaintiffs from employment in education. Multiple Plaintiffs allege that after being interviewed and offered positions, these offers were rescinded after problem codes were discovered during security checks (FAC ¶¶ 473-474). These retaliatory codes continue to harm Plaintiffs even after the mandate was lifted, preventing qualified educators from returning to work despite the staffing crisis (FAC ¶¶ 797-800, 884-892, 989-990).

The FAC also details how Defendants imposed coercive conditions designed specifically to punish those who sought to preserve their right to challenge discriminatory determinations. Specifically, Defendants required employees to "sign a waiver of their right to challenge the determination or face termination 'for cause' and lose their good standing, paid time off credits (which belonged to them by law and contract) and health insurance while they waited on leave without pay" (FAC ¶¶ 453-457). This explicit conditioning of benefits on the waiver of legal rights represents quintessential retaliation against those who sought to challenge discriminatory treatment.

Additionally, Defendants actively opposed Plaintiffs' unemployment benefits by continuing to make the same discriminatory arguments in administrative proceedings that the Second Circuit

had already rejected as unconstitutional, such as claiming Catholics should be denied benefits because "the Pope, the Catholic leader, has spoken in favor of the vaccination" (FAC ¶¶ 1096-1098).

These allegations more than satisfy the minimal pleading requirements for retaliation claims at this stage. *Littlejohn*, 795 F.3d at 311. The problem codes and waiver requirements in particular demonstrate Defendants' retaliatory intent against those who sought to exercise their religious rights and preserve their ability to challenge discrimination.

### E. Plaintiffs Properly Alleged Harassment Claims

Notably, Defendants' motion fails to address Plaintiffs' harassment claims altogether. While Defendants challenge various aspects of the Amended Complaint, they make no argument whatsoever against Plaintiffs' well-pleaded allegations of religious harassment. The FAC details how Defendants subjected Plaintiffs to religious "heresy inquisitions" (FAC ¶¶ 236-254), routinely denigrated Plaintiffs' religious beliefs, and created a hostile work environment based on religion, and then attached problem codes, obstructed unemployment proceedings and continues to refuse to reinstate or rehire employees unwilling to violate their religious beliefs. These harassment claims constitute a distinct cause of action under Title VII and corresponding state laws. By failing to challenge these allegations, Defendants have effectively conceded that Plaintiffs' harassment claims are adequately pleaded and should survive dismissal regardless of the Court's determination on other aspects of the case. See *Mozzochi v. Borden,* 959 F.2d 1174, 1179 (2d Cir. 1992) (finding claims unchallenged in motion to dismiss must survive unless frivolous).


## POINT V
## PLAINTIFFS' CLAIMS ARE NOT LIMITED TO ARTICLE 78 PROCEEDINGS AND ARE NOT TIME-BARRED

There is no support for Defendants' argument that these claims had to be brought as an

Article 78 proceeding rather than a plenary action. Despite their extensive citations, Defendants fail to provide a single case holding that SHRL, CHRL, Title VII claims or federal constitutional claims must be brought as Article 78 proceedings. Defendants' argument is frivolous because it directly contradicts well-established Supreme Court precedent establishing that plaintiffs are masters of their complaints and may choose their forum. As noted in *Whitfield v. City of New York*, 96 F.4th 504, 528-29 (2d Cir. 2024), "it is the petitioner's choice whether to bring an Article 78 proceeding – with the attendant summary procedures, deferential review of agency action, and limited menu of relief – or a plenary action." Furthermore, Defendants' position would effectively strip this Court of jurisdiction over federal claims, contrary to the explicit statutory grant of jurisdiction under 28 U.S.C. §§ 1331 and 1343. It would also undermine Congress's express intent to provide a federal forum for civil rights claims through 42 U.S.C. § 1983 and Title VII, and the Court's right and obligation to exercise supplemental jurisdiction over state law claims intertwined with facts at issue in federal claims. The SHRL and CHRL contain their own comprehensive statutory schemes with specific remedies that are not contemplated within the limited scope of Article 78 review, further demonstrating the impropriety of forcing these claims into that procedural vehicle. New York courts have consistently recognized that state statutory discrimination claims under SHRL and CHRL are distinct from administrative challenges and properly brought as plenary actions.

Tellingly, none of Defendants' cited authorities—*Kern v. Joyce*, *Lee v. City of New York*, *Marsteller v. City of New York*, *Thorne-Long v. City of New York*, *Garry v. Adams*, or *Damino v. City of New York*—even remotely support their argument. These cases merely establish the uncontroversial proposition that challenges to administrative determinations can be brought as Article 78 proceedings. They do not support the radical proposition that federal or state statutory

civil rights claims and constitutional claims *must* be brought in state court through Article 78 proceedings rather than as plenary actions.

The Supreme Court has repeatedly affirmed that federal courts have a "virtually unflagging obligation" to exercise the jurisdiction given to them. *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976). Defendants' attempt to funnel federal and state civil rights claims into state administrative proceedings directly contradicts this principle. Defendants' argument also ignores that many of Plaintiffs' claims and requested relief could not even be properly adjudicated through an Article 78 proceeding. Plaintiffs seek compensatory damages, pain and suffering damages, and injunctive relief for violations of federal and state law—remedies that extend well beyond the limited scope of Article 78 proceedings. The SHRL and CHRL specifically authorize compensatory and punitive damages that would not be available through an Article 78 proceeding, which focuses primarily on the reasonableness of the administrative action rather than providing the full slate of remedies contemplated by state and federal civil rights statutes. In fact, in *Kern*, a case upon which Defendants rely, the Second Circuit recognized that "an Article 78 proceeding does not preclude a subsequent § 1983 proceeding because damages sought pursuant to § 1983 typically are not available in Article 78 proceedings." 857 F. App'x 691, 694 (2d Cir. 2021). In that case, it was only because the plaintiff failed to seek damages in the subsequent federal suit that the court barred her second claim on the basis of *res judicata*.

**POINT VI**
**PLAINTIFF MODZELEWSKI'S CLAIMS ARE NOT BARRED BY RES JUDICATA OR COLLATERAL ESTOPPEL**

Defendants' argument that Plaintiff Modzelewski's claims are barred by res judicata and collateral estoppel is as fundamentally flawed as their Article 78 argument. As addressed in Point II, Defendants' own case, *Kern v. Joyce*, 857 F. App'x 691 (2d Cir. 2021) itself acknowledges that Article 78 proceeding does not preclude a subsequent § 1983 proceeding because damages sought

34

pursuant to § 1983 typically are not available in Article 78 proceedings." 857 F. at 694. The fact that this suit seeks such additional damages eviscerates Defendants argument that Plaintiff Modzelewski is barred from bringing this lawsuit because her Article 78 claim, brought in a group lawsuit involving dozens of plaintiffs, was dismissed as time barred.

Even more damaging to Defendants' position is their citation to *Razzano v. Remsenburg-Speonk Union Free Sch. Dist.*, 751 F. App'x 24, 27 (2d Cir. 2018), which they cite for the proposition that res judicata bars claims that "might properly have been litigated" in a prior proceeding. However, Defendants conveniently omit the court's further holding in that case that plenary discrimination claims cannot "properly have been litigated" in the limited context of a special proceeding and will not result in res judicata. *Id.* at 27. The Second Circuit has consistently recognized this distinction. *See, e.g., Davidson v. Capuano*, 792 F. 2d 275, 278 (2d Cir. 1986) ("dismissal of Article 78 petition seeking reinstatement is "of course" without prejudice to the institution of any future actions"); *Whitfield*, 96 F.4th at 526 ("pure Article 78 proceeding does not bar future damages claims.")

Furthermore, Defendants conflate claim preclusion (res judicata) with issue preclusion (collateral estoppel). They cite *Lingfei Sun v. City of New York*, 803 F. App'x 469, 471 n.3 (2d Cir. 2020) for the proposition that a statute of limitations dismissal constitutes an adjudication "on the merits" for claim preclusion purposes. However, they fail to acknowledge that while this might be true for claim preclusion, insofar as another Article 78 cannot follow, it does not attach for issue preclusion—which they also assert. Defendants' own cited authority, *Gunn v. Beschler*, No. 22-971, 2023 U.S. App. LEXIS 8082, at *4 (2d Cir. Apr. 5, 2023), clearly states that for collateral estoppel to apply, "the issue in the prior proceeding [must have been] actually litigated and decided" and "the issue previously litigated [must have been] necessary to support a valid and final

35

judgment on the merits." The statute of limitations dismissal in *Garry v. Adams* decided only the timeliness of Plaintiff Modzelewski's Article 78 petition, not any substantive issues regarding religious discrimination or failure to accommodate. Plaintiff Modzelewski's claims are not barred by res judicata or collateral estoppel.

**POINT VII**
**PLAINTIFFS' STATE LAW CLAIMS ARE NOT BARRED BY NOTICE OF CLAIM REQUIREMENTS**

Defendants' argument that Plaintiffs' state law claims should be dismissed for failure to timely file notices of claim fails for multiple reasons. Plaintiffs were not required to file notices, and even if they were, they functionally and actually met the requirements.

**A.  Notice Requirements Do Not Apply to Claims Against the City**

All parties appear to agree that the state law claims against the City do not require any pre-suit notice. The Education Law only applies to suits against schools, and it is undisputed that the City's General Municipal Law notice requirements do not attach to human rights claims. As set forth in Point I, the City is jointly liable for the discriminatory religious accommodation policies inflicted on Plaintiffs and would be required to pay damages even if monetary claims against the DOE were barred.

**B.  Notice Requirements Do Not Apply to Claims Against the DOE**

Defendants' argument that the state law claims against DOE should be barred is also in error. First, courts in this district have held that the notice of claim requirement does not attach to human rights claims. For example, as this Court recognized in *Caputo v. Copiague Union Free Sch. Dist.*, 218 F. Supp. 3d 186 (E.D.N.Y. 2016), "a notice of claim for a NYSHRL claim against a school district or its personnel is not required." This approach is consistent with New York law, which distinguishes between claims brought to vindicate private rights and those brought to vindicate public rights. See *Union Free Sch. Dist. No. 6 v. N.Y. State Human Rights Appeal Bd.*,

36

35 N.Y.2d 371 (1974).

Second, Plaintiffs' lawsuit qualifies for the "public interest exception" to the notice of claim requirement. The New York Court of Appeals holds that the notice of claim requirement do not apply to "actions and proceedings brought to vindicate a public interest." *Union Free Sch. Dist. No. 6.*, 35 N.Y.2d. To the extent that Defendants argue that damages claims defeat the public interest exemption, that argument is refuted by *Union Free Sch. Dist. No. 6* itself, in which the Court of Appeals awarded the exception to a single teacher seeking damages, holding: "It is true, of course, that this proceeding was triggered by the complaint of this one teacher and that the relief granted below will redound to the benefit of that teacher as well as to the benefit of other teachers similarly situated. Such circumstances cannot be allowed, however, to obscure the fact that advantages which accrue to these teachers stem not from their rights of contract or other individual entitlement but rather flow as an appropriate and intended consequence of the [] of the public's interest in the elimination of discrimination based on sex -- a public interest duly declared by legislative enactment." *Id.* at 380. This lawsuit is not brought over contract rights but rather is a proposed class action seeking to address systematic deficiencies in civil rights policies which impacted thousands of employee's religious rights, clearly placing it within the public interest exception. As the Court of Appeals explained in *Mills v. County of Monroe*, 59 N.Y.2d 307, 311 (1987), the public interest exception is applied to actions like this one that are "brought to protect an important right, which seek relief for a similarly situated class of the public, and whose resolution would directly affect the rights of that class or group..."

Third, no notice of claim is required to order DOE to reinstate plaintiffs, as these claims "which are equitable in nature, are not barred by their failure to file a notice of claim pursuant to Education Law § 3813(1), which is only required when money damages are sought" *Kahn v. New*

37

*York City Dep't of Educ.*, 79 A.D.3d 521, 522 (1ˢᵗ Dep't 2010), aff'd, 18 N.Y.3d 457, 963 N.E.2d 1241 (2012); *see also Ruocco v. Doyle,* 38 A.D.2d 132, 133-34 (2d Dep't 1972) ("The requirements of section 3813 are applicable only to claims against a district's property or to demands for payment of money by a district and are not otherwise applicable). Assuming, arguendo, that any Plaintiff failed to provide adequate notice, he could still receive a reversal of his denial of religious accommodation and reinstatement from the DOE (unquestionably equitable in nature) and secure any additional monetary damages from the City, which is not able to claim a notice defense (Point IV(A)). Fourth, it is undisputed that Education Law § 3813(1) only applies to state law claims and cannot impact Title VII or Federal Constitutional Claims against the DOE.

### C. Plaintiffs Met the Notice of Claim Requirements in Any Event

To the extent Education Law § 3813(1) imposes notice requirements for state law claims against the DOE, Plaintiffs satisfied them either literally or functionally.

### 1. Functional Notice Suffices

New York courts consistently hold that functional notice satisfies Education Law § 3813(1). The Court of Appeals recognizes that Human Rights charges can serve as notice (*Union Free Sch. Dist. No*. 6, 35 N.Y.3d at 380), and Appellate Divisions have found that unverified letters (*Spoleta Const*. *v. Bd. of Educ.*, 221 A.D.2d at 928 (1995), PERB complaints (*Deposit Cent. Sch. Dist. v. PERB*, 214 A.D.2d at 292 (1995)), and Petitions to the Commissioner (*Mennella v. Uniondale Union Free S.D.*, 287 A.D.2d at 636-37 (2001)) all constitute sufficient notice. Similarly, courts in this district recognize EEOC complaints as sufficient notice. See *Kushner v. Valenti*, 285 F. Supp. 2d 314, 316 (E.D.N.Y. 2003); *Brtalik v. S. Huntington Union Free Sch. Dist.,* 2010 WL 3958430, at *5 (E.D.N.Y. Oct. 6, 2010); *Richard v. NYC Dep't of Educ*., 2022 WL 4280561, at *17 (E.D.N.Y. Sept. 15, 2022). Defendants citation to an older S.D.N.Y case does not undermine

38

this argument. Newer SDNY precedent recognizes that courts in this circuit "have begun to coalesce around the rule that an EEOC complaint can satisfy notice of claim requirements" when it provides adequate notice and is properly served. *Riccardo v. N.Y.C. Dep't of Educ.*, 2016 WL 7106048, at *8 (S.D.N.Y. Dec. 2, 2016).

## 2. Plaintiffs Provided Timely and Proper Notice

The 90-day notice period begins when plaintiffs receive "clear and definite notice" of the final adverse action. *Langsford v. Yale Univ. Sch. of Med.*, 39 F. App'x 683, 685 (2d Cir. 2002). When agencies create "ambiguity or uncertainty" about whether a final decision has been issued, courts must "resolve any ambiguity created by the public body against it." *Carter v. State*, 95 N.Y.2d 267, 270 (2000).

### a. Defendants' Specific Allegations Are Disputed and Premature

Defendants claim that eleven Plaintiffs never filed NOCs and that others filed untimely NOCs. These assertions involve factual disputes inappropriate for resolution on a motion to dismiss:

- **Disputed Termination Dates**: For many Plaintiffs, the DOE created uncertainty about when their employment officially ended. For example, Ms. Hogan's February 2023 work history contradicted the September 2022 work history she had previously received (FAC ¶¶ 528-529). Mr. Contreras received a COBRA notice with an incorrect termination date (FAC ¶ 566). Mr. Pressley never received a termination notice at all (FAC ¶ 1052).

- **Continuing Violations**: The DOE's August 2022 offer to reinstate employees who complied with vaccination effectively reset the clock for many Plaintiffs who requested accommodation at that time (FAC ¶¶ 958-962, 985-986, 1160-1161). The attachment of problem codes in 2023 constitutes continuing discrimination that extends the notice period under the continuing violation doctrine, which is still applicable to CHRL claims.

39

- **Multiple Forms of Notice**: Many Plaintiffs provided notice through multiple channels. For example:

  o Ms. Hogan filed both an EEOC charge (May 2022) and a formal NOC (March 2023) (FAC ¶¶ 532-534) within 90 days of being informed of her termination in February 2023.

  o Mr. Contreras's September 2022 EEOC charge, filed within 90 days of DOE's first notification to him that he'd been fired, put the DOE on notice of his claims (FAC ¶ 592).

  o Ms. Jack filed both an EEOC charge (December 2021, within 90 days of her October denial) and an NOC (March 2023, within 90 days of continuing harm inflicted by the problem codes and refusal to rehire) (FAC ¶ 820).

  o Ms. Modzelewski timely filed two NOCs and an EEOC charge, covering multiple different incidents of harassment, failure to accommodate and retaliation (FAC ¶ 964).

**b. Plaintiffs' Post-Kane Letters Provided Functional Notice**

In *Berkowitz*, the court held that a simple unverified letter sent to the school board was sufficient to satisfy the notice requirements under Education Law § 3813(1). The court found that this group letter, which alerted the district to the nature of the claims and the class-wide implications, functionally met the notice requirements.

Similarly, following the *Kane* decision, each Plaintiff in this case submitted individual letters to the DOE, Chancellor, and/or NYC Law Department (FAC ¶¶ 513, 563, 636, 664, 688, 714, 737-738, 764, 792, 820, 840, 872, 922, 955-957, 984, 1003-1004, 1025, 1047, 1065, 1088-1094, 1125, 1151). These letters specifically alerted the DOE that: (1) The Second Circuit had held

the DOE's religious accommodation policies were unconstitutional; Plaintiffs had been harmed by these unlawful policies; and (3) Plaintiffs were requesting fresh review of their accommodation requests pursuant to the Court's ruling. These letters, submitted by every Plaintiff, contained all the essential elements required for notice under § 3813(1) and were more substantial than the single group letter deemed sufficient in *Berkowitz*. The letters identified the nature of the claims (religious discrimination), the parties involved, and the relief sought (fresh consideration of accommodation requests). DOE failed to adjust them within thirty days, and Plaintiffs should be able to proceed on this alone.

Where factual disputes exist about the timeliness or adequacy of notice, these must be resolved in Plaintiffs' favor at this motion to dismiss stage. The extensive communication between Plaintiffs and the DOE regarding their religious discrimination claims created factual issues that cannot be resolved through a motion to dismiss.

## POINT VIII
## PLAINTIFFS' TITLE VII CLAIMS ARE NOT BARRED BY FAILURE TO EXHAUST

Defendants' arguments that Plaintiffs failed to exhaust their administrative remedies mischaracterize both the facts and applicable law. The record clearly demonstrates that Plaintiffs properly exhausted administrative remedies where required, and those who did not individually file EEOC charges are entitled to "piggyback" on timely filed charges under well-established Second Circuit precedent.

### A.  Plaintiffs Hogan and Contreras Timely Filed EEOC Charges and This Lawsuit

As alleged in the Amended Complaint, Plaintiffs Hogan and Contreras timely filed EEOC charges and received right to sue letters. (FAC ¶¶ 500-537, 592-598.) Defendants' peculiar focus on the fact that these Plaintiffs filed their lawsuits on "the last possible day" before their deadline expired (MOL 30-31) is irrelevant as a matter of law. The only salient question is whether the

41

lawsuits were filed within ninety days of receiving a right to sue letter. Plaintiff Hogan filed her EEOC charge in May 2022 and received her Right to Sue letter on August 29, 2023. (FAC ¶¶ 504, 537; Smith Decl. Ex. A, C.) She filed this action on November 27, 2023, within the 90-day window to do so. Plaintiff Contreras filed his EEOC charge on September 22, 2022, and received a Right to Sue letter on April 26, 2024. (FAC ¶¶ 592, 598; Smith Decl. Ex. D, E.) He joined this action on July 25, 2024, within the 90-day window after receiving his Right to Sue letter.

Defendants' claim that Contreras filed his EEOC charge 337 days after the alleged mistreatment ended is factually incorrect and contradicted by the FAC. The FAC clearly alleges, and Defendants acknowledge, that Contreras was not terminated until "in or around February 2022" and was not informed of his termination by DOE until August 2022. (FAC ¶ 565.) His September 22, 2022 EEOC charge therefore falls well within the 300-day filing period. Furthermore, while Defendants focus on a date listed on the EEOC charge form, they ignore the substantive narrative in Contreras's complaint which clearly indicates he is challenging his "unlawful termination" in 2022. As articulated in his EEOC complaint, Contreras explained that he filed for religious accommodation in September 2021, never received a response, and was simply terminated months later without any interactive process or acknowledgment of his accommodation request. (Smith Decl. Ex. D.) His claim of ongoing discrimination through his termination in February 2022 makes his EEOC complaint timely filed.

### B.  The Single Filing Rule Permits Other Plaintiffs to Join This Action

Under the "single filing" rule, "where one plaintiff has filed a timely EEOC complaint, other non-filing plaintiffs may join in the action if their individual claims arise out of similar discriminatory treatment in the same time frame." *Tolliver v. Xerox Corp.*, 918 F.2d 1052, 1058 (2d Cir. 1990); see also *Holowecki v. Fed. Express Corp.*, 440 F.3d 558, 564 (2d Cir. 2006). The

42

employer need only receive notice that discrimination extends beyond the individual filer. *Snell v. Suffolk Coun*ty, 782 F.2d 1094, 1101 (2d Cir. 1986).

Here, all Plaintiffs' claims arise from the same discriminatory religious accommodation policies applied during 2021-2022. Plaintiff Hogan's May 2022 EEOC charge provided clear notice of systemic discrimination, alleging the DOE lacked a "clear uniformed process" for religious exemptions, noting that Mayor de Blasio stated "only Jehovah's Witnesses and Christian Scientists would get exemptions," and observing that "about a hundred religious exemptions were granted to some employees." (Smith Decl. Ex. A.) The charge references the *Kane* lawsuit and outcome, highlighting a known systemic issue, and addresses DOE's failure to accommodate through September 2022. These allegations clearly put DOE and EEOC on notice of classwide harm. See *Tolliver*, 918 F.2d at 1058.

The DOE's position statement responding to Plaintiff Contreras's charge further confirms this classwide nature, acknowledging thousands of employees applied for accommodations under the same policies. (FAC ¶¶ 594-596.) Additionally, "Defendants and the EEOC were on notice that the issues were classwide through the filing of hundreds of other claims from similarly situated DOE employees, and multiple related proposed class-action lawsuits." (FAC ¶ 1212.)

Defendants argue that Plaintiffs Jack, Modzelewski, and Pressley cannot piggyback onto Hogan's charge because they filed their own EEOC charges. See *Holowecki*, 440 F.3d at 564. However, Jack and Pressley's December 2021 charges addressed only the initial 2021 denials, not their 2022 terminations or the August 2022 reinstatement offer requiring vaccination without religious accommodation—discrete acts triggering new filing periods. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002). Hogan's charge, which resulted in an August 2023 right-to-sue letter, encompasses this later conduct. Jack and Pressley may therefore piggyback onto Hogan's

43

charge for these later acts, as their claims are "sufficiently similar." *Tolliver*, 918 F.2d at 1057-58.

As for Plaintiff Modzelewski, even if Defendants' timeline regarding her March 2023 right-to-sue letter is accurate, her filings still provide additional notice of the class wide discrimination and support state statutory claims arising from DOE's failure to reinstate her after the February 2023 mandate rescission—a separate discriminatory act. (FAC ¶ 964.) This post-mandate discrimination affected all similarly situated plaintiffs. While her federal claims may be time-barred, this would not affect other plaintiffs' ability to rely on Hogan's timely filings, and only reinforces Modzelewski's state claims arising from the DOE's failure to accommodate and continuing harm.

In sum, Hogan's timely charge, supported by the charges of other plaintiffs and the broader litigation context, enables non-filing plaintiffs to piggyback for claims arising from DOE's discriminatory policies, with Jack and Pressley being able to pursue claims for the August 2022 discrete acts. Plaintiffs concede that if Defendants' facts are correct, Plaintiff Modzelewski cannot piggyback on to the Title VII claim.

### C.   Plaintiffs Were Not Required to "Exhaust" the Stricken Standards Appeals

Defendants' argument that Plaintiffs are barred from Title VII relief because they failed to exhaust internal appeals under the discriminatory Stricken Standards or Citywide Panel is baseless. It does not appear that Defendants even read the cases they cited for this principal before bringing the argument. For example, rather than support Defendants' frivolous argument, *Oyster Bay* directly refutes it, stating that exhaustion is not required "when an agency's action is challenged as either unconstitutional or wholly beyond its grant of power, or when resort to an administrative remedy would be futile or when its pursuit would cause irreparable injury." *Town of Oyster Bay v. Kirkland*, 19 N.Y.3d 1035, 1038 (2012). Here, Plaintiffs that did not appeal under the Stricken Standards were entirely within their rights, as the facially discriminatory policy stated that their

44

beliefs would not be accommodated. *See also Patsy v. Bd. of Regents of State of Fla.*, 457 U.S. 496, 516 (1982) (plaintiffs need not exhaust where it is futile). The Second Circuit did not limit relief to those *Kane* plaintiffs who had exhausted under the unlawful Stricken Standards, and neither should this court.

Second, every Plaintiff explicitly alleges they attempted to appeal to the Citywide Panel but were arbitrarily denied this opportunity. (See, e.g., FAC ¶¶ 513-518, 636-638, 664-666, 714-715, 736-739, 764-765, 792, 820, 840, 872, 920-922, 955-957, 984, 1003-1004, 1025, 1047, 1065, 1088-1092, 1124-1125, 1151.) But as Defendants acknowledge, they were systematically prevented from accessing the Citywide Panel appeal process. [Def. Br. At 33 "To wit, appeals to the Citywide Panel were available only to DOE employees who had first appealed the denial of an exemption request to an independent arbitrator."] Plaintiffs cannot be barred from pursuing claims because they failed to complete a process that Defendants themselves made inaccessible. To hold otherwise would reward Defendants for their own obstructive conduct.

## POINT IX
## THE AMENDED COMPLAINT COMPLIES WITH RULE 8, AND DEFENDANTS' ARGUMENTS ARE PROCEDURALLY IMPROPER, SUBSTANTIVELY MERITLESS, AND IRRELEVANT

Defendants' contention that the Amended Complaint violates Rule 8 is procedurally improper and substantively meritless. This Court already rejected nearly identical arguments in denying Defendants' Motion to Strike [ECF No. 22-1] as reflected in the Minute Entry dated August 16, 2024. Defendants offer no new grounds to revisit this settled issue, and their attempt to re-litigate it is baseless.

Substantively, Defendants' claim that the Amended Complaint's discussion of the "Stricken Standards" is "irrelevant" misrepresents the heart of Plaintiffs' case. [Def. Br. at 50–51]. Defendants argue that these standards, struck down as unconstitutional by the Second Circuit in

November 2021, are immaterial because they "have not been in use for nearly three years." *Id*. at 50 (citing *Kane*, 19 F.4th). Far from supporting dismissal, this argument underscores Plaintiffs' central claim: Defendants applied unconstitutional standards to deny Plaintiffs' religious exemption requests and failed to remedy the resulting harm. Unlike the *Kane* plaintiffs, who received "fresh consideration" post-ruling, Plaintiffs were denied any review under lawful standards, leaving them subject to decisions tainted by admittedly discriminatory criteria. The "Stricken Standards" are not mere historical context—they are the foundation of Plaintiffs' claims of religious discrimination, failure to accommodate, and retaliation. These allegations are essential to establishing Defendants' pattern of unconstitutional conduct and their refusal to provide a remedy, directly supporting Plaintiffs' causes of action under Title VII, the First Amendment, the Fourteenth Amendment, and state law.

The Amended Complaint complies with Rule 8's requirement for "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Given the complexity of this case—involving 22 plaintiffs, multiple defendants, *Monell* claims and a years-long pattern of alleged discriminatory conduct—the level of detail is proportionate and necessary to articulate each plaintiff's experience and the systemic violations alleged.

Finally, Defendants' lengthy argument in the brief - that the vaccine mandate is lawful is irrelevant and not properly before the Court. [Def. Br. at 47–49]. Plaintiffs do not challenge the mandate's legality but instead assert that Defendants engaged in religious discrimination, failed to accommodate, and retaliated against Plaintiffs in processing exemption requests and imposing adverse employment actions. Defendants' reliance on cases like *Broecker v. N.Y.C. Dep't of Educ.*, 585 F. Supp. 3d 299 (E.D.N.Y. 2022), is a red herring, addressing a claim not raised here. The Court should disregard this argument as outside the scope of Plaintiffs' claims and irrelevant to

46

this motion.

## **CONCLUSION**

Defendants' motion to dismiss fails to overcome the Amended Complaint's well-pleaded allegations of systemic religious discrimination, failure to accommodate, harassment and retaliation, which are squarely supported by *Kane*, 19 F.4th 152, and *New Yorkers for Religious Liberty*, 121 F.4th 448. The FAC plausibly alleges that Defendants' unconstitutional "Stricken Standards" and refusal to provide remedial Citywide Panel review violated Plaintiffs' rights under the First Amendment, Title VII, SHRL, and CHRL. Defendants' procedural objections, including Rule 8 and Article 78 arguments, are meritless, as this Court confirmed in denying their motion to strike. [ECF No. 22-1]. And Plaintiffs met the notice and exhaustion requirements to bring their federal, state and local claims.

Accordingly, the Court should deny the motion to dismiss in its entirety, direct Defendants to answer within 60 days (to which Plaintiffs do not object), and grant such further relief as is just, including leave to formalize the stipulated withdrawal of the substantive due process claim.

Dated: Ithaca, New York           Respectfully Submitted,
      May 14, 2025

Gibson Law Firm, PLLC

By:    */s/ Sujata S. Gibson*
      Sujata S. Gibson
      120 E Buffalo Street, Suite 201
      Ithaca, NY 14850
      (607) 327-4125
      sujata@gibsonfirm.law

      *Attorneys for the Plaint*